CALCATERRA POLLACK LLP
Regina Calcaterra
1140 Avenue of the Americas, 9th Floor
New York, NY 10036-5803
Tel: (212) 899-1765
Email: rcalcaterra@calcaterrapollack.com

BERGER MONTAGUE PC
Sherrie R. Savett
Michael Dell'Angelo
Barbara A. Podell
Andrew Abramowitz
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3000
Email: ssavett@bm.net
        mdellangelo@bm.net
        bpodell@bm.net
        aabramowitz@bm.net

*Attorneys for Lead Plaintiff*
*Rahul Saraf and the Proposed Class*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| RAHUL SARAF, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>EBIX, INC., ROBIN RAINA, and STEVEN M. HAMIL<br><br>Defendants. | Case No. 1:21-cv-01589-JMF<br><br>CLASS ACTION<br><br>Hon. Jesse M. Furman<br>Courtroom 1105<br><br><u>JURY TRIAL DEMANDED</u> |

## SECOND AMENDED CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

**Page**

I.    NATURE OF THE ACTION AND OVERVIEW .......................................................... 1

II.    JURISDICTION AND VENUE .................................................................................. 16

III.    PARTIES .................................................................................................................... 17

IV.    SUBSTANTIVE ALLEGATIONS ........................................................................... 19

    A.    Background ...................................................................................................... 19

        1.    Company Overview ............................................................................ 19

        2.    EbixCash ........................................................................................... 20

    B.    Ebix Plans the Spinoff of EbixCash in an Initial Public Offering ....................... 27

    C.    Ebix's History of Suspicious Accounting Practices and Misleading Investors.... 32

    D.    Confidential Witnesses Confirm Plaintiff's Allegations ..................................... 36

    E.    The Regulatory Scheme .................................................................................. 40

        1.    Sarbanes Oxley Act of 2002 ............................................................. 40

        2.    Public Filing Requirements--Quarterly Reports ...................................... 41

        3.    Executive Certification of Filings ............................................................. 41

    F.    The Auditing Standards Governing The Audit of Ebix's Financial Statements... 41

        1.    An Auditor Must Obtain "Sufficient Appropriate Audit Evidence"
            to Provide a Reasonable Basis for the Audit Opinion ............................. 42

        2.    An Auditor Must Communicate with the Audit Committee
            Regarding "Significant Unusual Transactions" ......................................... 42

        3.    An Auditor Must Identify Material Weaknesses in Internal
            Controls Over Financial Reporting............................................................ 43

        4.    Defendants Denied RSM "Sufficient Appropriate Audit Evidence"
            to Evaluate "Significant Unusual Transactions," Thus Undermining
            the Fairness and Reliability of Ebix's Financial Statements ................... 44

        5.    Defendants Knew But Failed to Disclose to Investors That
            RSM Had Identified "Significant Unusual Transactions" ....................... 46

        6.    RSM Identified Material Weakness in Ebix's Internal
            Controls Over Financial Reporting............................................................ 47

        7.    RSM Took The Extraordinary Action of
            Resigning From The Ebix Audit.............................................................. 48

        8.    Instead of Addressing RSM's Concerns, Defendants Allowed
            RSM to Resign and Quickly Engaged Another Auditing Firm

i

           They Knew Would Issue a Clean Opinion ................................................ 50

      9.     When RSM's Clean 2019 Audit Opinion, Including the Effectiveness of Internal Control, Was Reissued in the 2020 10-K, RSM's Prior Reference to Internal Control Was Completely Removed ...................... 54

    G.     The Audit Committee Was Aware of Repeated Requests from RSM for Sufficient Audit Evidence and Ebix's Failure to Provide It........................... 55

    H.     Disclosures at the End of the Class Period ........................................... 58

V.     MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD AND OMISSIONS OF MATERIAL FACT .............................. 63

VI.    CLASS ACTION ALLEGATIONS ................................................................. 67

VII.   UNDISCLOSED ADVERSE FACTS .............................................................. 68

VIII.  LOSS CAUSATION .................................................................................... 69

IX.    SCIENTER ALLEGATIONS ......................................................................... 71

X.     APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE) .................................................. 78

XI.    NO SAFE HARBOR .................................................................................. 81

FIRST CLAIM
    Violation of Section 10(b) of The Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants ........................................... 81

SECOND CLAIM
    Violation of Section 20(a) of The Exchange Act Against The Individual Defendants .... 84

PRAYER FOR RELIEF ....................................................................................... 85

JURY TRIAL DEMANDED ................................................................................. 86

Lead Plaintiff Rahul Saraf ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief are based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Ebix, Inc. ("Ebix" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Ebix and information on Ebix's website; (c) review and analysis of other publicly available information concerning Ebix; (d) consultation with experts; (e) interviews of confidential witnesses in the United States and India; (f) review and analysis of investor conference calls conducted by Ebix; and (g) review and analysis of analyst reports about Ebix. Plaintiff believes that discovery will further support the allegations in this Second Amended Complaint.[1]

## I.    NATURE OF THE ACTION AND OVERVIEW

1.      This is a class action on behalf of persons and entities that purchased or otherwise acquired Ebix securities during the period from November 9, 2020 to February 19, 2021, inclusive (the "Class Period"). Plaintiff's claims arise under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Ebix supplies infrastructure exchanges to the insurance, financial, travel, cash remittances, and healthcare industries. Headquartered in Johns Creek, Georgia, Ebix's operations are overwhelmingly weighted in India, and its revenues and profits are primarily derived from the Company's India-based EbixCash subsidiary, particularly payment solutions such as prepaid cards

---

[1] For the convenience of the Court, attached as Exhibit A is a redline comparison of the changes between the Amended Class Action Complaint (ECF No. 54) and this Second Amended Class Action Complaint.

and gift cards. EbixCash has recently developed into a driver of Ebix's revenue and profits. As of December 31, 2020, of Ebix's total 9,802 employees worldwide, 8,640 were located in India, and during that fiscal year (which ended December 31, 2020), approximately 91% of Ebix revenues came from EbixCash, as described below, and Insurance Exchanges.

3.    During the third quarter of 2020 ("3Q20"), EbixCash experienced spectacular growth. Its revenues grew astronomically during that quarter, skyrocketing ***268%*** compared to the third quarter of 2019. On a sequential basis, EbixCash's overall revenues grew a staggering ***82%*** in the third quarter of 2020 over the second quarter of 2020. The increase in 2020 total revenue compared to 2019 was due primarily to strong demand for Ebix's payment solutions offerings in India (primarily prepaid gift cards), which increased by more than $200 million year-over-year to approximately $256 million – a year-over-year increase of ***590%***. This substantial increase reflected the strong demand for prepaid cards and other electronic payment solutions since the COVID-19 pandemic arose. As the Company experienced growth during this time frame, it was important to investors that internal control over financial reporting was sufficient to keep pace with Ebix's exponentially increasing sales and revenue for payment solutions.

4.    On November 9, 2020, the first day of the Class Period, Ebix filed with the SEC its quarterly report for the period ended September 30, 2020 on Form 10-Q ("3Q20 10-Q"), which was signed by CEO Defendant Robin Raina ("Raina"), Ebix's Chief Executive Officer ("CEO") and Defendant Steven M. Hamil ("Hamil"), Global Chief Financial Officer ("CFO") and Principal Financial and Accounting Officer and included certifications by Defendants Raina and Hamil pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"). In the 3Q20 10-Q, Defendants Ebix, Raina and Hamil specifically represented to investors that there were "***no changes in our internal control over financial reporting during the quarter ended September 30, 2020 that have***

*materially affected, or are reasonably likely to materially affect, our internal control over financial reporting*." This statement and Defendants Raina's and Hamil's SOX certifications attesting to the truth of this statement were false when the statements were made in that they omitted the material fact that, as the Company's independent auditor, RSM US LLP ("RSM"), later confirmed, there was, in fact, a material weakness in internal control over financial reporting: specifically, Ebix's failure to design controls over the gift or prepaid card revenue transaction cycle sufficient to prevent or detect a material misstatement.

5.      Existing internal control over financial reporting was insufficient during 3Q20 because, at the time Defendants' statements were made on November 9, 2020, Defendants knew or recklessly disregarded that there was a "perfect storm" of adverse circumstances which conspired to create a material weakness in Ebix's then-existing internal control for 3Q20 and thereafter. The factors listed herein that occurred during 3Q20 created a material weakness in internal control during 3Q20, as subsequently confirmed by RSM upon its discovery of "significant unusual transactions" for which Ebix did not provide sufficient audit evidence. The "significant unusual transactions" in 4Q20 which precipitated RSM's resignation were the direct result—and a predictable manifestation—of the material weakness in internal control which already existed during 3Q20. RSM's identification of "significant unusual transactions" in 4Q20 confirmed the known existing material weakness which arose during 3Q20 as a consequence of the unprecedented growth in the gift card business in India at the same time that Ebix's competitors in the same market were losing money and other factors alleged herein:

- *First*, EbixCash's gift and prepaid card business was experiencing astronomical growth in 3Q20. The COVID-19 pandemic was ravaging India, causing people to avoid traditional in-person payment solutions and instead opting en masse for the digital

payment solutions offered by EbixCash, particularly gift and prepaid cards. EbixCash's growth was even more extraordinary because its competitors were losing money in the same market, as Raina stated during the Nov. 9, 2020 3Q20 Investor Call: "***EbixCash performance is particularly noteworthy when you compare it to its key competitors with high valuations who collectively lost $1 billion last year in the Indian market and delivered much less top line growth than EbixCash***."

- *Second*, the pandemic also ravaged Ebix's workforce during 3Q20 most of which was working remotely, thus creating disruptions and inefficiencies and materially weakening internal control over financial reporting.

- *Third*, recent regulations in India had facilitated widespread growth in the digital payment space, thereby fueling the skyrocketing growth for Ebix's gift and prepaid cards, which existing internal control was unable to handle.

- *Fourth*, EbixCash had redoubled it marketing efforts to concentrate on its gift and prepaid card products, knowing that skyrocketing growth would be the result, although internal control over financial reporting was not strengthened to account for the expected growth and protect against financial misstatements.

- *Fifth*, as digital payment solutions surged in popularity, concomitant digital fraud by "malicious" third parties [in Ebix's words] was on the rise, with Ebix being a prime target. Defendants knew about this new form of fraud yet did nothing to strengthen internal control over financial reporting to protect Ebix and its investors.

- *Sixth*, each business unit within Ebix maintained its own separate accounting team and accounting systems. EbixCash's accounting system was based in Noida, India. As

4

described by a Confidential Witness (CW3)[2], Ebix had a "broken" accounting system. The time difference between Noida and corporate headquarters in Georgia, USA (9.5 hours), and the differing accounting systems made it difficult for Defendants to effectively manage the Noida accounting team which used accounting methods different than in the US according to CW3 and thus to manage internal control over financial reporting, particularly in the face of unprecedented growth and the other red flags alleged herein.

- *Seventh*, according to CW3, there were serious known problems with the invoicing function of the Ebix accounting system that led to the accumulation of a material amount of past due receivables, as well as the failure to write off such accounts. This was a red flag of a material issue affecting internal control over financial reporting.

- *Eighth*, an interim audit of Ebix's 2020 financials conducted by RSM and the Company's internal audit team began in November 2020, according to a Confidential Witness (CW2). The internal audit began at or around the time of Defendants' materially false and misleading statements on November 9, 2020. Auditing standards required Ebix's internal and independent auditors to investigate red flags alerting them to material weakness in internal control over financial reporting as early as November 2020. Auditing standards required auditors to perform risk assessments to identify and assess the risk of material misstatements in the financial statements when planning an audit (AS 2110—Identifying and Assessing Risk of Material Misstatement). The unprecedented growth in the gift card business in India in 3Q20 was a significant red

---

[2] Detailed facts about the backgrounds and information provided by the confidential witnesses are alleged in Section IV. D herein.

flag requiring the auditors to focus the interim audit on the risk of material misstatements in the financial statements caused by such growth. Another red flag requiring the interim audit team to focus on the gift card business in India was the discrepancy between EbixCash's astronomical 3Q20 growth at the very same time that its key competitors were losing money in the same market. Auditing standards also required the interim audit by RSM and Ebix's internal audit team to focus on internal control over financial reporting (AS 2101.7) as a matter of course, but particularly in the face of the then existing material red flags. The obvious red flags presenting a risk of a material financial misstatement would have alerted the auditors to the material weakness in internal control during the interim audit beginning in November 2020.

- *Ninth*, Defendants had the motivation to conceal the existing material weakness in internal control because disclosure would not only cause the price of Ebix stock to drop significantly – to the personal financial detriment of Defendant Raina – but, as Defendants themselves acknowledged, it would also require "management to devote significant time and incur significant expense to remediate any such weakness" which would have been difficult in the midst of the pandemic. *See* ¶ 22 herein, quoting 2019 and 2020 Forms 10K. Because according to CW3, Raina was "betting the ranch" on EbixCash, Raina had a strong motivation to protect his own personal financial interests and reputation by concealing the 3Q20 material weakness in internal control.

- *Tenth,* according to a CW3, Raina "tightly" controlled every financial aspect of Ebix's business from the smallest details, such as approving a purchase of a laptop for an employee, to the most material aspects of financial reporting, including revenue, expenses and internal control over financial reporting. CW3 stated that Raina was

"betting the ranch on EbixCash." In addition, Raina and Hamil were personally responsible for internal control over financial reporting and certified in SOX certifications that they designed Ebix's internal control over financial reporting, or had it designed under their supervision, and "continually" monitored it. There is a cogent inference − and no plausible contrary inference − that Raina and Hamil knew in the face of the red flags alleged herein that a material weakness in internal control existed during 3Q20 when they made their false statements on November 9, 2020. This material weakness was later confirmed by RSM when it discovered "significant unusual transactions" in the 4Q20, which were a direct and predictable result of the already existing material weakness in 3Q20.

6.      In the face of EbixCash's growth of astounding magnitude, coupled with the cumulative impact of the red flags listed in the preceding paragraph, the need for effective internal control over financial reporting could not have been more critical. Yet Defendants knew and were only too willing to turn a blind eye to the fact that internal control fell short of the minimum needed for operating effectiveness, and they concealed this material fact from Plaintiff and the Class.

7.      Defendants knew that the sufficiency of the Company's internal control was a material fact to investors under any circumstances – much less during a period of astronomical growth – as demonstrated by the fact that the Company went out of its way to assure investors in the 3Q20 10-Q that:

> Disclosure controls also are designed to reasonably assure that such information is accumulated and communicated to management, including the Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosures. ***Disclosure controls include components of internal control over financial reporting, which consists of control processes designated to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements in accordance with United States generally accepted accounting principles.***

\*    \*    \*

[w]e monitor and evaluate on an ongoing basis our disclosure controls and procedures in order to improve their overall effectiveness. ***In the course of these evaluations, we modify and refine our internal processes and controls as conditions warrant.***

Our management, including our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our "disclosure controls and procedures" (as defined in Rule 13a-15(e) promulgated under the Exchange Act) as of September 30, 2020. ***Based on this evaluation the Company's Chief Executive Officer and Chief Financial Officer have concluded that these disclosure controls and procedures are effective. There were no changes in our internal control over financial reporting during the quarter ended September 30, 2020 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting. We have not experienced any material changes to our internal controls over financial reporting*** despite the fact that all non-essential employees are working remotely due to the COVID-19 pandemic. ***We are continually monitoring the impact of COVID-19 on the operating effectiveness of our internal control over financial reporting.*** (Emphasis added)

8.    As referenced above, the 3Q20 10-Q also included a Certification Pursuant to Section 302 of SOX for the Chief Executive Officer, signed and dated by Defendant Raina on November 9, 2020:

I, Robin Raina, certify that:

1. I have reviewed this quarterly report on Form 10-Q of Ebix, Inc.;

2. ***Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;***

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. ***The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:***

8

(a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) **designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;**

(c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) **disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's third fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting**; and

5. **The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors:**

(a) **all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information**; and

b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting (emphasis added).

9.     Defendant Hamil signed a substantially identical SOX certification, which was also included in the 3Q20 10-Q as Exhibit 31.2.

10.     Defendants Raina's and Hamil's SOX certifications regarding internal control over financial reporting are not opinions or vague expressions of optimism, but instead are certifications of fact based upon their personal knowledge, including their specific certification that they are "responsible for establishing and maintaining internal control over financial reporting. . . ."

11.     Further, the 3Q20 10-Q included as Exhibit 32.1 the following SOX Certification signed and dated by Defendant Raina on November 9, 2020:

**CERTIFICATION PURSUANT TO 18 U.S.C. SECTION 1350,
AS ADOPTED PURSUANT TO SECTION 906
OF THE SARBANES-OXLEY ACT OF 2002**

I, Robin Raina, state and attest that:

(1)     I am the Chief Executive Officer of Ebix, Inc. (the "Registrant").

(2)     In connection with the Quarterly Report of the Registrant on Form 10-Q for the quarter ended September 30, 2020 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I hereby certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that the Report containing financial statements fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m or 78o(d)); and the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Registrant as of, and for, the periods presented.

Defendant Hamil signed a substantially identical SOX certification, which was included in the 3Q20 10-Q as Exhibit 32.2.

12.     Defendants' statement on November 9, 2020 that "[t]here were no changes in our internal control over financial reporting during the quarter ended September 30, 2020 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting" was materially false and misleading when it was made and omitted the material fact that Ebix's existing internal control over financial reporting did, in fact, contain material weaknesses during 3Q20 and thereafter. Indeed, Defendants knew about the material weakness during 3Q20, based upon their certification that they had designed the internal control, or had it designed under their supervision and had recently evaluated it.

13.     RSM's subsequent "clear and unequivocal" communication to Defendants that there existed a material weakness in internal control confirmed what Defendants already knew on

November 9, 2020, when they filed the 3Q20 Form 10-Q, including Raina's and Hamil's SOX certifications. The "significant unusual transactions" during 4Q20 for which Ebix did not provide sufficient audit evidence were the direct result of then existing 3Q20 material weakness in internal control, of which Defendants were aware, during 3Q20 and thereafter.

14.    Investors, however, did not learn this material fact until February 19, 2021, at the end of the Class Period, when Ebix disclosed that its independent auditor, RSM, resigned before completing the 2020 audit and that RSM had identified a material weakness in internal control such that Ebix had failed to design and maintain controls over the gift card or prepaid card revenue transaction cycle sufficient to prevent or detect a material misstatement.

15.    This material weakness, concealed by Defendants throughout the Class Period, was first publicly disclosed in a Form 8-K filed by Ebix with the SEC after the market closed on February 19, 2021. That filing revealed that Ebix's independent auditor, RSM, had taken the drastic and highly unusual step of resigning – before completing the 2020 audit – after it had **repeatedly requested** – and did not receive -- sufficient appropriate audit evidence that would allow it to evaluate the business purpose of **significant unusual transactions** that occurred in the fourth quarter of 2020 related to the Ebix's gift card business in India. Specifically, according to the February 19, 2021 8-K, RSM resigned "**as a result of being unable, despite repeated inquiries, to obtain sufficient appropriate audit evidence that would allow it to evaluate the business purpose of significant unusual transactions that occurred in the fourth quarter of 2020**" related to the Company's gift card business in India. (Emphasis added). RSM also stated that there was a **material weakness** related to Ebix's failure to design controls "over the gift or prepaid card revenue transaction cycle **sufficient to prevent or detect a material misstatement**." RSM explained that because it had not completed the audit, it could not reach conclusions "**on other control**

*deficiencies that may rise to the level of a material weakness*." In addition, Ebix and RSM disagreed over the accounting treatment of $30 million that had been transferred into a commingled trust account of Ebix's outside legal counsel in December 2020.

16.     Because Ebix failed to provide RSM with the audit evidence it requested, RSM had no choice but to resign and force Ebix to publicly disclose for the first time that there existed a material weakness in Ebix's internal control over financial reporting. Not only had Defendants concealed that fact from investors throughout the Class Period, but, as stated above, they affirmatively represented just the opposite: that there were "*no changes in our internal control over financial reporting during the quarter ended September 30, 2020 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting*." (Emphasis added).

17.     Defendants Raina's and Hamil's certifications pursuant to SOX – that they "*have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors: (a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information*" – were also materially false and misleading and omitted the material fact that no such disclosures had been made. Defendants had not, in fact, disclosed any deficiencies or material weakness in internal control to RSM, which repeatedly struggled to wrest from Ebix sufficient appropriate audit evidence of "significant unusual transactions" in the gift card business in India, having made repeated requests for such evidence, which Ebix had repeatedly failed to provide.

18.    Given the revelations of February 19, 2021, there can be little doubt that on November 9, 2020, at the time of the filing of the 3Q20 10-Q and the SOX certifications by Defendants Raina and Hamil, Defendants knew or recklessly disregarded that the Company lacked sufficient internal control over financial reporting during 3Q20. RSM's revelations confirmed what Defendants already knew during 3Q20: the "significant unusual transactions" during 4Q20 identified by RSM were a direct result of the already existing material weakness in internal control throughout 3Q20. The astronomical growth experienced by EbixCash in the third quarter 2020, coupled with the other factors listed above which weakened internal control, had by that point revealed a material weakness in internal control over financial reporting. Specifically, Ebix had failed to design controls "over the gift or prepaid card revenue transaction cycle sufficient to prevent or detect a material misstatement." Because Defendants certified pursuant to SOX that they had designed the internal control over financial reporting or had it designed under their supervision, and were "continually monitoring the impact of COVID-19 on the operating effectiveness of our internal control over financial reporting," they knew of the material weakness during 3Q20 or recklessly disregarded the substantial risk that their statements were false. Yet, Defendants failed to disclose the material fact of a material weakness in internal control over financial reporting to investors, thereby causing significant losses to Plaintiff and the Class when the truth was revealed on February 19, 2021 as a result of RSM's resignation before completing the 2020 audit.

19.    The market reaction to Ebix's disclosures was swift and dramatic. The Company's share price fell $20.24 per share – ***losing approximately 40% of its value in a single trading day*** – to close at $30.50 on February 22, 2021, on unusually heavy trading volume of more than 11

million shares. (by comparison, trading volume on the prior trading day, February 19, 2021, was a mere 289,000 shares).

20.     Importantly, Defendants knew that RSM was not receiving the material audit evidence it had repeatedly requested. In a letter dated February 22, 2021, filed with the SEC on February 23, 2021, RSM stated that it communicated "***clearly and unequivocally [to Ebix] that if the information repeatedly requested by RSM — but which was not provided by the Company — related to gift cards issued by ItzCash/EbixCash in the fourth quarter of 2020 was further investigated, it might materially impact the fairness or reliability of the financial statements subject to RSM's audit or affect RSM's willingness to be associated with the Company's financial statements***." (Emphasis added). Therefore, not only did Defendants repeatedly fail to provide RSM with information relating to the business purpose of the significant unusual transactions despite repeated requests from RSM, but Defendants knew from RSM's "clear" and "unequivocal" warning that the failure to provide the requested information was likely to cause RSM to take the serious step of resigning before its completion of the 2020 audit – an act which Defendants knew would be devastating to investors.

21.     Nor could RSM's discovery of "significant unusual transactions" in the gift card business − and confirmation of the existing material weakness in 3Q20 − have been a surprise to Defendants. The potential for fraudulent transactions in digital media, such as the gift and pre-paid card business in India, was well known to Defendants, as stated in the 2020 10-K. Defendants' knowledge that EbixCash and the gift card business were subject to "*new* types of consumer fraud risk" and Ebix's tools to protect against fraud "may not always be successful" was a red flag alerting Defendants to 3Q20 material weakness in internal control over financial reporting and requiring RSM and Ebix's internal auditors to vigorously asses the risks of financial misstatements

14

and deficiencies in internal control over financial reporting relating to the gift card business in

India during 3Q20 when they began the interim audit in November 2020:

> ***Malicious third parties*** are using increasingly sophisticated methods to engage in illegal activities such as identity theft, fraud and paper instrument counterfeiting. ***As we make more of our services available over the internet and other digital media, we subject ourselves to new types of consumer fraud risk due to more complex requirements relating to consumer authentication with internet services. Additionally, the COVID-19 pandemic has led to increased cyber and payment fraud risk, as cybercriminals attempt to profit from the disruption, given increased online banking, e-commerce and other online activity.*** We use a variety of tools to protect against fraud; however, these tools may not always be successful. Allegations of fraud may result in fines, settlements, litigation expenses and reputational damage.

> Our industry is under increasing scrutiny from federal, state and local regulators in the U.S. and regulatory agencies in many other countries in connection with the potential for consumer fraud. If consumer fraud levels involving our services were to rise, it could lead to further regulatory intervention and reputational and financial damage. This increased regulatory scrutiny, in turn, could lead to additional government enforcement actions and investigations, reduce the use, renewal and/or acceptance of our services or increase our compliance costs and, thereby, have a material adverse impact on our business, financial condition and results of operations.

(Emphasis added).

22.    Further, the materiality of RSM's identification of a material weakness in internal

control cannot be overstated, as Defendants were well aware. As Ebix explained in the 2020 10-K:

> ***If we fail to maintain an effective system of internal controls, we may not be able to accurately determine our financial results or prevent fraud. As a result, our stockholders could lose confidence in our financial results, which could harm our business and the market value of our common shares.***

> ***Effective internal controls over financial reporting are necessary for us to provide reliable and accurate financial reports and effectively prevent fraud.*** We may in the future discover areas of our internal controls that need improvement. Section 404 of the Sarbanes-Oxley Act of 2002 ("SOX") requires us to evaluate and report on the effectiveness of our internal controls over financial reporting and have our independent auditors issue their own opinion regarding the effectiveness of our internal control over financial reporting and related disclosures. ***While we continually undertake efforts to maintain an effective system of internal controls and compliance with SOX***, we cannot always be certain that we will be successful in maintaining adequate control over

our financial reporting and related financial processes. ***Furthermore, as we grow our business, our internal control structure may become more complex, and could possibly require significantly more resources to ensure our internal controls remain effective. If we or our independent auditors discover a material weakness or significant deficiency in our controls over financial reporting, the disclosure of that fact, even if immediately remedied, could significantly reduce the market value of our common stock.*** In addition, ***the existence of any material weakness or significant deficiency may require management to devote significant time and incur significant expense to remediate any such weaknesses,*** and management may not be able to remediate the same in a timely manner.

(Emphasis added). *See also* 2019 10-K filed with the SEC on March 2, 2020.

23.     As a direct and proximate result of Defendants' wrongful acts and omissions as alleged herein, which caused the precipitous decline in the market value of Ebix securities, Plaintiff and other Class members have suffered significant losses and damages.

## II.    <u>JURISDICTION AND VENUE</u>

24.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

25.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

26.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.

27.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the

United States mail, interstate telephone communications, and the facilities of a national securities exchange.

### III.    **PARTIES**

28.    Plaintiff Rahul Saraf, as set forth in his certification filed with the Court (ECF No. 13-1), purchased Ebix securities during the Class Period and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

29.    Defendant Ebix is incorporated under the laws of Delaware with its principal executive offices located in Johns Creek, Georgia. Ebix's common stock trades on the NASDAQ exchange under the symbol "EBIX."

30.    Defendant Raina was the Company's CEO at all relevant times. Raina signed the 3Q20 10-Q filed with the SEC, which included the SOX certifications quoted above. Raina has been a director of Ebix since 2000 and Chairman of the Board of Ebix since May 2002. He joined Ebix in October 1997 as Vice President-Professional Services and was promoted to Senior Vice President-Sales and Marketing in February 1998. Raina was promoted to Executive Vice President, Chief Operating Officer in December 1998 and was appointed President effective August 2, 1999, CEO effective September 23, 1999 and Chairman in May 2002. According to the Ebix Proxy Statement dated August 19, 2020 ("2020 Proxy"), Raina's "strategic direction for the Company and implementation of such direction has proven instrumental for the Company's growth and success."

31.    According to the 3Q20 10-Q, Raina is Ebix's "top operating decision-maker as to performance and allocation of resources:"

> The Company operates within one reportable segment whose results are regularly reviewed by Ebix's Chief Executive Officer, Defendant Robin Raina ("Raina"), ***Ebix's top operating decision-maker as to performance and***

17

*allocation of resources*. (Emphasis added).

32.     According to the 2020 Proxy, Raina is described as the visionary "single leader" of

Ebix who:

> *serves as both the Chief Executive Officer and Chairman of the Board*. We
> combine this traditional leadership structure with a board structure in which
> Mr. Raina is the only non-independent director. We believe this leadership
> model, with our Chief Executive Officer also serving as Chairman of our Board,
> benefits our Company in several ways. *A combined Chairman/Chief Executive
> Officer role helps provide strong, unified leadership for our management team
> and Board*. Our customers, suppliers and other business partners view our
> Chairman/Chief Executive Officer as a *visionary leader* in our industry, and we
> believe that having a *single leader* for the Company is good for our
> business. (Emphasis added).

33.     At the 2016 Annual Meeting, the stockholders approved a Bonus Plan for

Defendant Raina which provides for the payment of annual cash incentive awards to the

Company's CEO based upon the achievement by the Company of specified performance goals.

Participation in the Bonus Plan is limited to the CEO of the Company. The Bonus Plan provides

that Raina is eligible to receive cash incentives in connection with a particular fiscal year during

the term of the Bonus Plan if the Company meets or exceeds certain performance goals set each

year by the Compensation Committee.

34.     According to the 2020 Proxy, Defendant Raina beneficially owns 4,378,892 shares

of Ebix stock, or 14.3% of the outstanding shares.

35.     Defendant Raina was described as instrumental to Ebix's success in the 2019 Form

10-K filed with the SEC on March 2, 2020:

> Our future success is substantially dependent on the continued services and
> continuing contributions of our senior management and other key personnel,
> particularly Robin Raina, our President and Chief Executive Officer, and
> Chairman of the Board. Since becoming Chief Executive Officer of the
> Company in 1999, Mr. Raina's strategic direction and vision for the Company
> and the implementation of such direction has been instrumental in our profitable
> turnaround and growth.

36.     Defendant Hamil was the Company's CFO during the Class Period. Defendant Hamil signed the 3Q20 10-Q filed with the SEC, which included the SOX certifications quoted above, which he signed as the "Global Chief Financial Officer (Principal Financial and Accounting Officer)." Hamil also serves as the Company's Corporate Executive Vice President. Earlier in his career, Defendant Hamil was a staff auditor at Ernst & Young LLP and is a certified public accountant (of inactive status in the State of Alabama).

37.     Defendants Raina and Hamil (collectively the "Individual Defendants"), because of their positions with Ebix, possessed the power and authority to control the contents of Ebix's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. On information and belief, the Individual Defendants were provided with copies of Ebix's reports and other statements alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material nonpublic information, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations which were being made were materially false and/or misleading and omitted material facts. The Individual Defendants are liable for the materially false statements and omissions alleged herein.

## IV.    SUBSTANTIVE ALLEGATIONS

### A.    Background

#### 1.    Company Overview

38.     Founded in 1976 as Delphi Systems, Inc., Ebix provides on-demand software and e-commerce services to the insurance, financial, healthcare and e-learning industries. Although it has operations worldwide, Ebix's operations are overwhelmingly weighted in India and its

revenues and profits are primarily derived from its EbixCash subsidiary, whose operations are in India, particularly payments solutions such as prepaid cards and gift cards, as described in detail herein. International revenue accounted for 73.4% and 68.6% of Ebix's total revenue for the twelve months ended December 31, 2020 and 2019, respectively.

39.    EbixCash has become a primary driver of Ebix's revenue, profit and success. Ebix's 2020 10-K reported that "***the increase in 2020 total revenue year-over-year was due primarily to strong demand for the Company's payment solutions offerings in India (primarily prepaid gift cards), which increased by more than $200 million year-over-year to approximately $256 million, or 590% year-over-year growth.***" As reported on the November 9, 2020 Third Quarter Investor Call, "EbixCash revenues grew 268% in third quarter of 2020 versus the third quarter of 2019. On a sequential basis, EbixCash overall revenues grew 82% in the third quarter of 2020 over second quarter of 2020." The 3Q20 10-Q reported that:

> ***total revenues increased year-over-year during the third fiscal quarter of 2020 due primarily to strong demand for the Company's payment solutions offerings in India***. . . .  Revenues impacted by COVID-19 through September 30, 2020 were substantially offset by an approximately $98 million increase in payment solutions revenues, primarily in India. This substantial increase reflects the strong demand for prepaid cards and other electronic payment solutions since the COVID-19 pandemic arose. (Emphasis added).

### 2.    EbixCash

40.    In May 2017, Ebix took a leadership position in the digital payments market in India by acquiring an 80% stake in ItzCash, the dominant payment solutions exchange in India. The acquisition, which valued ItzCash (which became EbixCash) at $150 million, was touted as providing the Company with the opportunity to process financial, insurance, and healthcare transactions on an integrated Exchange. The press release announcing the acquisition on May 24, 2017, stated in relevant part:

JOHNS CREEK, GA – May 24, 2017 – Ebix, Inc. (NASDAQ: EBIX), a leading international supplier of On-Demand software and E-commerce services to the insurance, financial, e-governance and healthcare industries, today announced that it has entered into a joint venture with India-based Essel Group, while acquiring an 80% stake in ItzCash, India's leading payment solutions Exchange. ItzCash is recognized as a leader in the prepaid cards and bill payments space in India, besides being the only profitable payments solutions provider out of all its peers, while having grown at a CAGR of 35% over the last 3 years.

A leading driving force in the digitization of cash across India, ItzCash is a Financial Exchange for payment solutions that connects 75+ million consumers and 1,500+ corporate partners on its integrated payments solutions superhighway. With an Omni-channel strategy that encompasses a distribution network of 75,000+ physical retail outlets, the Company today is recognized as a leader in the prepaid cards and bill payments space. ItzCash processes approximately 600,000 transactions per day and approximately $2 Billion in annual payment volume, with an industry leading transaction success rate of 99%.

*      *      *

Key Strengths

- The Company is recognized as a leader in the Gift card space with brand gift cards across all categories with 100+ Brand copartners like Amazon, Flipkart.com, Croma, Lifestyle, Big Bazaar, Tanishq, BookMyShow.com, Reliance Digital, MakeMyTrip.com, Café Coffee Day, Pizza Hut, Myntra.com, Pantaloon etc.

*      *      *

"With the youngest tech-savvy society, the largest middle class, a 1.3 billion population, a country committed to going digital and a growth rate of 7% plus, India is an emerging economic superpower today. We are big believers in the power of exchanges and thus have been keen to take an early position in India in terms of powering financial and insurance exchanges," said Ebix Chairman, President and CEO Robin Raina. "In ItzCash, we found attributes that none of their peers had – market penetration across 3000 cities, 75,000+ brick & mortar distribution outlets, a CAGR of approximately 35% and the only company who was profitable amongst all its peers. With one of India's most prominent business houses, the Essel Group deciding to align their interests with Ebix, the decision to invest in ItzCash became easy for us."

Robin added, "We believe that the synergies between Ebix and ItzCash are at multiple levels and the ItzCash exchange when complemented with Ebix's portfolio of insurance & healthcare services along with our international scale, will set the foundations of a very powerful and scalable business opportunity."

21

41.     Described as employing a "Phygital" strategy that combines over 320,000 physical distribution outlets in India and many Associations of Southeast Asian Nations ("ASEAN") countries, to an online digital platform, the Company's EbixCash Financial exchange portfolio includes: domestic and international money remittance, foreign exchange (Forex), travel, prepaid and gift cards, utility payments, software solutions for lending and wealth management in India and other markets.

42.     Revenues from EbixCash are primarily derived from the sales of prepaid gift cards and consideration paid by customers for financial transaction services, including services like transferring or exchanging money. The significant majority of EbixCash revenue is for a single performance obligation and is recognized at a point in time. These revenues vary by transaction based upon channel, send and receive locations, the principal amount sent, whether the money transfer involves different send and receive currencies, and speed of service. EbixCash also offers several other services, including payment services and ticketing and travel services for which revenue is impacted by varying factors. EbixCash acts as the principal in most transactions and reports revenue on a gross basis, as EbixCash controls the service at all times prior to transfer to the customer, is primarily responsible for fulfilling the customer contracts, has the risk of loss, and has the ability to establish transaction prices. As set forth more fully herein, the main services from which EbixCash derives revenue are gift cards and prepaid cards, travel exchanges, money transfers, Forex and remittance services, and technology services.

43.     Among its operations, EbixCash sells general purpose prepaid gift cards, that can be later redeemed at various merchants, to corporate customers and consumers. The gift cards are co-branded between EbixCash and its card-issuing banking partner(s) and are affiliated with major payment associations such as VISA, Mastercard, and Rupay. The gift cards are sold to a diversified

set of corporate customers from various industries. The gift cards are used by corporate customers to disburse incentives to the end users, which are primarily their employees, agents and business associates. The gift cards sold by EbixCash are not reloadable, cannot be used at ATMs or for any other cash-out or funds transfer transactions, and are subject to maximum limits per card (currently INR10,000 or approximately $133.36, depending on the exchange rate). Gift cards issued by EbixCash are valid for a period of 15 months from the date of issuance for virtual cards and three years for physical cards. EbixCash has entered into arrangements with banks and financial institutions to settle payments to merchants based on utilization of the gift cards.

44.    Ebix has end-to-end responsibilities related to the gift cards sold, from the activation and ongoing utilization of the gift cards to customer service responsibilities to risk of loss due to fraud on the gift cards sold. EbixCash acts a principal in the sale of gift cards and, thus, gift card revenue is recognized on a gross basis (full purchase value at the time of sale) with the corresponding cost of the gift cards recorded as cost of services provided. Unredeemed gift cards at December 31, 2020 were not significant to Ebix's financial results and were recorded as deferred revenues in the financial results.

45.    Ebix reported the substantial revenue growth in payment solutions in Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A") in the 3Q20 10-Q, which stated in relevant part:

> While our travel, foreign exchange and remittance businesses continue to be materially negatively impacted by COVID-19, *total revenues increased year-over-year during the third fiscal quarter of 2020 due primarily to strong demand for the Company's payment solutions offerings in India.*
>
> \*        \*        \*
>
> For the nine months ended September 30, 2020 the Company's travel, foreign exchange and remittance business revenues declined by over $100 million year-over-year, a decrease of greater than 60%. *Revenues impacted by COVID-19 through September 30, 2020 revenues were substantially offset by an*

> *approximately $98 million increase in payment solutions revenues, primarily in India. This substantial increase reflects the strong demand for prepaid cards and other electronic payment solutions since the COVID-19 pandemic arose.*

46.    The Ebix Third Quarter 2020 Investor Call took place on November 9, 2020. Defendants Raina and Hamil participated, among others. Defendant Raina explained during the call that the EbixCash revenue growth enhanced the lucrative prospects of the planned IPO of Ebix Cash:

> *EbixCash revenues grew 268% in third quarter of 2020 versus the third quarter of 2019. On a sequential basis, EbixCash overall revenues grew 82% in the third quarter of 2020 over second quarter of 2020.* Remittance revenues grew 46% sequentially, while foreign exchange revenues grew 113% sequentially. Travel revenues grew 346% sequentially, while our technology-based India revenues grew 8% sequentially in third quarter of 2020. I expect EbixCash revenues to continue to grow in coming quarters with the gradual improvement in the travel, foreign exchange and e-Learning areas besides the organic growth in our other business areas. We are, for example, presently pursuing some large opportunities in the bus exchange arena that are highly recurring and income-intensive. We are presently trying to draw a balance between our efforts to grow our EbixCash margins and our attempts to be a leader in the financial markets. *EbixCash performance is particularly noteworthy when you compare it to its key competitors with high valuations who collectively lost $1 billion last year in the Indian market and delivered much less top line growth than EbixCash.*
>
> *                *                *
>
> *With regards to the IPO, we are keeping our fingers crossed as we look at the overall IPO climate improve in India.* We already have 3 top investment banks on our site with a fourth investment bank to be added to the investment banking team. We already have the legal firms hired, along with a Big Three firm for subject matter analysis work that goes into our IPO documents. The IPO effort is a very involved process that entails hiring of 3 to 4 set of legal firms, multiple subject matter, analyst firms, a credit rating firm, IR and PR firm, auditors to approve all numbers being filed across 3 years for all subsidiaries, et cetera. We think that it is prudent to let the COVID-19 crisis blow over and let the markets normalize before we launch our IPO. *Accordingly, we intend to work closely with all our investment bankers through this period, and keep parcels in a ready-mode for the IPO, while we wait for this pandemic to pass. We're keeping a close watch on the improving financial markets in India. The recent IPOs in India have been heavily oversubscribed, and there seems to be a pent-up demand for solid IPOs. There are a number of big IPOs planned next year.*

***And we hope that we will be one of them***. We will keep you informed about that.

We see the IPO as a possible multibagger opportunity for the shareholders of Ebix, as all other financial exchange sector companies in India with billions of dollars in valuation do not have the strong financial metrics that our operation in India has. If anything, the COVID-19 period has further shown the strength of our business model. (Emphasis added).

47.    During the call, Jeffrey Lee Van Rhee, Partner & Senior Research Analyst, Craig-Hallum Capital Group LLC, Research Division, asked the following questions about the importance and potential of the payments business and Defendant Raina answered as follows:

JEFFREY LEE VAN RHEE: Okay. Okay. And then secondly, I guess, Robin, as it relates to the payments business, the payments card for the digital payment solutions side is seeing very strong demand. Can you help put some -- a little more clarity around that. What was it in Q2? What was it in Q3? Kind of what's the trajectory in Q4? It sounds like you've seen strength there. And I think you made a comment in the script that you -- since that strength will continue, it will be a bigger part of the business. Obviously, it has substantial negative impacts on the gross margin side, but I'm sure has some uplift on the EBITDA dollar side.

So just talk about that business, if you can quantify it and then the thinking around why it's surging and whether or not you want to continue to lean into that revenue stream?

ROBIN RAINA: Well, Jeff, first of all, I mean, look at our competition. Meaning I have worthy competitors out there who only do payment solutions, are presently -- and are presently getting valued in -- up between $10 billion and $20 billion with way lesser revenues, $450 million, $400 million of revenue and $600 million, $700 million of lost sales. ***So clearly, market seems to still like the payments business. So having said that, from our perspective, being in payment business is very important because it makes us completely -- it spreads our reach virtually across the country. It is -- this is amazing marketing for us.*** Besides -- I -take the point of lower gross margin. There's no question about it. At the same time, this takes us everywhere across the world it allow -- it across the country. It allows us to cross-sell so many of our remaining products. So when you consider all of that, when you put that into the mix, we think that's a good position to be in to continually -- there are high-margin areas and then there are lower margin areas. So if your lower-margin areas allow you to sell more of your high-margin areas then you should continue with the lower margin area as long as you're not losing money on any one of those.

And having said that, *we expect the payments businesses to continue to improve. Part of it is what COVID has done, it has created a new thinking pattern where people now are -- especially in the payments business, people don't want to touch an ATM machine now. People -- you're going to see more and more of these ATM machines go out of play. So people are wanting to do touchless systems.* People are trying to buy more stuff online right now, maybe now it's not going to change entire India overnight simply because India has a pretty good lower middle class and a very strong lower -- and has a very strong middle class. So having said that, and a lot of them are illiterate. So it's not that easy to make everybody digital overnight. At the same time, there is a continuous move in that direction right now. And if you see some of the larger players that have entered the market, what has happened is, if you see the -- right now, for example, Google Pay has become the largest player in the market with more than -- between PhonePe and Google Pay, they now have close to 70% of the market. And then you have players like Paytm come in with much smaller market share because it's become a very important area of the business.

*So everybody feels -- the reason they want to play into this business area because this may take them everywhere. And then they will obviously cross-sell all their remaining products. So for obvious reasons, when we do our payment services, we're also able to market our remaining product because everything is connected, right? Where we become the brand who -- the only player who cannot only do payment solutions, but incidentally, we can handle -- we can conduct their ForEx, their travel, you want to buy your bus tickets or whatever you want to do, we are virtually there with all those different tool sets. And incidentally, for all of those, they still need to use that -- some kind of a card or something out there. So we feel it's a complete -- it meshes in really well with our overall strategy.* (Emphasis added).

48.     The Ebix 2020 10-K explained the reasons for the astronomical revenue growth for

Ebix's payment solutions in India during 2020, primarily prepaid gift cards. According to the 2020

10-K:

*the increase in 2020 total revenue year-over-year was due primarily to strong demand for the Company's payment solutions offerings in India (primarily prepaid gift cards), which increased by more than $200 million year-over-year to approximately $256 million, or 590% year-over-year growth. The increased demand for prepaid gift cards in India was primarily due to: (i) changes in regulations by the Reserve Bank of India related to debit cards, which has shifted demand in the market towards prepaid gift cards; (ii) COVID-19, which has facilitated increased online and electronic commerce due to restrictive lockdowns in 2020; and (iii) the Company's increased marketing efforts around the prepaid gift card business.* (Emphasis added).

49.     During the April 27, 2021 Investor Call in which both Defendants Raina and Hamil

participated, Defendant Hamil further described the sequential growth in payment solutions of *96%* from 3Q20 to 4Q20 and the reasons for such growth:

> ***The payment solutions business increased 96% sequentially in the fourth quarter from Q3 2020 and for the fiscal year experienced year-over-year growth of approximately 590%***. This growth was fueled by several factors. First, the Government of India has made the digitization and electronification of the Indian economy a priority in recent years. Second, actions taken in 2019 by the regulatory authorities in India resulted in prepaid gift cards being an attractive product for customers relative to traditional debit card options. Third, COVID-19 and the lockdowns that resulted from the pandemic increased the demand for our prepaid gift cards. ***And lastly, Ebix consciously targeted this product with increased marketing efforts to address market demand and increase our own EbixCash brand awareness through the co-branded gift cards between EbixCash and our bank partner.*** (Emphasis added).

### B.    Ebix Plans the Spinoff of EbixCash in an Initial Public Offering

50.    Beginning in 2018, Defendants advised the market that they intended to spin off EbixCash in an IPO, which the Individual Defendants knew could be highly lucrative both for the Company and for themselves personally. For instance, *Inc42*, a news service focused on India-based technology startups, published an article on August 15, 2018 titled "With An Eye On IPO In India For 2019, Ebix May Invest $500 Mn More In Acquisitions." The article reported that "with plans to make EbixCash, the Indian subsidiary of Ebix Inc, public next year, the parent company has continued to double down on its aggressive acquisition strategy in India." The article quoted Raina as saying that Ebix was planning the IPO for some time in 2019.

51.    On June 18, 2019, in a press release titled "Ebix Commences EbixCash IPO Process while Targeting a Q2 2020 IPO," the Company announced that it was moving forward with the planned IPO of EbixCash and was intending to proceed in the second quarter of 2020:

> JOHNS CREEK, Ga., June 18, 2019 (GLOBE NEWSWIRE) -- Ebix, Inc. (NASDAQ: EBIX), a leading international supplier of On-Demand software and E-commerce services to the insurance, financial, healthcare and e-learning industries announced that its Board of Directors has approved the process of appointment of up to five investment bankers, with an initial public offering (IPO) targeted timeline of Q2 2020 for its EbixCash operations headquartered in India.

The Company announced that is in advanced stages of selection of investment bankers, towards launching the EbixCash IPO on the Indian stock exchanges. The details of the IPO in terms of the targeted money raise and the bankers who would lead this exercise will be announced in due course.

With a "Phygital" strategy that combines 320,000 physical distribution outlets in many Southeast Asian Nations ("ASEAN") countries, to an Omni-channel online digital platform, the Company's EbixCash Financial exchange portfolio encompasses leadership in areas of domestic & international money remittance, foreign exchange (Forex), travel, pre-paid & gift cards, utility payments, lending, wealth management etc. in India and other markets.

EbixCash's Forex operations have emerged as a leader in India's airport Foreign Exchange business with operations in 32 international airports including Delhi, Mumbai, Bangalore, Hyderabad, Chennai and Kolkata, conducting over $4.8 billion in gross transaction value per year.

EbixCash's inward remittance business in India conducts approx. $5 billion gross annual remittance business, confirming its undisputed leadership position in India. EbixCash, through its travel portfolio of Via and Mercury, is also one of Southeast Asia's leading travel exchanges with over 2,200+ employees, 212,450+ agent network, 25 branches and over 9,800 corporate clients; processing an estimated $2.5 billion in gross merchandise value per year.

EbixCash's technology services Division has emerged as a leader in the areas of lending technology, asset & wealth management technology, travel technology in India; besides having grown its international expanse to Europe, Middle East, Africa and ASEAN countries.

EbixCash's investments in targeted asset-lite technology startups like Routier and AHA taxis have positioned it as a key player in niche sectors like trucking logistics and intercity corporate and consumer cab travel respectively.

52.    On January 6, 2020, Ebix provided investors with an update on the planned IPO of

EbixCash. In a press release titled "EbixCash Announces IPO Update," the Company stated, in

pertinent part:

NOIDA, INDIA & JOHNS CREEK, GA – January 6, 2020 – EbixCash, a fully owned subsidiary of Ebix, Inc. (NASDAQ: EBIX), a leading international supplier of On-Demand software and E-commerce services to the insurance, financial, healthcare and e-learning industries today announced an update on its EbixCash IPO plans in India.

EbixCash announced that it is continuing to make progress in terms of moving forward with its IPO plans. The Company declared today the appointment of two domestic legal counsel and one international legal counsel, to handle its IPO.

The Company also said that it will soon announce the appointment of a reputed international industry analyst firm towards analyzing the industry and EbixCash's relative position in the markets with respect to the industry. All of this detailed analysis would form an integral part of the EbixCash Draft Red Herring Prospectus (DRHP) – the offer document to be filed by the company for its public IPO.

The Company declared that it is also evaluating a number of international investment bankers, with a view to appoint one or two international investment bankers, as the Company deems fit. The Company intends to formalize the appointment/s soon, with a view to finalize its investment banking roster.

On 4th September 2019, the Company announced the appointment of ICICI Securities as the Left Banker, besides being one of the Book Running Lead Managers for the IPO. The Company also announced the appointment of Axis Capital and Edelweiss Financial Services as Book Running Lead Managers on the same date.

53.     On March 2, 2020, *Seeking Alpha* published an article titled "Ebixcash IPO, BSE [Bombay Stock Exchange] Deal Make Ebix a Buy at its 4-Year Low." Among other things, the article opined on the potential value of the EbixCash IPO by comparing it to other recent spinoffs based on EbixCash's past and expected performance:

In the past few years, Ebix has been focused mostly in the Indian market. It has successfully penetrated the industry through a number of acquisitions. In 2018, the company acquired 13 companies in the country. Last year, it spent more than $337 million to acquire Yatra. Yatra is now part of Ebixcash making it the second-biggest online travel company after MakeMyTrip (MMYT), which is valued at more than $2.65 billion. China's CTrip owns 49% of the company.

Ebixcash has other cash-related offerings ranging from hotels, trucks, mobile money, currencies and bill payments. ***Today, Ebixcash is the biggest division for Ebix. In the most recent quarter, the division made more than $82 million***.

***In the earnings call, the management said that the IPO process was ongoing.*** The likely valuation is not yet known. However, a close look at the Indian industry can give a picture of what to expect. For example, MakeMyTrip is valued at more than $2.65 billion, while growing at 13%. Meanwhile, Ebixcash made $82 million, has better margins, and has a faster growth rate. In the last quarter, without acquisitions, Ebixcash grew by 23%.

*Also, the company expects Ebixcash to make between $500 million and $600 million in the coming year. Therefore, at minimum, I expect the company to receive a valuation of more than $1.5 billion. In the earnings call, the company talked about a company that received a valuation of $1.5 billion even with its annual revenue of $1.5 billion.*

Ebixcash has some significant challenges ahead. The biggest challenge is competition, with all its sub-sectors facing significant competition. For example, its forex service is facing challenges from the likes of Transferwise and Google Pay while its taxi business facing competition from the likes of Uber (UBER) and Ola. Still, the company has something that other companies in the cash industry don't have. It has a physical presence throughout the country. This is advantageous since 70% of the Indian population stays in the rural areas. Therefore, *we expect the IPO to be positive for the company's shareholders, who will likely receive a special dividend.* It will also be positive for the company because it will help it do some deleveraging. (Emphasis added).

54.     During the November 9, 2020 third quarter investor call, Defendant Raina stated

regarding the IPO:

> With regards to the IPO, we are keeping our fingers crossed as we look at the overall IPO climate improve in India. *We already have 3 top investment banks on our site with a fourth investment bank to be added to the investment banking team. We already have the legal firms hired, along with a Big Three firm for subject matter analysis work that goes into our IPO documents.* The IPO effort is a very involved process that entails hiring of 3 to 4 set of legal firms, multiple subject matter, analyst firms, a credit rating firm, IR and PR firm, auditors to approve all numbers being filed across 3 years for all subsidiaries, et cetera. We think that it is prudent to let the COVID-19 crisis blow over and let the markets normalize before we launch our IPO. Accordingly, we intend to work closely with all our investment bankers through this period, and keep parcels in a ready-mode for the IPO, while we wait for this pandemic to pass. We're keeping a close watch on the improving financial markets in India. *The recent IPOs in India have been heavily oversubscribed, and there seems to be a pent-up demand for solid IPOs. There are a number of big IPOs planned next year. And we hope that we will be one of them.* We will keep you informed about that.
>
> We see the IPO as a possible multibagger opportunity for the shareholders of Ebix, as all other financial exchange sector companies in India with billions of dollars in valuation do not have the strong financial metrics that our operation in India has. If anything, the COVID-19 period has further shown the strength of our business model. (Emphasis added).

55.    On April 16, 2021, the Company issued a press release updating investors on the EbixCash IPO. In that release, Defendants announced that the India-based subsidiary had decided to commence work on the IPO following a meeting with four investment banks, including ICICI Securities, Axis Capital, SBI Capital, and Edelweiss Financial Services. Those four financial institutions were expected to be the lead managers of the proposed IPO. In pertinent part, the April 16, 2021 press release stated:

> NOIDA, India and JOHNS CREEK, Ga., April 16, 2021 (GLOBE NEWSWIRE) -- Ebix, Inc. (NASDAQ: EBIX), a leading international supplier of On-Demand software and E-commerce services to the insurance, financial, healthcare and e-learning industries today announced that its EbixCash Indian subsidiary has decided to commence work with immediate effect, leading to the proposed IPO of EbixCash. The Company made that decision after a meeting of all the four investment bankers with the Company a few days back. ICICI Securities, Axis Capital, SBI Capital & Edelweiss Financial Services are Lead Managers to the proposed EbixCash IPO.
>
> Accordingly, the Company has decided to engage two statutory auditors in a dual auditor role (a named national auditor and a named international auditor) for the IPO, to commence the 3-year audit exercise leading to filing of the draft red herring prospectus (DRHP), with the Securities and Exchange Board of India. DHRP is the preliminary registration document prepared by the investment bankers for the prospective IPO. The Company is targeting the filing of the DHRP by the fourth quarter of 2021 with a targeted IPO in the first quarter of 2022.
>
> EbixCash also announced earlier that it has already engaged the domestic and international legal firms for this exercise. The Company has selected a BIG4 accounting firm for the market and product analysis sections of the DHRP. Over the next few months, the Company will be engaging a few other firms for various elements of the DHRP.
>
> A few weeks back, the Company had announced the addition of SBI Capital Markets as the fourth Lead Manager for the EbixCash IPO, besides ICICI Securities, Axis Capital & Edelweiss Financial Services who were appointed Book Running Lead Managers for the IPO earlier. ICICI Securities serves as the Left Banker for the IPO.

56.    The performance incentives embedded in the Individual Defendants' compensation render them poised to benefit tremendously from the IPO of EbixCash. For instance, Defendant

Raina's Bonus Plan, approved by Ebix's shareholders in 2016, provides for the payment of annual cash incentive awards reflective of certain performance goals. The Bonus Plan provides that Raina is eligible to receive cash incentives in connection with a particular fiscal year during the term of the Bonus Plan if the Company meets or exceeds certain performance goals set each year by the Compensation Committee. Accordingly, Defendant Raina had every motivation to complete the EbixCash IPO, and to enhance the perceived value of EbixCash – and indeed Ebix itself – so as to complete the EbixCash IPO at the highest possible price and benefit financially from an IPO as a more than 14% shareholder of Ebix.

### C.    **Ebix's History of Suspicious Accounting Practices and Misleading Investors**

57.    Defendants' false and misleading statements and material omissions about the sufficiency of Ebix's internal control over financial reporting occurred within the context of Ebix's history of suspicious accounting practices and misleading investors, particularly at a time when Ebix was touting the potential for a lucrative IPO of EbixCash, which would benefit Raina financially as the owner of more than 14% of Ebix's stock.

58.    Since at least 2018, the financial media has been voicing concerns over Ebix's accounting and senior management's lack of transparency with investors. For instance, between December 2018 and July 2019, Fraser Perring ("Perring") of Viceroy Research ("Viceroy") published no less than seven reports regarding Ebix. On December 11, 2018, in a report titled "Ebix – Goodwill Hunting," Viceroy reported on "accounting irregularities, undisclosed tax investigations, auditor shuffling" and "accounting irregularities dating as far back as 2008 to the present day." Among the issues pointed out in this article were the improper recording of revenue and the engagement of an auditing firm too inexperienced to expose the discrepancies:

- ***Numerous accounting discrepancies in years 2013 to 2018 regarding the recognition of goodwill and acquisitions within the Ebix group***. These

discrepancies have largely gone unnoticed due to the delay in local filings being signed off and the multi-jurisdictional nature of these transactions.

- Over the course of our investigation we uncovered evidence of what we believe is a ***scheme to incorrectly book revenue and earnings. We believe this is done through the shuffling of assets from one subsidiary to another*** while improperly booking internal revenues, and contingent consideration "cookie jar" accounting.

- We are limited by the recency of the available subsidiary filings. We believe this behavior continues to take place. Ebix's acquisition spree in India further muddies the waters.

- Ebix announced a change in auditor to T.R. Chadha from Cherry Bekaert (of MiMedx fame) after reporting material weaknesses regarding purchase and income tax accounting, pursuant to appointing a big four accounting firm in Q1 2019.

- ***T.R. Chadha has never audited a US-listed entity and was auditor of several Indian Ebix subsidiaries in which there appear to be several accounting discrepancies***.

(Emphasis added).

59.    Two days later, on December 13, 2018, Viceroy published another piece on Ebix, this one titled "Ebix – The Taxman Cometh," which reported that Indian tax authorities had searched Ebix's Mumbai offices. That report noted that although Defendant Raina asserted that Ebix has "never been on the wrong side of any regulatory or tax authority," the Company had, in fact, settled a dispute with the IRS for approximately $20 million, was the target of a "prolonged" SEC investigation, and was the subject of a "possible ongoing DOJ investigation."

60.    The December 13, 2018 Viceroy report stated that, "contrary to Raina's claims, it appears his conduct was subject to regulatory scrutiny even prior to his rise to CEO. Ebix's former auditor, Arthur Anderson, was charged by the SEC for improper conduct and fraud relating to the audit of Ebix's revenue recognition practices at a time where Raina was VP of Sales and Marketing and COO." (Emphasis added).

61.    Yet another Viceroy report, published on January 7, 2019, shone a light on a "major red flag" at Ebix and management's tendency to mislead investors regarding contracts. The report, titled "Ebix – Ebix's 2019 'Not-So-Good Business Acumen' Nomination," stated as follows:

> Ebix Inc (NASDAQ: EBIX) have come out with multiple acquisitions and service "deals" since our multiple publications on the Company. On further investigation, we found that one of Ebix's announced contracts had not yet been finalized. Ebix retracted its press release about a Dubai Forex Services contract: *investors were misled on the status of the contract.*
>
> *This is a major red flag*, and exaggerates what we believe is an already extremely high risk investment strategy at Ebix.
>
> *Investors will note that Ebix have avoided commenting on the audit committee's recommendation for Ebix to retain the services of Top 4 Auditor for regulatory reasons.* We can only assume the Top 4 preferred to give ad hoc accountancy advice rather than full audit responsibilities.

(Emphasis added).

62.    On March 19, 2019, Viceroy submitted a request to the SEC, pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, for all consumer complaints made against Ebix. The SEC's response was telling: in a letter to Viceroy on June 20, 2019, the SEC refused to turn over certain information relating to whistleblowers, enforcement activity, and confidential sources working with law enforcement – thus implicitly acknowledging the existence of such activity.

63.    On January 15, 2019, in an article titled "Stock Sale Came Days Before Announcement Sent Ebix Shares Plummeting," *The Atlanta Journal-Constitution* reported that Ebix's controlling shareholder with ties to the Board sold a sizable block of shares just before the Company announced a change in auditor, which, according to legal experts, "rais[ed] questions of insider trading." In reporting on an auditor shakeup at the Company – which would become a familiar occurrence at Ebix – the article stated:

Rennes Foundation, an entity based in Liechtenstein with a controlling interest in Ebix, sold 12,800 shares on Oct. 3. ***Rennes' lead director, Zurich attorney Rolf Herter, sits on Ebix's board of directors***.

***Two days later***, on a Friday, ***the company announced it was changing auditors, from Virginia-based Cherry Bekaert to an Indian firm, T R Chadha & Co.*** According to a federally-required Form 8-K filed with the U.S. Securities and Exchange Commission, the decision was "necessitated by the company's revenue and asset concentration in India for the year 2018."

The article also noted that Ebix has recently been the target of investigations by the SEC, U.S. Department of Justice ("DOJ"), and the U.S. Internal Revenue Service ("IRS").

64.    In August 2019, Perring tweeted an excerpt from an article published by the Economic Times claiming that Defendant Raina had misled investors about the status of a purported contract between Ebix and Dubai International Airport. According to Perring, Defendant Raina was "caught lying" when he claimed in November 2018 that EbixCash had secured a contract with the Dubai airport. The existence of the contract could not be verified until more than eight months later when, on July 18, 2019, an airport spokesperson confirmed the agreement with EbixCash.

65.    Financial analyst Praveen Chawla, in an article published on financial news service GuruFocus.com on June 7, 2021, observed a "[l]ack of transparency in segment reporting" within Ebix. According to Chawla, "[a] big issue I noticed is that in spite of Ebix conducting multiple unrelated businesses, it reports as a single segment. This is odd as it is not clear why it does so. This makes it very hard for investors to analyze and value a business within the corporate umbrella. Everything is lumped together. Since the company continually and aggressively makes tuck-in acquisitions, it becomes very difficult to ascertain if these acquisitions are adding or detracting from the bottom line."

66.    The article continued: "Ebix has spent $812 million between 2008 and 2020 acquiring new businesses. Meanwhile, net income went from around $27 million to $89 million in

that period (cumulative income of $946 million in the 2008 to 2020 period). This does not appear to be an impressive return on investment. Return on invested capital has been declining continuously for the last 15 years."

67.    What is more, Defendants' propensity for deception has also resulted in litigation. In 2020, online travel company Yatra Online, Inc. ("Yatra") sued Ebix, among other parties, in the Delaware Court of Chancery for fraud, breach of the covenant of good faith and fair dealing, breach of contract, and tortious interference with contract in connection with a planned merger between Yatra and Ebix. *See Yatra Online, Inc. v. Ebix, Inc., et al.*, Case No. 2020-0444-JRS (Del. Ch.). The suit accuses Ebix of withholding material information while the parties negotiated the terms of a merger and lying about the fact that its accounting practices were the target of investigations by the SEC and other regulators. Motions to dismiss remain pending as of the filing of this Amended Complaint.

### D.    Confidential Witnesses Confirm Plaintiff's Allegations

68.    Former Ebix employees have come forward to attest to the lack of internal control over the Company's financial reporting. For example, Confidential Witness 1 ("CW1"), a former Technical Accounts Manager who worked at Ebix's Salt Lake City, Utah location from August 2011 to December 2018, reported that, from the very beginning of the CW's tenure with the Company in 2011, fellow employees described Ebix's CEO, Defendant Raina, as "unethical" and an executive who "mix[ed] his own personal interests in India with the company's."

69.    Likewise, Confidential Witness 2 ("CW2") had serious concerns about the Company's finances when RSM resigned in February 2021. CW2 was Ebix's Financial Controller and SEC Reporting Manager from August 2020 to March 2021, the entirety of the Class Period, after which he served as SEC Reporting Consultant until May 2021. CW2 reported directly to CFO

Defendant Hamil, who reported directly to the CEO, Defendant Raina. CW2's job responsibilities included reconciling Ebix's accounting for the year and preparing SEC filings.

70.     According to CW2, each Ebix business had its own accounting team, including its own CFO. The gift card business revenue was recorded by the EbixCash team in Noida, India. Local accounting teams typically ran disparate accounting systems. CW2 found it difficult to manage his team in India because of the time difference and the difference between accounting systems.

71.     According to CW2, an internal audit for 4Q20 began in November 2020, conducted by both the Ebix internal audit team and Ebix's outside auditor, RSM. The formal audit for 2020 began after the books were closed in late January or early February 2021.

72.     In his role, CW2 had direct visibility into the auditor function and was aware of RSM's resignation in February 2021. According to CW2, "[a]uditors just don't quit, unless there's fraud or something. I used to be an external auditor, so I understand it. They will not just resign for no reason. I've never experienced resigning from a client." Critically, CW2 stated that Defendant Hamil – to whom CW2 directly reported – "was ***devastated [over RSM's resignation] because that's a disaster***. He said we had to find a new auditor. So I started thinking about leaving."

73.     Although CW2 did not have visibility into Ebix's operations or finances in India, CW2 "wasn't comfortable" remaining at Ebix after RSM resigned because of CW2's concerns over the internal control over financial reporting: "We have controls in place on the U.S. side, however ***I'm not sure what other controls are in place in India for that matter***." (Emphasis added). CW2 therefore resigned: "When I gave my resignation, Steve [Defendant Hamil] didn't want to let me go, so he asked me what he could do. I said, 'Either you hire an internal auditor in

the U.S. who is under our supervision who will oversee the India operations, or I'm gone.'" CW2 told Defendant Hamil that Ebix needed to have someone from the U.S. handling the testing of internal control, and that they needed to "look into the revenue process most definitely, because that's why they were having issues." According to CW2, this function needed to be conducted in the U.S.: "It's a different culture here in the U.S., especially for auditors. That person would be working under our supervision and it's different. If the internal auditor is there in India and the CEO is there – that's a different scenario, especially because of the culture." According to CW2, this decision did not lie with Defendant Hamil, but with Defendant Raina in India.

74.    Confidential Witness 3 ("CW3") confirmed CW2's observations about Ebix's disparate accounting systems. CW3 worked for Ebix from May 2015 through June 2020 in the Ebix Health business, including serving as Executive Director of Information Technology for the Ebix Health Administration Exchange from March 2016 through June 2017 and Vice President for the Ebix Benefits Administration and Wellness group from June 2017 through June 2020 at the Johns Creek, Georgia office. From June 2017 through June 2020, CW3 reported directly to Raina. Among CW3's responsibilities were reporting revenue on a quarterly basis to "corporate." According to CW3, Ebix's structure allowed different businesses and groups to function autonomously and there was no corporate structure, per se. CW3 explained Ebix's businesses in India did not operate on the same systems that were used at Ebix headquarters in Johns Creek, Georgia. CW3 noticed differences in accounting between India and the US and that the "Indian accounting people did things that did not make sense to the US accounting team," such as for example, allocating revenue across accounts in a manner that did not make sense and was not in line with the expectations of the US accounting representatives.

75.    According to CW3, Ebix had grown through acquisitions and the different businesses operated on disparate information systems. Ebix did not integrate acquired businesses by migrating their information systems onto common or corporate information systems. CW3 explained that Ebix's strategy entailed buying companies, laying off the legacy employees and not investing in systems. The acquired entities were immediately accretive just after the deals closed, but Raina did not invest in the acquired businesses.

76.    According to CW3, Ebix had a "broken" accounting system. CW3 discovered problems during the last 6 months of his employment at Ebix during the first half of 2020. For example, CW3 discovered receivables going back "12 years that had not been resolved" and a "couple million dollars" of receivables that "needed to be written off" because of the age of the accounts and the customers no longer did business with Ebix. CW3 discovered a problem with the invoicing function of the accounting system because the system could only produce an invoice for the receivable for the current month and could not bill for past periods. That led to the accumulation of past due receivables and accordingly, the failure to write off the accounts. In addition to being unable to invoice for past due receivables, there was a problem with payment application. According to CW3, if a customer did not put an invoice number on a check sent to Ebix, no one knew how to apply the payment when it was received.

77.    CW3 discussed the problems with Vice President of Finance Robert Ferris sometime in 2020. Ferris explained that he was making "substantial changes" to the accounting function, including the problem with past due receivables. CW3 believed that Ebix would have to "open up previous quarters" that had "already been reported to the SEC" to write off the past due and uncollectable receivables. CW3 believed that "the last thing they wanted to do was to open up a quarter and restate revenue."

78.    CW3 explained that despite the lack of structure and the autonomy of the different businesses, everything was "tightly" controlled by Raina – down to the smallest details. For example, Raina even approved purchases of laptops for new employees. Purchases could not be made until Raina signed off on them.

79.    According to CW3, Raina was equally attuned to revenue for each of the Ebix groups. CW3 explained that all businesses, including EbixCash, sent at least quarterly revenue updates to Raina via Excel spreadsheets, as CW3 did. With respect to the gift card business, CW3 stated that Raina was "very proud" that Ebix was going into that business and was "betting the ranch on EbixCash." CW3 explained that there was no doubt that Raina "kept track of the numbers."

80.    According to CW3, previous auditors were fired by Raina because he disagreed with them over "statement of revenues."

E.    **The Regulatory Scheme**

1.    **Sarbanes Oxley Act of 2002**

81.    "Internal control over financial reporting" refers to policies and procedures that provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external reporting purposes in accordance with U.S. GAAP. A corporation's CEO and CFO are responsible for designing or supervising those procedures.

82.    Pursuant to Section 302 of SOX, public companies must maintain "internal control over financial reporting" and "disclosure controls and procedures." 15 U.S.C. § 7241; 17 C.F.R. § 240.13a-15(a)-(d). "Internal control" over financial reporting is defined as "reasonable assurance" regarding the "reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles." 17 C.F.R. § 240.13a-15(f). Critically, ***internal control safeguarding accuracy must be "under the***

***supervision of[ ] the issuer's principal executive and principal financial officers*.**" 17 C.F.R. § 240.13a-15(f). "[D]isclosure controls and procedures" are "designed to ensure that information required to be disclosed by the [company] in the reports that it files or submits under the Act ... is recorded, processed, summarized and reported" and "communicated to the [company's] management." 17 C.F.R. § 240.15d-15(e).

### 2.    Public Filing Requirements--Quarterly Reports

83.    Pursuant to SOX, public companies issue quarterly reports "evaluat[ing] any change in the company's internal control over financial reporting that occurred during a fiscal quarter that has materially affected . . . the company's internal control over financial reporting." SEC Release No. 33-8238 at *15.

### 3.    Executive Certification of Filings

84.    SOX requires that CEOs and CFOs of public companies certify public filings. *See* 15 U.S.C. § 7241. Certification indicates that "based on the officer's knowledge, the report does not contain any untrue statement of material fact" and that the signing officers have "evaluated the effectiveness of the [company's] internal controls ... within 90 days prior to the report." 15 U.S.C. § 7241(a).

### F.    The Auditing Standards Governing
### The Audit of Ebix's Financial Statements

85.    SOX directed the Public Company Accounting Oversight Board ("PCAOB") to establish auditing and related professional practice standards for registered public accounting firms to follow in the preparation and certification of audit reports for public companies in the U.S. As a publicly-traded Delaware corporation, the audit of Ebix's year-end December 31, 2020 financial statements was subject to PCAOB standards.

### 1.    An Auditor Must Obtain "Sufficient Appropriate Audit Evidence" to Provide a Reasonable Basis for the Audit Opinion

86.    PCAOB Auditing Standard ("AS") 1001 states that "[t]he objective of the ordinary audit of financial statements by the independent auditor is the expression of an opinion on the fairness with which they present, in all material respects, financial position, results of operations, and its cash flows in conformity with generally accepted accounting principles." In order to meet this objective, AS 1105.04 and 1105.05 state that an auditor must plan and perform audit procedures to obtain *sufficient appropriate audit evidence* to provide a reasonable basis for his or her opinion. Sufficiency is the measure of the quantity of audit evidence, which is affected by: (1) the risk of material misstatement (in the audit of financial statements) or the risk associated with the control (in the audit of internal controls over financial reporting); and (2) the quality of the audit evidence obtained. (Emphasis added). In addition, pursuant to PCAOB AS 1105.06, "appropriateness" is the measure of the quality of audit evidence, i.e., its relevance and reliability. (Emphasis added). To be appropriate, audit evidence must be both relevant and reliable in providing support for the conclusions on which the auditor's opinion is based.

87.    According to Ebix's Form 8-K dated February 19, 2021, RSM was unable to understand the business purpose of each identified significant unusual transaction as required by PCAOB auditing standards because Ebix refused to (or was unable to because none existed) provide sufficient and appropriate audit evidence to explain the business purpose of these transactions "despite repeated inquiries" by RSM.

### 2.    An Auditor Must Communicate with the Audit Committee Regarding "Significant Unusual Transactions"

88.    PCAOB 2401.66 defines "*significant unusual transactions*" as significant transactions that are outside the normal course of business for the company or that otherwise

appear to be unusual due to their timing, size, or nature, and may be used to engage in fraudulent financial reporting or to conceal the misappropriation of assets.

89.     PCAOB AS 1301.12 states that an auditor shall communicate to a company's audit committee, *inter alia*, significant unusual transactions that: (1) are outside the normal course of business for the company or that otherwise appear to be unusual due to their timing, size, or nature; and (2) the policies and practices management used to account for the significant unusual transactions. Moreover, PCAOB AS 1301.13(d) states that the auditor should communicate to the audit committee the auditor's understanding of the business purpose (or lack thereof) of the significant unusual transactions.

### 3.     An Auditor Must Identify Material Weaknesses in Internal Controls Over Financial Reporting

90.     According to PCAOB AS 1305.03, a ***material weakness in a company's internal control over financial reporting*** is defined as a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis. There is a reasonable possibility of an event when the likelihood of the event is either "reasonably possible" or "probable."[3] Likewise, PCAOB AS 2201.62, states that the auditor must evaluate the severity of each control deficiency that comes to his or her attention to determine whether the deficiencies, individually or in combination, are material weaknesses as of the date of management's assessment.

91.     Furthermore, PCAOB AS 2201.70, states that if the auditor determines that a deficiency, or combination of deficiencies, might prevent prudent officials in the conduct of their

---

[3] *See* Paragraph 3 of Financial Accounting Standards Board Statement No. 5, *Accounting for Contingencies*.

own affairs from concluding that they have reasonable assurance that transactions are recorded as necessary to permit the preparation of financial statements in conformity with US GAAP, then the auditor should treat the deficiency, or combination of deficiencies, as an indicator of a material weakness.

### 4. Defendants Denied RSM "Sufficient Appropriate Audit Evidence" to Evaluate "Significant Unusual Transactions," Thus Undermining the Fairness and Reliability of Ebix's Financial Statements

92.     RSM was engaged on June 12, 2020 to serve as Ebix's independent auditor for the year-ended December 31, 2020, and it performed audit services in connection with that audit until its resignation on February 15, 2021.

93.     According to Ebix's Form 8-K dated February 19, 2021 and RSM's letter dated February 22, 2021, filed with the SEC on February 23, 2021, when conducting the 2020 audit of Ebix, RSM identified certain significant unusual transactions during the fourth quarter of 2020 related to Ebix's gift card business in India.

94.     Ebix stated in its February 19, 2021 8-K that RSM informed Ebix in a letter dated February 15, 2021, that it had resigned "…as a result of being unable, *despite repeated inquiries*, to obtain sufficient appropriate audit evidence that would allow it to evaluate the business purpose of significant unusual transactions that occurred in the fourth quarter of 2020, including whether such transactions have been properly accounted for and disclosed in the financial statements subject to the Audit." RSM stated in a February 22, 2021 letter to the SEC, filed by Ebix with the SEC on February 23, 2021 that it communicated:

> *clearly and unequivocally* [to Ebix] that if the information repeatedly requested by RSM — but which was not provided by the Company — related to gift cards issued by ItzCash/EbixCash in the fourth quarter of 2020 was further investigated, it might materially impact the fairness or reliability of the financial statements subject to RSM's audit or affect RSM's willingness to be associated with the Company's financial statements. (Emphasis added)

95.     In addition, in its resignation letter dated February 15, 2021, RSM stated that it failed to obtain sufficient appropriate audit evidence that would allow it to evaluate the business purpose of significant unusual transactions that occurred in the fourth quarter of 2020. In short, RSM resigned because Ebix failed to provide or could not provide (because it did not exist) audit evidence that was both "sufficient" and "appropriate" that would enable RSM to independently evaluate the business purpose of each identified significant unusual transaction.

96.     As described herein, RSM could not, despite repeated inquiries, obtain from Ebix sufficient audit evidence relating to the business purpose of the significant unusual transactions that occurred in the fourth quarter of 2020, and was not sufficiently comfortable with the quantity, nor the relevance and reliability of the audit evidence provided by Ebix concerning these transactions in order to issue a clean (i.e., unqualified) opinion on the financial statements subject to the year-end December 31, 2020 audit.

97.     Defendants, the Audit Committee, and Ebix management knew or recklessly disregarded the existence of the significant unusual transactions at issue and the weakness of internal control over financial reporting because RSM made "repeated inquiries, to obtain sufficient appropriate audit evidence…to evaluate the business purpose of [the] significant unusual transactions…" in EbixCash, Ebix's core business and primary driver of revenue and profit.

98.     RSM's letter dated February 22, 2021, filed with the SEC on February 23, 2021, makes it abundantly clear that RSM repeatedly attempted to obtain information from Ebix related to the significant unusual transactions and was continually rebuffed – to the point where RSM determined it had no other alternative but to take the extraordinary action of resigning as Ebix's independent auditor before it completed the audit, thus abandoning a lucrative contract with a large public company.

99.    Furthermore, not only did Defendants know and fail to disclose that RSM had uncovered "significant unusual transactions" for which there was insufficient appropriate audit evidence, as well as a material weakness in internal control over financial reporting, but Defendants also knew and failed to disclose that Ebix was either unwilling or unable to provide RSM with sufficient and appropriate audit evidence to explain and support the significant unusual transactions. Defendants also knew or recklessly disregarded that Ebix's failure to furnish the requested information to RSM created a serious risk that RSM would resign as auditor, thus creating a severe negative impact on Ebix and its stock price and material losses to investors.

100.    Because Ebix did not provide (or could not provide) sufficient appropriate audit evidence that would permit RSM to evaluate the business purpose of the significant unusual transactions, RSM could not comply with the PCAOB's basic auditing standards relating to these transactions, which required RSM to obtain sufficient competent evidential matter in support of such transactions and evaluate the business purpose of each transaction. RSM could not ascertain whether the transactions had been properly accounted for and disclosed in Ebix's financial statements, thus causing it to take the serious step of resigning before the audit was completed.

### 5.    Defendants Knew But Failed to Disclose to Investors That RSM Had Identified "Significant Unusual Transactions"

101.    As alleged herein, pursuant to PCAOB AS 1301.12 and 1301.13(d), RSM had an obligation to communicate to Ebix's Audit Committee information related to the significant unusual transactions identified by RSM, and to communicate the business purpose or lack thereof. The Audit Committee was responsible for communicating such matters to the Board, including its Chairman, Defendant Raina, and Ebix's financial management, including Defendant Hamil. Accordingly, Defendants and the Audit Committee knew or recklessly disregarded the existence of significant unusual transactions and RSM's inability to obtain sufficient appropriate audit

evidence relating to the significant unusual transactions at issue. The existence of a material weakness in internal control would have been discovered by RSM and the internal audit team during the interim audit beginning in November 2020, at or around the time of Defendants' false statements on November 9, 2020.

### 6. RSM Identified Material Weakness in Ebix's Internal Controls Over Financial Reporting

102. The weakness in internal control which caused RSM to resign was material. RSM resigned because, among other things, Ebix's internal control over financial reporting was "ineffective." According to the February 19, 2021 8-K, there was a failure to "design or implement the necessary procedures and controls over the gift or prepaid card revenue transaction cycle sufficient to prevent or detect a material misstatement" in Ebix's financial statements subject to the year ended December 31, 2020 audit.

103. Under PCAOB standards, in order to determine a material weakness, RSM determined: (1) that the deficiency in Ebix's internal accounting controls relating to the gift or prepaid card revenue transaction cycle were "severe"; (2) that there was a reasonable possibility that Ebix's annual or interim financial statements could contain a material misstatement; (3) that there was no reasonable assurance that the gift and prepaid card revenues in India were necessarily recorded to ensure compliance with US GAAP; and (4) that Ebix failed to maintain the necessary procedures and controls over its gift or prepaid card revenue transaction cycle sufficient to prevent or detect a material misstatement in the financial statements subject to the audit – all of which amounted to a material weakness in Ebix's internal accounting controls.

104. As stated above, the material weakness in internal control over Ebix's financial reporting, which existed during 3Q20 and was confirmed and publicly identified by RSM in February 2021, were known to or recklessly disregarded by Defendants throughout the Class

Period, including on November 9, 2020 at the beginning of the Class Period, when Defendants represented to investors in the 3Q20 10-Q that there were "***no changes in our internal control over financial reporting during the quarter ended September 30, 2020 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting***." The interim audit beginning in November 2020, at or around the time of Defendants' false statements on November 9, 2020, would have confirmed a material weakness in internal control during 3Q20.

### 7.    RSM Took The Extraordinary Action of Resigning From The Ebix Audit

105.    Defendants' ongoing frustration with RSM's efforts to properly complete the audit pursuant to GAAP and PCAOB standards was a material fact which should have been disclosed to investors.

106.    Accounting literature provides that an auditor should consider withdrawing from an audit in the following circumstances: (1) when the client limits the scope of an audit and does not permit the auditor to access all of the components of the business due to the possibility of a qualified or unclean audit opinion; (2) the identification of fraudulent activity by a client that jeopardizes the integrity of the engagement; (3) the audit client lacks integrity, is dishonest, and/or misstates audit evidence; and (4) the auditor losses independence during the audit due to a conflict of interest and/or intimidation, and the integrity of the audit is compromised rendering it unreliable. Moreover, it is well-accepted that auditing firms should avoid withdrawing from an audit unless absolutely necessary for the firm to maintain the integrity of its deliverables, business, and the larger auditing profession.

107.    An auditor resignation from an engagement shortly before the completion of an audit is a rare and extraordinary event. Doing so suggests that the client is associated with greater risk, one with which the auditor does not wish to be associated.

108.    In particular, large, sophisticated, well-staffed auditors, like RSM, have both the incentives and the ability to detect hidden risks and when they detect that risks are sufficiently high, they resign from the engagement. Resignations by such auditing firms signal that engagements have high litigation risk, high audit risk, and/or high business risk

109.    RSM's evaluation of the significant unusual transactions with no apparent business purpose, for which Ebix did not, despite repeated requests, provide sufficient appropriate audit evidence explaining their business purpose, and the material weakness in internal control over financial reporting related to the gift or prepaid card business revenue transaction cycle provided sufficient basis for RSM to determine that the Ebix audit had high litigation risk, high audit risk, and/or high business risk that made RSM's further engagement or work on the audit untenable.

110.    RSM's resignation as independent auditor of Ebix in February of 2021, in the middle of an audit was a drastic measure. RSM stated in its letter dated February 22, 2021, filed with the SEC on February 23, 2021 that even if Ebix had provided the information sought by RSM related to the significant unusual transactions, RSM may have still decided to resign because such information may have "…materially impact[ed] the fairness or reliability of the financial statements subject to RSM's audit."

111.    To take the dramatic step to resign, RSM evaluated the significant unusual transactions with no explained business purpose, Ebix's failure to provide sufficient and appropriate audit evidence explaining and justifying the transactions' business purpose, and the material weakness in internal control over financial reporting relating to the gift or prepaid card

business revenue transaction cycle, and decided to resign, knowing that it was mid-February 2021, and the audit was not complete. Defendants knew or recklessly disregarded these circumstances and their materiality to investors throughout the Class Period yet failed to disclose them publicly.

### 8. Instead of Addressing RSM's Concerns, Defendants Allowed RSM to Resign and Quickly Engaged Another Auditing Firm They Knew Would Issue a Clean Opinion

112. Following RSM's resignation on February 15, 2021, Ebix engaged K.G. Somani & Co. ("K.G. Somani") as its replacement auditor on March 5, 2021. In a complete about-face from RSM's challenges, only one month and three weeks later, on April 27, 2021, K.G. Somani apparently determined it had obtained sufficient evidence to explain the business purpose behind the significant unusual transactions concerning Ebix's gift card business in India. Despite all of the concerns raised by RSM regarding the 2020 Ebix audit – concerns so serious that RSM had resigned, effectively walking away from a lucrative engagement with a rapidly expanding client – K.G. Somani signed off on its new client's financial statements without a hint of trouble. A mere seven weeks after RSM's resignation, K.G. Somani provided Ebix with a clean, unqualified audit opinion without mentioning either the material weakness in internal control identified by RSM or any remediation efforts.

113. Pursuant to PCAOB AS 2610.09, the successor auditor should make specific and reasonable inquiries of the predecessor auditor regarding matters that will assist the successor auditor in determining whether to accept the engagement, and matters subject to inquiry should include, inter alia, the predecessor auditor's understanding of the nature of the company's relationships and transactions with related parties and significant unusual transactions. Thus, upon information and belief, K.G. Somani was well informed by RSM of the significant unusual transactions, their lack of business purpose, RSM's identification of a material weakness in internal control and the fact that Ebix failed to or could not provide, despite repeated inquiries by RSM,

sufficient and appropriate audit evidence explaining and supporting the business purpose of these transactions.

114.    K.G. Somani is a firm based in India that according to its website has only seventeen (17) partners and two-hundred (200) staff across just six (6) practice groups, and only one (1) office located at 3/15, Asaf Ali Road, New Delhi, 110002, and upon information and belief, only one partner holding the certified public accountant ("CPA") designation and license who was well versed with Generally Accepted Accounting Principles ("US GAAP"). RSM, however, according to its website, has dozens of offices in the U.S. and around the world, more than 11,000 employees, and provides dozens of accounting service offerings, including auditing, tax, and consulting. Yet K.G. Somani was able to review all of the significant unusual transactions identified by RSM, for which RSM was forced to resign due to insufficient audit evidence being available, determine their business purpose, complete Ebix's December 31, 2020 year-end audit, and issue a clean, unqualified opinion in a period of less than seven weeks without explaining the material weakness in internal control identified by RSM or any remediation efforts.

115.    Inexplicably, although Ebix failed to, or could not, provide RSM with the audit evidence and information necessary to explain the business purpose behind each significant unusual transaction identified by RSM relating to Ebix's gift card business in India, only weeks after RSM's resignation, by April 27, 2021, all of the serious issues that caused RSM to resign and surrender a lucrative engagement were apparently resolved by K.G. Somani, an auditing firm with far less resources and experience than RSM.

116.    K.G. Somani was miraculously able to accomplish what RSM – a firm with far greater resources and experience – could not: obtain sufficient appropriate audit evidence from Ebix concerning each significant unusual transaction identified by RSM and issue a clean,

unqualified audit opinion. Troublingly, K.G. Somani's clean opinion, dated April 27, 2021, did not even mention *any* material weakness in internal control or *any* remediation of the material weakness identified by RSM. The most compelling inference raised by this timeline and sequence of events is that, hampered by RSM's thorough audit that uncovered a multitude of accounting concerns, Ebix turned to an auditor which would not look too closely at the significant unusual transactions, lack of sufficient appropriate audit evidence, and material weakness in internal control, and instead deliver a clean audit opinion promptly to avoid NASDAQ delisting and to preserve the viability of the lucrative planned IPO of EbixCash.

117.    The 2020 10-K explained that because of RSM's resignation without completing the 2020 audit and Ebix's failure timely to file the 2020 10-K, Ebix received a letter from The Nasdaq Stock Market LLC on March 2, 2021 informing it that it was not in compliance with the requirements for continued NASDAQ listing. Defendants knew that delisting would have a material negative effect on Ebix, its business, its shareholders and its planned IPO of EbixCash. In an effort to regain compliance by the April 16, 2021 deadline to submit a plan to Nasdaq, Ebix quickly retained K.G. Somani, which produced a clean audit opinion in record time, in view of RSM's reasons for resignation. With respect to Nasdaq delisting, the 2020 10-K states:

> ***We are not in compliance with the requirements of Nasdaq for continued listing, and if Nasdaq does not concur that we have adequately remedied our non-compliance with Nasdaq Listing Rule 5250(c)(1), our common stock may be delisted from trading on Nasdaq, which could have a material adverse effect on us and our shareholders.***
>
> On March 1, 2021, subsequent to the resignation of RSM from its position on February 15, 2021, we filed a Notification of Late Filing with the SEC pursuant to Rule 12b-25 of the Securities Exchange Act of 1934, as amended ("Rule 12b-25"), indicating that we were unable, without unreasonable effort and expense, to finalize our 2020 Financial Statements by March 1, 2021, the filing due date to file the Company's Annual Report on Form 10-K for the year ended December 31, 2020 (the "2020 Form 10-K"). We indicated at the time that we intended to file the 2020 Form 10-K as soon as practicable, and would make every effort to file the 2020 Form 10-K within the fifteen-day extension period

afforded by Rule 12b-25.

On March 2, 2021, we received a notification letter from The Nasdaq Stock Market LLC ("Nasdaq") stating that, because the Company had not yet filed the 2020 Form 10-K, *the Company was no longer in compliance with Nasdaq Listing Rule 5250(c)(1), which requires listed companies to timely file all required periodic financial reports with the SEC. Nasdaq's notification letter states that we have 45 calendar days, or until April 16, 2021, to submit to Nasdaq a plan to regain compliance with the Nasdaq Listing Rules*. If Nasdaq accepts the Company's plan, then Nasdaq may grant the Company up to 180 days from the prescribed due date for filing the 2020 Form 10-K to regain compliance. If Nasdaq does not accept the Company's plan, then the Company will have the opportunity to appeal that decision to a Nasdaq hearings panel.

The Company has provided its plan to Nasdaq, and as described in more detail above, the Company has retained KGS as its independent registered public accounting firm to audit the Financial Statements. However, there can be no assurance that Nasdaq will concur that we have remedied our non-compliance with Listing Rule 5250(c)(1), in which case our common stock could remain subject to delisting by Nasdaq. If our common stock is delisted, there can be no assurance whether or when it would again be listed for trading on Nasdaq or any other securities exchange. Further, the market price of our shares could decline and become more volatile, and our shareholders might find that their investment in our shares has limited liquidity. Moreover, institutions whose charters forbid holding securities in unlisted companies might sell our shares, which could have a further adverse effect on the price of our stock. (Emphasis added).

118.    Defendants explained the potential material adverse effects of weakness in internal control in the 2020 10-K, thus confirming Ebix's need to obtain a clean, unqualified audit opinion on internal control from K.G. Somani—and quickly, by the fast approaching deadline for Nasdaq delisting. In Ebix's case, the widely touted planned IPO of EbixCash could be jeopardized by RSM's identification of a material weakness in internal control and Defendants knew that Ebix had to change the narrative quickly. The 2020 10-K acknowledges the materiality of a material weakness in internal control, stating in relevant part:

we may discover future deficiencies in our internal controls over financial reporting, including those identified through testing conducted by us or subsequent testing by our independent registered public accounting firm. **If we are unable to meet the demands that have been placed upon us as a public company**, including the requirements of the Sarbanes-Oxley Act, we may be unable to accurately report our financial results in future periods, or report them

within the timeframes required by law or stock exchange regulations. Failure to comply with the Sarbanes-Oxley Act, when and as applicable, could also potentially subject us to sanctions or investigations by the SEC or other regulatory authorities. ***Any failure to maintain or implement required new or improved controls, or any difficulties we encounter in their implementation, could result in additional material weaknesses or significant deficiencies, cause us to fail to meet our reporting obligations or result in material misstatements in our financial statements. If we cannot provide reliable financial reports or prevent fraud, our business and results of operations could be harmed, and investors could lose confidence in our reported financial information***. (Emphasis added).

9.    **When RSM's Clean 2019 Audit Opinion, Including the Effectiveness of Internal Control, Was Reissued in the 2020 10-K, RSM's Prior Reference to Internal Control Was Completely Removed**

119.    RSM delivered a clean audit opinion on Ebix's 2019 financial statements, which was included in the 2019 Ebix Form 10-K filed with the SEC on March 2, 2020. This opinion included an "unqualified opinion on the effectiveness of the Company's internal control over financial reporting" and stated explicitly:

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the Company's internal control over financial reporting as of December 31, 2019, based on criteria established in Internal Control - Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission in 2013, and ***our report dated March 2, 2020 expressed an unqualified opinion on the effectiveness of the Company's internal control over financial reporting.*** (Emphasis added).

120.    RSM's 2019 audit opinion was reissued in the 2020 10-K filed with the SEC on April 27, 2021, after RSM's resignation on February 15, 2021, and its disclosure of a material weakness related to Ebix's failure to design controls "over the gift or prepaid card revenue transaction cycle sufficient to prevent or detect a material misstatement." Tellingly, however, the reissued version of the 2019 audit opinion was altered such that it deleted RSM's crucial language attesting to the effectiveness of Ebix's internal control over financial reporting. The language quoted above in the 2019 audit opinion appears ***nowhere*** in the reissued 2019 audit opinion

included in Ebix's 2020 10-K.

121.    This deletion speaks volumes. RSM's omission of its 2019 unqualified opinion on the effectiveness of Ebix's internal control over financial reporting in the reissued version filed in the 2020 10-K was intentional and not coincidental or accidental. In the context of RSM's resignation as Ebix's auditor, in part as a result of finding a material weakness in internal control, the reissued 2019 opinion omitting any reference to internal control raises an inference that the material weakness disclosed by RSM in its February 15, 2021 resignation letter may be more extensive than disclosed in that resignation letter. At the very least, the omission of such language in RSM's reissued 2019 opinion raises an inference that RSM was no longer comfortable with its prior unqualified opinion on internal control for the previous fiscal year of 2019 or opining on Ebix's internal control at all.

> **G.    The Audit Committee Was Aware of Repeated Requests from
> RSM for Sufficient Audit Evidence and Ebix's Failure to Provide It**

122.    Defendant Raina, as Ebix's CEO, Chairman of the Board, and the "single" visionary leader of Ebix, had an oversight duty with respect to Ebix's internal control over financial reporting, and Ebix's Audit Committee was obligated to monitor the effectiveness of Ebix's internal control over financial reporting and assist and communicate with the Board, including Defendant Raina, and Defendant Hamil as CFO, in such monitoring. The serious issues raised by RSM during the course of its audit were well within the scope of the oversight duties of the Audit Committee to "*[r]eview with the Auditors and the Company's management their findings on the adequacy and effectiveness of internal controls and their recommendations for improving the internal control environment,"*. As a result of their communication and interaction with the Audit Committee, Defendants Raina and Hamil knew or recklessly disregarded the existing material weakness in internal control and RSM's inability to obtain sufficient appropriate audit evidence

for significant unusual transactions in the gift card business, despite repeated requests for such evidence.

123.    Ebix has a standing Audit Committee. The Audit Committee's principal responsibility is to assist the Board in its general oversight of Ebix's financial reporting, internal controls, ethics compliance and audit functions. The Audit Committee Charter states its purpose as follows:

> The Audit Committee (the "Committee") of the Board of Directors (the "Board") of Ebix, Inc. (the "Company") shall oversee the Company's accounting and financial reporting processes and the audits of the Company's financial statements, and ***shall otherwise exercise oversight responsibility, and assist the Board in fulfilling its oversight functions, with respect to matters involving the accounting, auditing, financial reporting and internal control functions of the Company***. In so doing, ***it shall be the goal of the Committee to maintain free and open means of communication between the members of the Board, the Company's independent public accountants who audit the Company's financial statements (the "Auditors") and the Company's financial management***. While it is not the Committee's responsibility to certify the Company's financial statements or to guarantee the Auditors' report, ***the Committee will facilitate discussions among the Board, the Auditors and the Company's management.*** (Emphasis added).

124.    The Audit Committee Charter states that one of the Audit Committee's functions is "reviewing internal controls established by management." The Audit Committee discusses with the independent registered public accounting firm the matters required to be discussed under auditing standards generally accepted in the United States, including those matters set forth in Statement on Auditing Standards No. 1301 (Communication with Audit Committees), as currently in effect. The Audit Committee also receives from, and discusses with, its independent registered public accounting firm the matters required to be discussed under the applicable requirements of the PCAOB, the SEC and the Audit Committee's charter.

125.    The Audit Committee Charter requires it to:

> a.    ***"[m]eet with the Auditors and the Company's management to discuss, review and comment upon the interim financial***

        ***statements*** to be included in each of the Company's Quarterly Reports on Form 10-Q prior to the public announcement of financial results and the filing of the Form 10-Q with the SEC.);

    b.    "[b]e directly responsible for the appointment, compensation, retention and oversight of the work of the Auditors, including ***resolution of disagreements between management and the Auditors regarding financial reporting***, for the purpose of preparing or issuing an audit report or performing other audit, review or attest services for the Company. The Auditors shall report directly to the Committee;

    c.    "***[i]nquire of the Auditors and the Company's management about significant risks or exposures*** and assess the steps which management has taken to minimize such risks and monitor control of these areas;

    d.    "***[r]eview with the Auditors and the Company's management their findings on the adequacy and effectiveness of internal controls and their recommendations for improving the internal control environment,*** including management's controls and security procedures with respect to the Company's information systems;

    e.    "[e]stablish procedures for the receipt, retention, and ***treatment of complaints*** received by the Company regarding accounting, internal accounting controls, or auditing matters; and

    f.    "***[c]onduct or authorize investigations*** into any other matters within the Committee's scope of responsibilities. (Emphasis added).

126.    The Audit Committee Charter further states that "[t]he Committee plays a critical role in serving as a check and balance for the Company's financial reporting system. ***In carrying out its functions, the Committee's goal is to help ensure that management properly develops and adheres to a sound system of internal controls and that the Auditors, through their own review, objectively assess the Company's financial reporting practices.***" (Emphasis added).

127.    The mandated responsibilities and goals of the Audit Committee, as stated in its Charter, raise a strong inference that RSM's inability to obtain sufficient appropriate audit evidence of significant unusual transactions in the gift card and prepaid card business in India, despite repeated requests, and its identification of a material weakness in internal control were

highly significant topics discussed by the Audit Committee, the Board, and Defendants Raina and Hamil during the course of RSM's 2020 audit and interim audit, thus providing Defendants with actual knowledge of RSM's frustrations and resulting conclusions, to which Defendants turned a blind eye.

### H.    Disclosures at the End of the Class Period

128.    On February 19, 2021, after the market closed, Ebix revealed that RSM resigned "as a result of being unable, despite repeated inquiries, to obtain sufficient appropriate audit evidence that would allow it to evaluate the business purpose of significant unusual transactions that occurred in the fourth quarter of 2020" related to the Company's gift card business in India. RSM had also stated that there was a material weakness related to Ebix's failure to design controls "over the gift or prepaid card revenue transaction cycle sufficient to prevent or detect a material misstatement." In addition, Ebix and RSM disagreed over the accounting treatment of $30 million that had been transferred into a commingled trust account of Ebix's outside legal counsel in December 2020. Specifically, in a Form 8-K filed with the SEC, the Company stated, in relevant part:

> RSM informed the Company that there was a disagreement under Item 304(a)(1)(iv) of Regulation S-K with respect to the classification of $30 million. In connection with a pending acquisition, in ***December 2020 the Company transferred $30 million to a commingled trust account of its outside legal counsel that was not under the direct control of the Company, and classified the funds as a cash or cash equivalent on its balance sheet.*** RSM discussed with the Company RSM's view that these funds could not be classified as a cash or cash equivalent but could be classified as other current assets. There was no dispute that the $30 million was owned by the Company and would be classified as part of current assets included in the financial statements.
>
> *    *    *
>
> On February 15, 2021, RSM told the Chairman of the Company's Audit Committee during a telephone call that RSM was resigning as the Company's independent registered public accounting firm, effective immediately. ***RSM then advised the Chairman on the call that it was resigning as a result of being***

*unable, despite repeated inquiries, to obtain sufficient appropriate audit evidence that would allow it to evaluate the business purpose of significant unusual transactions that occurred in the fourth quarter of 2020, including whether such transactions have been properly accounted for and disclosed in the financial statements subject to the Audit. RSM informed the Chairman that the unusual transactions concerned the Company's gift card business in India.* RSM asserts that on that call it further advised the Chairman that if this requested information was further investigated it might materially impact the fairness or reliability of the financial statements subject to the audit or affect RSMs willingness to be associated with the Company's financial statements, but that since RSM had resigned, no further investigation would occur. The Chairman discussed with RSM the reasons for its resignation.

Promptly following the call between RSM and the Chairman of the Audit Committee, RSM sent the resignation letter dated February 15, 2021. RSM stated in its resignation letter that it was "resigning as a result of being unable, despite repeated inquiries, to obtain sufficient appropriate audit evidence that would allow it to evaluate the business purpose of significant unusual transactions that occurred in the fourth quarter of 2020, including whether such transactions have been properly accounted for and disclosed in the financial statements subject to the Audit." RSM informed the Company that the unusual transactions concerned the Company's gift card business in India. *RSM also stated in its letter that it believed that the Company's "internal control over financial reporting was not effective as of December 31, 2020 due to the identification of a material weakness. Specifically, management did not design or implement the necessary procedures and controls over the gift or prepaid card revenue transaction cycle sufficient to prevent or detect a material misstatement."* RSM further stated in the letter that, "because we have not completed the Audit, we cannot conclude on other control deficiencies that may rise to the level of a material weakness." (Emphasis added)

129.    On this news, the Company's share price plummeted $20.24 per share, or approximately 40%, to close at $30.50 on February 22, 2021, on abnormally heavy trading volume.

130.    On February 22, 2021, in an effort to confront the fallout from RSM's abrupt resignation and spin the narrative to its advantage, Ebix issued a press release reaffirming its business outlook for 2021 and thereafter. In this release, Defendants downplayed the significance of Ebix's gift card business and its materiality to the Company's financial statements. Additionally, they reassured investors that "[n]o one has made any such aspersion [of fraud or wrongdoing] in any manner whatsoever. The Company is not aware of any wrongdoing in any manner nor is aware

of any such aspersion being made by anyone." Defendants manipulated the meaning of "significant unusual transactions" by characterizing it as the 95% growth in the gift card business and further took the opportunity to attempt to distract investors from the extraordinary event of an auditor resignation by providing an update on the planned IPO for EbixCash. In pertinent part, the Company stated as follows in the February 22 press release:

Ebix Reaffirms Business Outlook for 2021 and Beyond

JOHNS CREEK, GA – February 22, 2021 – Ebix, Inc. (NASDAQ: EBIX), a leading international supplier of On-Demand software and E-commerce services to the insurance, financial, healthcare and e-learning industries, today reaffirmed a positive outlook for the year 2021 and beyond.

The Company decided to issue this release in response to investor questions over the weekend. The Company asserted the following in response to specific questions –

      •     How is the Company's financial health? - The Company's financial health is in better shape than ever, as reflected in our operating cash flows through the end of 2020. The Company continues to generate strong cash flows. As of 15th February 2020, the Company's cash and cash equivalents (including any restricted cash) amounted to greater than $140 million, including the $30 million earmarked for a new US acquisition that is back in Ebix's operating bank account.

      •     When is the EbixCash IPO targeted for? ***The Company is targeting the EbixCash IPO towards the end of 2021***, in consultation with its investment bankers.

      •     ***Does the Company suspect any fraud or wrongdoing?*** Has any such aspersion been made by anyone? No one has made any such aspersion in any manner whatsoever. ***The Company is not aware of any wrongdoing in any manner nor is aware of any such aspersion being made by anyone***.

      •     What is the income materiality of the Gift card business? As elaborated in our previous press release, the unaudited operating income from our gift card business was less than $1.4 million for the full year 2020 and less than $1 million for Q4 2020. The Company believes that the accounting, including for our gift card business, is consistent with GAAP.

      •     Does the gift card business involve extending payment terms to EbixCash customers? Over 95% of the sales of gift cards do not involve extending payment terms to EbixCash's corporate customers. Payments are collected

concurrently with the issuance of the gift cards and the gift cards are not activated until the upfront payment for the cards is received. There are a small number of corporate customers that are multi-solution or multi-service partners of EbixCash that the Company has extended payment terms to related to gift card purchases, but those sales represent a small percentage of overall gift card sales (less than 5%).

•    Was the $30 million amount earmarked for a past acquisition or a new acquisition? What geography was the acquisition targeted in? Does the classification of the $30 million in any way have any impact on operating cash flows? The $30 million amount was earmarked for a new software industry acquisition in the United States. The treatment of the cash amount is a balance sheet classification determination and has no impact on the operating cash flow of the Company.

•    ***Is the 95% growth in gift card business in Q4 2020 "unusual"?*** The term "significant unusual transactions" is an accounting term, defined as "a transaction that is outside the normal course of business for the company or that otherwise appears to be unusual due to its timing, size, or nature." In this regard, we note that our gift card business revenues grew substantially in Q4 2020. The increase in gift card revenues was driven by the increased use of digital money in India during the COVID-19 pandemic and the renewed push by the Company to grow its payment solutions business.

(Emphasis added).

131.    The following day, on February 23, 2021, Ebix disclosed in a filing with the SEC that RSM had furnished the Company with a letter, addressed to the SEC and dated February 22, 2021, in which RSM identified aspects of Ebix's February 19, 2021 disclosure (regarding the resignation of RSM) with which it disagreed. Indeed, RSM disagreed with significant characterizations by Defendants of the dispute with RSM. In the February 22 letter, RSM conveyed to the SEC, in pertinent part, that:

We are writing to you in response to the request of Ebix, Inc. (the "Company") pursuant to Item 304(a)(3) of Regulation S-K of the rules and regulations of the Securities and Exchange Commission ("Regulation S-K"), regarding the Current Report on Form 8-K of the Company (the "8-K") filed with the Securities and Exchange Commission on February 19, 2021. Specifically, RSM US LLP ("RSM" or the "Firm") agrees, and does not agree, with certain statements concerning our Firm set forth in Item 4.01 of the 8-K, as described below. To the extent we do not discuss or comment on other statements contained therein, we have no basis to agree or disagree. RSM was not requested by the Company to comment, and RSM

does not comment, on the press release issued by the Company on the same date it filed the 8-K entitled "Ebix Shares Strong Business Outlook and Discusses Recent Events."

\*        \*        \*

RSM agrees with the first sentence in the first paragraph, but otherwise disagrees with certain statements made in the two paragraphs in the section entitled "1: Disagreements Under Item 304(a)(1)(iv) of Regulation S-K." RSM disagrees that this issue was an initial difference of opinion based on incomplete facts or preliminary information rather than a disagreement pursuant to Item 304(a)(i)(iv). RSM repeatedly told the Company that the $30 million that the Company transferred on December 31, 2020 to an account of its outside legal counsel could not be classified as a cash or cash equivalent on its balance sheet. RSM stated this because the $30 million was transferred in connection with a pending acquisition to a commingled trust account that was not under the direct control of the Company. At the time of RSM's resignation, the Company had not communicated that it accepted RSM's position. In addition, RSM did not tell the Company these funds could be classified as "other current assets," nor did RSM concur that the $30 million was "owned by the Company."

RSM agrees with the first and last sentence, but otherwise disagrees with certain statements made in the Company's 8-K disclosure in the first paragraph of the section entitled "2: Reportable Events Under Item 304(a)(1)(v)." In its disclosure, the Company states: "RSM asserts that on that call it further advised the Chairman that if this requested information was further investigated it might materially impact the fairness or reliability of the financial statements subject to the audit or affect RSMs willingness to be associated with the Company's financial statements, but that since RSM had resigned, no further investigation would occur." (emphasis supplied). RSM disagrees with the use of the term "asserts" to the extent it could create uncertainty as to what RSM communicated. ***In the call that occurred between RSM and the Chairman of the Company's Audit Committee on February 15, 2021, RSM stated clearly and unequivocally that if the information repeatedly requested by RSM — but which was not provided by the Company — related to gift cards issued by ItzCash/EbixCash in the fourth quarter of 2020 was further investigated, it might materially impact the fairness or reliability of the financial statements subject to RSM's audit or affect RSM's willingness to be associated with the Company's financial statements, and that, as a result of RSM's resignation, further investigation has not occurred***.

(Emphasis added).

132.    Despite Defendants' attempts to reassure investors as to the sufficiency of Ebix's internal control over financial reporting and the reliability of its accounting, Ebix's shares have

remained depressed. Having fallen from a closing price of $50.74 on February 19, 2021 to $23.20 per share on February 23, 2021, Ebix shares have, in the five months since, generally traded at prices below $35 per share and, indeed, often below $30 per share.

## V.    MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD AND OMISSIONS OF MATERIAL FACT

133.    The Class Period begins on November 9, 2020, when Ebix filed its 3Q20 10-Q, stating in relevant part:

> *We monitor and evaluate on an ongoing basis our disclosure controls and procedures in order to improve their overall effectiveness. In the course of these evaluations, we modify and refine our internal processes and controls as conditions warrant*.
>
> Our management, including our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our "disclosure controls and procedures" (as defined in Rule 13a-15(e) promulgated under the Exchange Act) as of September 30, 2020. Based on this evaluation the Company's Chief Executive Officer and Chief Financial Officer have concluded that these disclosure controls and procedures are effective. *There were no changes in our internal control over financial reporting during the quarter ended September 30, 2020 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting. We have not experienced any material changes to our internal controls over financial reporting despite the fact that all non-essential employees are working remotely due to the COVID-19 pandemic. We are continually monitoring the impact of COVID-19 on the operating effectiveness of our internal control over financial reporting.* (Emphasis added).

134.    The statements that "*we modify and refine our internal processes and controls as conditions warrant,*" and "*there were no changes in our internal control over financial reporting*" and *"[w]e have not experienced any material changes to our internal controls over financial reporting"* were materially false and misleading when made and omitted the material fact that there was a material weakness during 3Q20 in internal control over financial reporting in the gift card and prepaid card business in India, which had experienced astronomical growth in the third quarter of 2020, in part because the COVID-19 pandemic motivated people to use digital

63

rather than in-person payment solutions; changes in regulations by the Reserve Bank in India; Ebix's increased marketing efforts for the prepaid and gift card business; and Defendants' knowledge that "malicious" third parties were taking advantage of the surge in digital use to commit digital fraud and that Ebix was a potential target. At the same time, the COVID-19 pandemic devastated India and had a material negative impact on the effectiveness of Ebix's staff because "all non-essential employees are working remotely due to the COVID-19 pandemic." Ebix's disparate accounting systems for its various businesses, including a separate accounting system for EbixCash in India, resulted in a "broken" accounting system, according to a confidential witness. This "perfect storm" of skyrocketing growth in the gift and prepaid card business and other factors listed above, coupled with the diminished ability of Ebix's staff to account for the burgeoning transactions in that business, created a material weakness in internal control over financial reporting during 3Q20 which was a material fact that should have been disclosed to investors. Contrary to Defendants' reassurance that "we modify and refine our internal processes and controls as conditions warrant," Defendants did not modify internal control at all or sufficiently to account for then existing conditions, nor did they disclose to investors that significant unusual transactions could not be properly accounted for with sufficient appropriate audit evidence. These material facts were concealed from investors, despite Defendants' admission that they were "continually monitoring the impact of COVID-19 on the operating effectiveness of our internal control over financial reporting" and their knowledge of rampant potential fraud, as stated in the 2020 10-K, that "[m]alicious third parties are using increasingly sophisticated methods to engage in illegal activities such as identity theft, fraud and paper instrument counterfeiting."

135.    As alleged herein, the 3Q20 10-Q contained certifications pursuant to SOX signed

by Defendants Raina and Hamil attesting to the accuracy of the financial statements, the effectiveness of internal control, and the disclosure of all fraud. In their SOX certifications, both Defendants Raina and Hamil attest to the fact that they "***designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles***" and then certified that internal control was effective. They further certified that the 3Q 10-Q "***does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading***" and that "***information contained in the Report fairly presents, in all material respects, the financial condition and results of operations***" of Ebix. These statements were materially false and misleading and omitted the material fact that there was a material weakness during 3Q20 in internal control over financial reporting in the gift card business in India at the time that Defendants signed their SOX Certifications for the reasons alleged above. Defendants failed to disclose what they knew or recklessly disregarded was a material unremedied internal control weakness—so serious that Ebix's auditor, RSM, resigned before completing the 2020 audit as a result of its inability to obtain sufficient appropriate audit evidence of significant unusual transactions in the gift card business in India, despite repeated requests for such evidence which Ebix failed to provide. These SOX certifications were false when made and omitted the material facts that Defendants Raina and Hamil knew or recklessly disregarded that 3Q20 internal control was not effective to detect fraud or explain significant unusual transactions, as confirmed when RSM publicly identified a material weakness and resigned because of its repeated requests for sufficient appropriate audit evidence.

65

136.    In addition, the SOX certifications falsely attested that Raina and Hamil had disclosed, "*based on our most recent evaluation of internal control over financial reporting*, to the registrant's auditors and the audit committee of the registrant's board of directors:

> *all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information.*" (Emphasis added).

137.    In stark contrast to what Raina and Hamil stated in their SOX certifications, they did not inform RSM of any material weakness in internal control on or before November 9, 2020. Rather, RSM had to make repeated requests for sufficient appropriate audit evidence which Ebix failed to provide, causing RSM to resign before completing the 2020 audit. RSM's February 15, 2021 resignation letter caused Ebix to disclose publicly for the first time, and which RSM reiterated subsequently in its February 22, 2021 letter what Defendants Raina and Hamil knew or recklessly disregarded at the time of their false statements on November 9, 2020 and during the Class Period—the existence of a material weakness in 3Q20 related to Ebix's failure to design controls "over the gift or prepaid card revenue transaction cycle sufficient to prevent or detect a material misstatement." This material weakness existed during 3Q20 and was known or recklessly disregarded by Defendants Raina and Hamil on November 9, 2020 and throughout the Class Period as a result of "continually" monitoring internal control in the context of the COVID-19 pandemic; skyrocketing 3Q20 growth in EbixCash occurring with a workforce of diminished capacity and at the same time that key competitors were losing money; an environment where Defendants knew that "[m]alicious third parties" were committing fraud in the digital arena; a "broken" accounting system; and an environment where Raina "tightly" controlled every aspect of EbixCash's financial performance because he was "betting the ranch" on EbixCash, according to CW3.

## VI.    CLASS ACTION ALLEGATIONS

138.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired Ebix securities between November 9, 2020 and February 19, 2021, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of Ebix and its subsidiaries and divisions, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

139.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Ebix's shares actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Millions of Ebix shares were traded publicly during the Class Period on the NASDAQ. Record owners and other members of the Class may be identified from records maintained by Ebix or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

140.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

141.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

142.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

        (a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

        (b)     whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Ebix; and

        (c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

143.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**VII.    UNDISCLOSED ADVERSE FACTS**

144.    The market for Ebix's securities was open, well-developed and efficient at all relevant times. As a result of these materially false and/or misleading statements, and/or failures to disclose, Ebix's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Ebix's securities relying upon the integrity of the market price of the Company's securities and market information relating to Ebix and have been damaged thereby.

145.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Ebix's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. The statements and omissions were materially false and/or

misleading because they failed to disclose material adverse information and/or misrepresented the truth about Ebix's internal control over financial reporting, as alleged herein.

146.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Ebix's internal control over financial reporting. These material misstatements and/or omissions caused Ebix's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements and omissions during the Class Period resulted in Plaintiff and other members of the Class purchasing Ebix's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## VIII.  LOSS CAUSATION

147.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

148.    During the Class Period, Plaintiff and the Class purchased Ebix's securities at artificially inflated prices and were damaged thereby. The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, thus causing investors' losses.

149.    As alleged herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Ebix's securities and operated as a fraud or deceit on purchasers of Ebix securities. When the truth about Defendants' misconduct was revealed, the value of Ebix's securities declined precipitously as the prior artificial inflation no

longer propped up the prices of such securities. The declines in the prices of Ebix shares were the direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market.

150.    The timing and magnitude of the share price declines negate any inference that the losses suffered by Plaintiff and members of the Class were caused by changed market conditions, macroeconomic or industry factors, or non-Company-specific facts unrelated to the Defendants' fraudulent conduct, as illustrated in the following chart comparing Ebix's stock price performance to relevant comparable indices:



151.    The economic loss, i.e., damages, suffered by Plaintiff and members of the Class, was a direct result of Defendants' fraudulent scheme to artificially inflate the prices of Ebix securities, as well as the subsequent significant decline in the value of the Ebix's securities when Defendants' prior misrepresentations and omissions were revealed.

152.    At all relevant times, Defendants' materially false and misleading statements and omissions alleged herein directly or proximately caused the damages suffered by Plaintiff and the members of the Class. Those statements were materially false and misleading through their failure to disclose a true and accurate picture of the Ebix's finances, accounting, and internal control over

financial reporting, as alleged herein. Before and during the time of Plaintiff's and Class members' purchases of Ebix's securities, Defendants issued materially false and misleading statements and omitted material facts necessary to make those statements not false or misleading, causing the prices of Ebix securities to be artificially inflated.

153.    Plaintiff and members of the Class purchased Ebix securities at artificially inflated prices, causing them to suffer damages, as complained of herein. Specifically, On February 19, 2021, when investors learned the truth about, *inter alia*, the material weakness of its internal control over financial reporting and RSM's resignation before completing the 2020 audit and disclosure of its reasons for resigning, as alleged herein, Ebix's shares immediately lost approximately 40% of their value, declining $20.24 per share in a single trading day, from a February 19, 2021 closing price of $50.74 to a February 22, 2021 closing price of $30.50 on atypically high volume.

## IX.    SCIENTER ALLEGATIONS

154.    As alleged herein, Defendants acted with scienter since Defendants knew or recklessly disregarded that the public documents issued or disseminated in the name of Ebix and the Individual Defendants were materially false and/or misleading and omitted material facts; knew that such documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such documents as primary violations of the federal securities laws. As alleged herein in detail, Defendants Raina and Hamil, by virtue of their receipt of information reflecting the true facts regarding Ebix, their control over, and/or receipt and/or modification of Ebix's allegedly materially misleading misstatements and/or their associations with Ebix which made them privy to material undisclosed facts concerning Ebix, participated in the fraudulent scheme alleged herein. Because the scienter of Ebix's corporate agents is imputed to Ebix, Raina's and Hamil's scienter, as alleged herein, is

imputed to Ebix.

155.    A cogent inference of scienter arises from the facts alleged herein about Defendant Raina, and there are no compelling or cogent inferences of non-fraudulent intent or plausible non-culpable explanations. Specifically, Raina knew or recklessly disregarded that his statements alleged herein about the sufficiency of internal control over financial reporting were materially false and misleading when he made the statements and omitted material facts throughout the Class Period because:

(a)    Raina was the CEO, Chairman of the Board, an owner of more than 14% of Ebix's outstanding stock, was described in Ebix public statements as the "single" and "visionary" leader of Ebix and "top operating decision-maker," was intimately familiar with EbixCash's operations in India where the significant unusual transactions in the gift card business were alleged to have occurred, communicated with the Audit Committee and RSM, and was informed about all material aspects of Ebix's business, particularly the EbixCash business, which was Ebix's primary revenue driver and a core business of Ebix. According to CW3, "everything was very tightly controlled" by Raina and he was "betting the ranch" on EbixCash. Because Raina's positions with Ebix gave him unique access and knowledge of EbixCash's business and internal control, he knew that his statements alleged herein about internal control over financial reporting were materially false and misleading and intended to deceive investors or he recklessly disregarded the substantial risk that his statements were false. His statements were reckless and an extreme departure from the standards of ordinary care to the extent that the danger that his statements were false was known to him or so obvious that he was aware of the falsity;

(b)    Raina admitted in the 3Q20 10-Q which he signed that he was personally responsible for internal control over financial reporting and was continually monitoring the impact of COVID-19 on the operating effectiveness of internal control and therefore, he knew or recklessly disregarded, as a result of his continual monitoring, that there was a material weakness related to Ebix's failure to design "controls over the gift or prepaid card revenue transaction cycle sufficient to prevent or detect a material misstatement." Raina knew that each of Ebix's acquired businesses, including EbixCash, operated under disparate accounting systems which were not coordinated for financial reporting or internal control, resulting in a "broken" accounting system which created a material weakness in internal control during 3Q20 in the gift card business in India;

(c)    Raina admitted in his SOX certification dated Nov. 9, 2020 that he designed the internal control over financial reporting or caused such internal control over

financial reporting to be designed under his supervision, thus giving him actual knowledge of the structure and likelihood of weakness in internal control under the then-existing circumstances during the 3Q20 of astronomical growth in EbixCash, while its competitors were losing money, and Ebix's focused marketing of the gift card and prepaid cards, coupled with the knowledge of "malicious third parties" intent on committing fraud in the digital arena. Therefore, he knew or recklessly disregarded the then- existing circumstances and red flags alleged herein which would result in a material weakness during 3Q20, including the astronomical growth in EbixCash at the same time that EbixCash's key competitors were losing money and Ebix's staff was devastated by the COVID-19 pandemic and Ebix's "broken" accounting system;

(d)     Raina knew or recklessly disregarded the 3Q20 material weakness in internal control over financial reporting as a result of his close and continuous contact with the Audit Committee of the Ebix Board in his roles as Chairman of the Board, CEO, top operating decision-maker and his intimate involvement in the financial management of Ebix. Raina and the Audit Committee would have been alerted to the findings of the interim audit which began in November 2020. Among other things, the Audit Committee oversees Ebix's accounting and financial reporting processes and assists the Board in fulfilling its oversight functions with respect to the internal control functions of Ebix with a goal to maintaining free and open communications between the Board, Ebix's independent public accountants who audit Ebix's financial statements and Ebix's financial management, including Defendants Raina and Hamil. The fact that RSM made repeated requests for sufficient appropriate audit evidence, which Ebix failed to provide, was a serious matter within the scope of the Audit Committee's oversight function and would have been raised with the Audit Committee and Defendants Raina and Hamil;

(e)     Raina knew or recklessly disregarded that the astronomical growth in the gift card business in the 3Q20 created a material weakness in the existing internal control over financial reporting at the time he made his false November 9, 2020 statement, the COVID-19 pandemic was ravaging India and Ebix's Indian staff. At the same time, Indians were motivated to use digital payment systems like gift or prepaid cards rather than in-person payment methods, thus causing skyrocketing growth in Ebix's gift and prepayment card business at the same time that EbixCash's key competitors were losing money and Ebix was trying to operate under a "broken" accounting system, according to CW3. As a result, EbixCash's staff's ability to monitor and properly account for the growth was materially diminished, at a time when "malicious third parties" were committing fraud in the digital arena. These were "red flags" of a material weakness in internal control which Raina knew or recklessly ignored or were so obvious that it was reckless to ignore them;

(f)     Raina had a financial incentive and motivation to misrepresent and omit material facts about Ebix's internal control and financial performance and was motivated to deceive investors because Raina was the sole beneficiary of a Bonus Plan which provides for the payment of annual cash incentive awards to him alone based upon

Ebix's achievement of specified performance goals. Participation in the Bonus Plan, which is limited solely to Raina, provides that Raina is eligible to receive cash incentives in a particular fiscal year during the term of the Bonus Plan if Ebix meets or exceeds certain performance goals set by the Compensation Committee;

(g)    Raina had a financial incentive and motivation to misrepresent and omit material facts about Ebix's internal control and financial performance and was motivated to deceive investors to protect the prospects for the lucrative planned IPO of EbixCash in the near future. Raina stood to benefit financially as a more than 14% shareholder of Ebix from the potential IPO, which was likely to be extremely lucrative for Ebix's shareholders and was repeatedly and exuberantly touted by Raina;

(h)    A cogent inference of Raina's scienter arises from the context of Ebix's history of accounting improprieties and misleading investors, as alleged herein. Accounting improprieties, a revolving door of auditors—sometimes fired by Raina when he disagreed with an auditor's "statement of revenues," according to CW3, and misleading statements to investors have occurred regularly, which are reflective of the culture tolerated by Raina at Ebix;

(i)    A cogent inference of Raina's scienter arises from the fact that K.G. Somani, an Indian auditing firm with far less expertise and experience in auditing major companies under U.S. GAAP than RSM, was hired only several weeks after RSM's resignation and delivered a clean audit opinion, with no mention of remediation of the material weakness in internal control identified by RSM. This occurred within only seven weeks after RSM's resignation, despite RSM's repeated inability to obtain sufficient appropriate audit evidence and public disclosure of a material weakness in internal control. Defendants were motivated to assure the quick turn-around of the audit, which was essential to regain NASDAQ delisting of Ebix and protect the lucrative planned IPO of EbixCash, in which Raina was likely to profit personally;

(j)    There is no compelling plausible inference which contradicts Raina's scienter in view of RSM having taken the drastic step of resigning before the completion of the audit. RSM's identification of a material weakness confirms what Raina knew or recklessly disregarded during the Class Period based on then-existing facts. RSM was repeatedly frustrated in its ability to obtain sufficient appropriate audit evidence, a topic within the scope of the responsibilities of the Audit Committee and Raina. In order to comply with its PCAOB obligations, RSM had no choice but to resign under the circumstances, thus giving strong credibility to its reasons for resignation. It is not plausible that RSM would resign from a lucrative retention if its reasons were not credible and supportable;

(k)    The existence of a 3Q20 material weakness in internal control was a straightforward conclusion and easily identified by Raina in view of the then-existing facts alleged herein which Raina knew or recklessly disregarded, including the facts that Raina

designed the internal control, or had it designed under his supervision, continually monitored it and thus was intimately aware of its strengths and weaknesses and how changing circumstances and red flags would affect internal control. CW2, who reported directly to Hamil, told Hamil that Ebix needed to have someone from the U.S. handling the testing of internal control, and that they needed to "look into the revenue process most definitely, because that's why they were having issues." CW3 confirmed CW2's observations by stating that Ebix's structure allowed different businesses and groups to function autonomously and there was no corporate structure, per se; Ebix's businesses in India did not operate on the same systems that were used at Ebix headquarters in Johns Creek, Georgia and there were differences in accounting between India and the US; and that the "Indian accounting people did things that did not make sense to the US accounting team," such as for example, allocating revenue across accounts in a manner that did not make sense and was not in line with the expectations of the US accounting representatives. These were glaring red flags alerting Raina, who "tightly" controlled all aspects of Ebix, to a material weakness in internal control in the gift card business in India.; and

(l)    Raina had a motive for concealing the material weakness in internal control because he knew that disclosure of that fact would cause the price of Ebix stock to fall, thus causing direct injury to himself as a more than 14% stockholder, and would require management to devote significant time and incur significant expense to remediate the weakness, which would be extremely challenging in the midst of a pandemic and with a "broken" accounting system. Because Raina was" betting the ranch" on EbixCash (according to CW3), he had a strong motive to protect his personal financial interest and reputation riding on the success of EbixCash and a forthcoming IPO.

156.    A strong, cogent inference of scienter arises from the facts alleged herein about Hamil, and there are no compelling or cogent inferences of non-fraudulent intent or plausible non-culpable explanations. Specifically, Hamil knew or recklessly disregarded that his statements about the sufficiency of internal control over financial reporting were materially false and misleading when he made the statements and omitted material facts throughout the Class Period because:

(a)    Hamil was CFO of Ebix and was intimately involved with the financial reporting and internal control in EbixCash, which is the main revenue driver of Ebix and its core business. Because Hamil's positions with Ebix gave him unique access and knowledge of EbixCash's business and internal control, he knew that his statements alleged herein about internal control over financial reporting were materially false and misleading and intended to deceive investors or he recklessly disregarded the

substantial risk that his statements were false. His statements were reckless and an extreme departure from the standards of ordinary care to the extent that the danger that his statements were false was known to him or so obvious that he was aware of the falsity;

(b)    Hamil admitted in the 3Q20 10-Q which he signed that he was continually monitoring the impact of COVID-19 on the operating effectiveness of internal control over financial reporting and therefore, he knew or recklessly disregarded as a result of his continual monitoring that there was a material weakness related to Ebix's failure to design controls "over the gift or prepaid card revenue transaction cycle sufficient to prevent or detect a material misstatement";

(c)    Hamil admitted in his SOX certification dated Nov. 9, 2020 that he designed the internal control over financial reporting or caused such internal control over financial reporting to be designed under his supervision, thus giving him actual knowledge of the structure and potential for weakness in internal control under the then-existing circumstances of astronomical growth in EbixCash and Ebix's focused marketing of the gift card and prepaid cards, coupled with the knowledge of "malicious third parties" intent on committing fraud in the digital arena. Therefore, he knew or recklessly disregarded the then-existing circumstances which would produce a material weakness, such as the astronomical growth in EbixCash at the same time that EbixCash's key competitors were losing money and EbixCash's staff was devastated by the COVID-19 pandemic and trying to operate with a "broken" accounting system;

(d)    Hamil knew or recklessly disregarded the material weakness in internal control over financial reporting as a result of his close and continuous contact with the Audit Committee of the Ebix Board in his role as CFO and the chief executive of Ebix's financial management. Hamil would have been alerted to the findings of the interim audit beginning in November 2020. Among other things, the Audit Committee oversees Ebix's accounting and financial reporting processes and assists the Board in fulfilling its oversight functions with respect to the internal control functions of Ebix with a goal to maintaining free and open communications between the Board, Ebix's independent public accountants who audit Ebix's financial statements and Ebix's financial management, including Defendants Raina and Hamil. The fact that RSM made repeated requests for sufficient appropriate audit evidence which Ebix failed to provide was a serious matter within the scope of the Audit Committee's oversight function and would have come before the Audit Committee and Defendants Raina and Hamil;

(e)    Hamil knew or recklessly disregarded that the astronomical growth in the gift card business in the 3Q20 created a 3Q20 material weakness in the existing internal control over financial reporting because the COVID-19 pandemic was ravaging India and Ebix's Indian staff. At the same time, Indians were motivated to use digital payment systems like gift or prepaid cards rather than in-person payment methods, thus causing skyrocketing growth in EbixCash's gift and prepayment card

business. Hamil was aware of the red flag that EbixCash was experiencing unprecedented growth at the same time that its key competitors were losing money. Ebix's staff to monitor and properly account for the growth was materially diminished because of its "broken" accounting system at a time when "malicious third parties" were committing fraud in the digital arena and targeting EbixCash. These were "red flags" of a 3Q20 material weakness in internal control which Hamil knew or recklessly ignored or were so obvious that it was reckless to ignore them;

(f)    There is no compelling plausible inference which contradicts Hamil's scienter in view of RSM having taken the drastic step of resigning before the completion of the audit. RSM's identification of a material weakness confirms what Hamil knew or recklessly disregarded during the Class Period based on then-existing facts. RSM was repeatedly frustrated in its ability to obtain sufficient appropriate audit evidence, a topic within the scope of the responsibilities of the Audit Committee and Hamil. In order to comply with its PCAOB obligations, RSM had no choice but to resign under the circumstances, thus giving credibility to its reasons for resignation. It is not plausible that RSM would resign from a lucrative retention if its reasons were not credible and supportable;

(g)    A cogent inference of Hamil's scienter arises from the fact that K.G. Somani, an Indian auditing firm with far less expertise and experience in auditing major companies under U.S. GAAP than RSM, was hired only several weeks after RSM's resignation and delivered a clean audit opinion, with no mention of remediation of the material weakness in internal control identified by RSM. This occurred within only seven weeks after RSM's resignation, despite RSM's repeated inability to obtain sufficient appropriate audit evidence and public disclosure of a material weakness in internal control. The quick turn-around of the audit was essential to regain NASDAQ delisting of Ebix and protect the lucrative planned IPO of EbixCash; and

(h)    The existence of a 3Q20 material weakness in internal control was a straightforward conclusion and easily identified by Hamil on or before November 9, 2020 in view of the then-existing facts alleged herein which Hamil knew or recklessly disregarded, including the facts that Hamil designed the internal control or had it designed under his supervision, continually monitored it and thus was intimately aware of its strengths and weaknesses and how changing circumstances would affect internal control. CW2, who reported directly to Hamil, told Hamil that Ebix needed to have someone from the U.S. handling the testing of internal control, and that they needed to "look into the revenue process most definitely, because that's why they were having issues." CW3 confirmed CW2's observations by stating that Ebix's structure allowed different businesses and groups to function autonomously and there was no corporate structure, per se; Ebix's businesses in India did not operate on the same systems that were used at Ebix headquarters in Johns Creek, Georgia and there were differences in accounting between India and the US; and that the "Indian accounting people did things that did not make sense to the US

accounting team," such as for example, allocating revenue across accounts in a manner that did not make sense and was not in line with the expectations of the US accounting representatives. These were glaring red flags alerting Hamil to a material weakness in internal control in the gift card business in India.

## X.    APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

157.    The market for Ebix's securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Ebix's securities traded at artificially inflated prices during the Class Period. On January 27, 2021, Ebix's share price closed at a Class Period high of $58.63 per share. Plaintiff and other members of the Class purchased or otherwise acquired Ebix's securities relying upon the integrity of the market price of Ebix's securities and market information relating to Ebix and have been damaged thereby.

158.    During the Class Period, the artificial inflation of Ebix's shares was caused by the material misrepresentations and/or omissions alleged herein, causing the damages sustained by Plaintiff and other members of the Class. As alleged herein, during the Class Period, Defendants made or caused to be made materially false and/or misleading statements and omissions about Ebix's internal control over financial reporting. These material misstatements and omissions created an unrealistically positive assessment of Ebix and its EbixCash business, thus causing the price of Ebix's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of Ebix's shares. Defendants' materially false and/or misleading statements and omissions during the Class Period resulted in Plaintiff and other members of the Class purchasing Ebix's securities at such artificially inflated prices, and each of them has been damaged as a result.

159.    At all relevant times, the market for Ebix's securities was an efficient market for the following reasons, among others:

(a)    Ebix shares met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)    As a regulated issuer, Ebix filed periodic public reports with the SEC and/or the NASDAQ;

(c)    Ebix regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services, investor conference calls, and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    Ebix was followed by securities analysts employed by brokerage firms who wrote reports about Ebix, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace. The analysts who regularly followed Ebix and published reports regarding Ebix included:

- BMO Capital Markets;

- Craig-Hallum Capital Group, LLC;

- Marketfield;

- CapitalCube;

- Singular Research;

- Sadif Analytics Prime;

- Vermilion Technical Research;

- BuySellSignals Research;

- Minkabu the Infonoid, Inc.;

- Wright Investors' Service, Inc.;

- Litchfield Hills Research, LLC;

- Thomson Reuters;

- MarketLine;

- Validea;

- New Constructs, LLC; and

- CFRA Research.

160.    As a result of the foregoing, the market for Ebix's securities promptly digested current information regarding Ebix from all publicly available sources and reflected such information in Ebix's share price. Under these circumstances, all purchasers of Ebix's securities during the Class Period suffered similar injury through their purchase of Ebix's securities at artificially inflated prices and a presumption of reliance applies.

161.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding Ebix's internal control over financial reporting—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here. Internal control over financial reporting is a material fact that is required to be disclosed in SOX certifications and other SEC filings.

XI.    <u>**NO SAFE HARBOR**</u>

162.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements alleged herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading and omitted material facts.

**<u>FIRST CLAIM</u>**

**Violation of Section 10(b) of The Exchange Act and Rule 10b-5**
**<u>Promulgated Thereunder Against All Defendants</u>**

163.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

164.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Ebix's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

81

165.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Ebix's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein and/or as controlling persons as alleged below.

166.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Ebix's internal control and financial condition, as alleged herein.

167.    Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Ebix's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Ebix and its internal control over financial reporting in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Ebix's securities during the Class Period.

168.    As alleged in detail herein, each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors of Ebix during the Class Period and members of Ebix's

management team or had control thereof; (ii) each of these Defendants, by virtue of their responsibilities and activities as senior executives and/or director of Ebix, was privy to and participated in the creation, development, monitoring and reporting of Ebix's internal control over financial reporting; (iii) each Defendant enjoyed significant personal contact and familiarity with the other Defendant and was advised of, and had access to, other members of Ebix's management team, internal reports and other data and information about Ebix's finances, operations, and internal control at all relevant times; and (iv) each of the Defendants was aware of Ebix's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading and omitted material facts when the dissemination was made.

169.    Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Ebix's financial condition from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' false statements and omissions about internal control over financial reporting throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading or ignoring facts which were obvious to them.

170.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as alleged herein, the market price of Ebix's

securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of Ebix's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which Ebix's securities trade, Plaintiff and the other members of the Class acquired Ebix's securities during the Class Period at artificially high prices and were damaged thereby.

171.    At the time of said the alleged misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the Ebix's internal control over financial reporting, which was not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Ebix securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

172.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

173.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of Ebix's securities during the Class Period.

## SECOND CLAIM

### Violation of Section 20(a) of The Exchange Act
### Against The Individual Defendants

174.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

175.    The Individual Defendants acted as controlling persons of Ebix within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and

their ownership, participation in, and/or awareness of Ebix's operations and intimate knowledge of the statements which they made and were filed by Ebix with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of Ebix, including the content and dissemination of the statements which Plaintiff contends are false and misleading and omitted material facts. The Individual Defendants were provided with or had unlimited access to copies of Ebix's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

176.    In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of Ebix and, therefore, had the power to control or influence the particular statements and omissions giving rise to the securities violations alleged herein, and exercised the same.

177.    As alleged herein, Ebix and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure and certifying Plaintiff as the Class representative and Plaintiff's counsel as Class Counsel;

(b)    Awarding compensatory damages in favor of Plaintiff and the other Class members

against all Defendants, jointly and severally, for all damages sustained as a result of Defendants'

wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in

this action, including counsel fees, expenses and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: October 15, 2021                    Respectfully submitted,

/s/ Regina Calcaterra
Regina Calcaterra
CALCATERRA POLLACK LLP
1140 Avenue of the Americas, 9th Floor
New York, NY 10036-5803
Tel: (212) 899-1765
Email: rcalcaterra@calcaterrapollack.com

Sherrie R. Savett
Michael Dell'Angelo*
Barbara A. Podell*
Andrew Abramowitz
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3000
Email: ssavett@bm.net
            mdellangelo@bm.net
            bpodell@bm.net
            aabramowitz@bm.net

*Admitted *Pro Hac Vice*

**Attorneys for Lead Plaintiff Rahul Saraf
and Lead Counsel for the Class**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 15, 2021, a true and correct copy of the foregoing

document was served by CM/ECF to the parties registered to the Court's CM/ECF system.


_/s/ Regina Calcaterra_
Regina Calcaterra