UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
                                                                  :
RAHUL SARAF, *individually and on behalf of all other*            :
*similarly situated*,                                             :
                                                                  :
                                    Plaintiff,                    :         21-CV-1589 (JMF)
                                                                  :
              -v-                                                 :         OPINION AND ORDER
                                                                  :
EBIX, INC. et al.,                                                :
                                                                  :
                                    Defendants.                   :
                                                                  :
------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

       In this putative class action, Lead Plaintiff Rahul Saraf brings securities fraud claims

against Ebix, Inc. ("Ebix" or the "Company"), and two Ebix executives, Robin Raina and Steven

Hamil (the "Individual Defendants"). The operative Second Amended Complaint alleges that,

between November 9, 2020, and February 19, 2021, Defendants made material misstatements

regarding Ebix's internal control over its financial reporting, in violation of Sections 10(b) and

20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a);

and Securities and Exchange Commission ("SEC") Rule 10b-5 ("Rule 10b-5"), 17 C.F.R.

§ 240.10b-5. Defendants now move, pursuant to Rule 12(b)(6) of the Federal Rules of Civil

Procedure, to dismiss the Second Amended Complaint. For the reasons that follow, Defendants'

motion is GRANTED, and the Second Amended Complaint is dismissed.

## BACKGROUND

       The following facts, which are taken from the Second Amended Complaint, documents it

incorporates, and matters of which the Court may take judicial notice, are construed in the light

most favorable to Plaintiff. *See, e.g.*, *Kleinman v. Elan Corp., PLC*, 706 F.3d 145, 152 (2d Cir.

2013); *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (stating that a court may consider "legally required public disclosure documents filed with the SEC").

Ebix is a Delaware corporation headquartered in Georgia; its common stock trades on the NASDAQ exchange.  ECF No. 62 ("SAC"), ¶ 29.  Ebix provides "software and e-commerce services" to a variety of industries worldwide.  *Id.* ¶ 38.  Raina is Ebix's Chief Executive Officer and Chairman of the Board.  *Id.* ¶¶ 30, 32.  Hamil was, during the class period, Ebix's Chief Financial Officer.  *Id.* ¶ 36.

In 2017, Ebix acquired an 80% stake in ItzCash, an Indian digital payment company subsequently renamed EbixCash.  *Id.* ¶ 40.  In its press release announcing the acquisition, Ebix noted that ItzCash was "India's leading payment solutions Exchange" and emphasized that ItzCash was "the only profitable payment solutions provider out of all its peers."  *Id.*  According to the Second Amended Complaint, EbixCash's portfolio includes "domestic and international money remittance, foreign exchange (Forex), travel, prepaid and gift cards, utility payments, software solutions for lending and wealth management in India and other markets."  *Id.* ¶ 41.  EbixCash's revenues are derived "primarily . . . from the sales of prepaid gift cards and consideration paid by customers for financial transaction services, including services like transferring or exchanging money."  *Id.* ¶ 42.

On November 9, 2020, the first day of the class period, Raina informed investors during Ebix's third quarter 2020 earnings call that "EbixCash revenues grew 268% in [the] third quarter of 2020 versus the third quarter of 2019," and grew 82% compared to the second quarter of 2020.  *Id.* ¶¶ 39, 46; *see id.* ¶ 3.  He advised investors that EbixCash was outperforming its "key competitors," which "delivered much less top line growth than EbixCash."  *Id.* ¶ 46.  In its Form 10-Q for the third quarter of 2020, Ebix further noted that the "$98 million increase in payment

solutions revenue, primarily in India[,] . . . reflects the strong demand for prepaid cards and other electronic payment solutions since the COVID-19 pandemic arose." *Id.* ¶¶ 39, 45; *see* ECF No. 66-1 ("10-Q"), at 37.[1]  The Company elaborated on the reasons for the growth of EbixCash in its 2020 Form 10-K, filed in April 2021, stating that "[t]he increased demand for prepaid gift cards in India was primarily due to: (i) changes in regulations . . .; (ii) COVID-19, which has facilitated increased online and electronic commerce . . .; and (iii) the Company's increased marketing efforts around the prepaid gift card business."  SAC ¶ 48; *see also id.* ¶ 49. Throughout this period, the Individual Defendants planed an IPO for EbixCash.  *Id.* ¶¶ 46, 50-55. According to a confidential witness, Ebix was "betting the ranch on EbixCash."  *Id.* ¶¶ 5, 79, 137.

The statements at the heart of Saraf's claims are certifications in Ebix's Form 10-Q for the third quarter of 2020.  Specifically, Ebix represented:

> We monitor and evaluate on an ongoing basis our disclosure controls and procedures in order to improve their overall effectiveness.  In the course of these evaluations, we modify and refine our internal processes and controls as conditions warrant.
>
> Our management, including our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our "disclosure controls and procedures". . . as of September 30, 2020.  Based on this evaluation the Company's Chief Executive Officer and Chief Financial Officer have concluded that these disclosure controls and procedures are effective.  There were no changes in our internal control over financial reporting during the quarter ended September 30, 2020 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

10-Q, at 48; *see* SAC ¶¶ 4, 7, 16, 133.  Additionally, Raina and Hamil attested in their Sarbanes-Oxley ("SOX") certifications that, based on their knowledge, the Form 10-Q "d[id] not contain

---

[1]     Citations to page numbers in ECF Nos. 66-1 ("10-Q"), 66-2 ("8-K"), and 66-4 ("10-K"), are to the page numbers automatically generated by the Court's Electronic Case Filing system.

any untrue statement of a material fact."  10-Q, at 53-54.  Further, they both confirmed that they were responsible for designing the Company's internal control procedures, designed such procedures "to provide reasonable assurance regarding the reliability of financial reporting," evaluated the internal control procedures, and disclosed to the Company's auditors "all significant deficiencies and material weaknesses in the design or operation of" the internal control procedures.  *Id.*; *see* SAC ¶¶ 8, 17, 135-36.

In November 2020, Ebix's external auditor, RSM US LLP ("RSM"), began an audit of the Company's 2020 financials.  SAC ¶¶ 5, 71; *see also* ECF No. 66-2 ("8-K"), at 3.  On February 15, 2021, however, RSM resigned without having completed the audit.  SAC ¶ 14; *see* 8-K, at 2-3.  RSM informed the Company that it was resigning due to its inability, "despite repeated inquiries, to obtain sufficient appropriate audit evidence that would allow it to evaluate the business purpose of significant unusual transactions that occurred in the fourth quarter of 2020."  8-K, at 3; *see* SAC ¶ 15.  Moreover, RSM informed Ebix in writing that the Company's "internal control over financial reporting was not effective as of December 31, 2020 due to the identification of a material weakness."  8-K, at 3; *see* SAC ¶ 15.  The weakness, according to RSM, was Ebix's failure to "design or implement the necessary procedures and controls over the gift or prepaid card revenue transaction cycle sufficient to prevent or detect a material misstatement."  8-K, at 3; *see* SAC ¶ 15.  Following disclosure of RSM's resignation, Ebix's stock price fell approximately 40%.  SAC ¶ 19.

After RSM resigned, Ebix hired a new auditor — K.G. Somani & Co. ("KGS").  *Id.* ¶ 112; ECF. No. 66-4 ("10-K"),[2] at 5.  Ebix authorized RSM to respond to any inquiries from KGS.  8-K, at 3.  On April 27, 2021, KGS issued a "clean, unqualified audit opinion" and did not

---

[2]     ECF No. 66-4 is an excerpt of Ebix's 10-K.

identify any material weaknesses in the Company's internal control.  SAC ¶ 112; *see also* 10-K, at 7-8.  Ebix also engaged outside an outside law firm and consulting firm to look into the issues raised by RSM's resignation.  10-K, at 5.  Based on their review, Ebix determined that "no steps [were] necessary with respect to any gift card business issues raised by [RSM]."  *Id.*

## LEGAL STANDARDS

In reviewing a motion to dismiss pursuant to Rule 12(b)(6), a court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff.  *See Giunta v. Dingman*, 893 F.3d 73, 79 (2d Cir. 2018).  A court will not dismiss any claims unless the plaintiff has failed to plead sufficient facts to state a claim to relief that is facially plausible, *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), that is, one that contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  More specifically, the plaintiff must allege facts showing "more than a sheer possibility that a defendant has acted unlawfully."  *Id.*  A complaint that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555.  Further, if the plaintiff "ha[s] not nudged their claims across the line from conceivable to plausible, [those claims] must be dismissed."  *Id.* at 570.

Because Saraf alleges securities fraud, he must also satisfy the heightened pleading requirements of both Rule 9(b), which requires that the circumstances constituting fraud be "state[d] with particularity," Fed. R. Civ. P. 9(b), and the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b)(2), which requires that scienter — that is, a defendant's "intention to deceive, manipulate, or defraud" — also be pleaded with particularity, *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 313 (2007) (internal quotation marks omitted).  To

satisfy Rule 9(b), a plaintiff generally "must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 108 (2d Cir. 2012) (quoting *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004)).  To satisfy the PSLRA, a complaint must, "with respect to each act or omission alleged to [constitute securities fraud], state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *United States ex rel. Chorches v. Am. Med. Response, Inc.*, 865 F.3d 71, 88 n.14 (2d Cir. 2017) (quoting 15 U.S.C. § 78u-4(b)(2)); *see In re Lions Gate Ent. Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 22 (S.D.N.Y. 2016) (noting that a plaintiff "must allege facts supporting a strong inference with respect to each defendant").  The "strong inference" must be "more than merely plausible or reasonable." *Tellabs*, 551 U.S. at 314.  The necessary inquiry is "inherently comparative." *Id.* at 323.  That is, the Court "must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Id.* at 324.  Thus, a complaint alleging securities fraud will survive "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.*

In this Circuit, a plaintiff may satisfy the scienter pleading requirement in either of two ways: "by alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI Commc'ns*, 493 F.3d at 99.  The former requires a plaintiff to allege that the defendant "benefitted in some concrete and personal way from the purported fraud." *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.,* 553 F.3d 187, 198 (2d Cir. 2009) (quoting *Novak v. Kasaks*, 216 F.3d 300, 307-08 (2d Cir. 2000)).  The latter requires

allegations of either actual intent or "conscious recklessness — *i.e.*, a state of mind approximating actual intent, and not merely a heightened form of negligence." *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 106 (2d Cir. 2015). More specifically, a plaintiff must allege conduct by a defendant that is, "at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001) (internal quotation marks omitted). As a general matter, courts have approved of claims when plaintiffs "have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements. Under such circumstances, defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation." *Novak*, 216 F.3d at 308.

## DISCUSSION

Applying the foregoing standards, the Court concludes that Saraf's claims must be and are dismissed for failure to adequately allege that any Defendant acted with the requisite state of mind. *See Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37 (2011) (noting that scienter is an element of a Section 10(b) and Rule 10b-5 claim); *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996) (noting that, to state a control-person claim under Section 20(a), a plaintiff must, at a minimum, plead a plausible "primary violation" of Section 10(b)).[3]

For starters, Saraf's "motive and opportunity" arguments — which he makes only as to Raina, *see* SAC ¶ 155; ECF No. 68 ("Pl.'s Opp'n"), at 24-25 — are easily rejected. Saraf does not allege that Raina sold shares during the class period. *See, e.g.*, *Rombach*, 355 F.3d at 177

---

[3]     Defendants argue that Saraf's claims fail for the additional reason that he does not plausibly allege any false or misleading statements. *See* ECF No. 65 ("Defs.' Mem."), at 2, 7-9, 11-15. In light of the Court's conclusion as to scienter, it need not and does not reach the issue.

(finding "no personal interest sufficient to establish motive" where the "[p]laintiffs [did] not allege that defendants sold stock or profited in any way during the relevant period"). Instead, he suggests that Raina, "as a more than 14% stockholder" of Ebix who would "profit handsomely" from an IPO of EbixCash, was motivated to avoid disclosing facts that would cause Ebix's stock price to fall, including any material weaknesses in the Company's internal control. SAC ¶ 155(l); Pl.'s Opp'n 9, 24-25. But that motivation is "possessed by virtually all corporate insiders" and, thus, does not qualify as a "motive" for purposes of the scienter analysis. *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009) (quoting *Novak*, 216 F.3d at 308); *accord Woolgar v. Kingstone Cos., Inc.*, 477 F. Supp. 3d 193, 233-34 (S.D.N.Y. 2020); *Janbay v. Canadian Solar, Inc.*, No. 10-CV-4430 (RWS), 2012 WL 1080306, at *10 (S.D.N.Y. Mar. 30, 2012). Put simply, Saraf fails to allege that any Defendant received a "concrete and personal" benefit from the alleged scheme. *ECA*, 553 F.3d at 198. Accordingly, his motive and opportunity arguments fail.

Saraf's "conscious misbehavior or recklessness" arguments require more discussion, but they too ultimately fall short. Notably, absent evidence of motive, "the strength of" a plaintiff's "circumstantial allegations [of scienter] must be correspondingly greater." *Kalnit*, 264 F.3d at 142 (internal quotation marks omitted). Specifically, to plead "conscious misbehavior," a plaintiff must plausibly allege a defendant's actual knowledge. *See Novak*, 216 F.3d at 308. To plead recklessness, a plaintiff must set forth particularized factual allegations demonstrating that each defendant acted with "a state of mind approximating actual intent, and not merely a heightened form of negligence." *Id.* at 312 (internal quotation marks omitted). In this case, Saraf attempts to meet these standards in two ways: first, by showing that Raina and Hamil knew the Form 10-Q statements regarding Ebix's internal control were false at the time they were

made; and second, by showing that Raina and Hamil recklessly disregarded red flags regarding the Company's insufficient internal control.  Pl.'s Opp'n 20-24.  Neither attempt passes muster.

In support of his argument that Raina and Hamil knew the Form 10-Q statements were false, Saraf essentially relies on the "core operations" doctrine, which "permits an inference that a company and its senior executives have knowledge of information concerning the 'core operations' of a business, which include matters critical to the long term viability of the company and events affecting a significant source of income."  *Hensley v. IEC Elecs. Corp.*, No. 13-CV-4507 (JMF), 2014 WL 4473373, at *5 (S.D.N.Y. Sept. 11, 2014) (internal quotation marks omitted); *see* Pl.'s Opp'n 21-22.  In particular, Saraf alleges that, because of their senior positions within Ebix, both Raina and Hamil were familiar with the operations of EbixCash and in "close and continuous contact with the Audit Committee."  SAC ¶¶ 155-56.  Moreover, they both certified that they were responsible for the design of the Company's internal control procedures, that they regularly evaluated their internal control procedures, and that the Company was "continually monitoring the impact of COVID-19 on the operating effectiveness of [its] internal control."  10-Q, at 48; *see* SAC ¶ 7.  Finally, Saraf makes a variety of conclusory allegations based on three confidential witnesses: that Raina "tightly controlled" every aspect of Ebix's business, that there were differences in how the India and U.S. accounting teams operated, that the India team seemed to lack internal control over financial reporting, and that Ebix overall had a "broken accounting system."  SAC ¶¶ 73-74, 76, 78-79.[4]

---

[4]      Saraf alleges other statements by the confidential witnesses that have no bearing on the Individual Defendants' scienter.  For example, one stated that Raina was "unethical" and "mixed his own personal interests in India with the company's," SAC ¶ 68 (cleaned up), but provided no specific facts to support these assertions or to tie them to the alleged misstatements.  Another stated that Hamil "was devastated" by RSM's resignation, *id.* ¶ 72, but does not explain why Hamil was devasted or provide other context that ties it to the alleged misstatements.

As an initial matter, "it is far from clear that the core operations doctrine remains valid in light of the PSLRA." *Marcu v. Cheetah Mobile Inc.*, No. 18-CV-11184 (JMF), 2020 WL 4016645, at *8 (S.D.N.Y. July 16, 2020); *see, e.g., Plumbers & Pipefitters Loc. Union No. 630 Pension-Annuity Tr. Fund v. Arbitron Inc.*, 741 F. Supp. 2d 474, 490 (S.D.N.Y. 2010) ("Whether a plaintiff may rely on the core operations doctrine in light of the PSLRA has not been decided by the Court of Appeals for the Second Circuit.  Those Courts of Appeals that have addressed the question have found that it is no longer viable in most situations." (citation omitted)).  In any event, the doctrine "typically applies only where the operation in question constitutes nearly all of a company's business." *Woolgar*, 477 F. Supp. 3d at 239 (cleaned up).  And here, Saraf does not allege that EbixCash constituted "nearly all" of Ebix's business.  *Cf.* SAC ¶ 2 (noting that approximately 91% of the Company's revenue was from EbixCash *and* Insurance Exchanges, without specifying how much came from each operation).  Moreover, core-operations allegations are "supplementary"; that is, they are not "independently sufficient means to plead scienter." *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 353 (S.D.N.Y. 2011).  And here, Saraf does not allege other supporting facts sufficient to establish scienter.  *See In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 407 (S.D.N.Y. 2016) ("Scienter . . . cannot be inferred solely from the fact that, due to the defendants' board membership or executive managerial position, they had access to . . . any adverse information." (internal quotation marks omitted)).

Indeed, Saraf makes no non-conclusory showing that Raina or Hamil had access to "*specific* contradictory information . . . *at the same time*" that they signed the Form 10-Q.  *Das v. Rio Tinto PLC*, 332 F. Supp. 3d 786, 813 (S.D.N.Y. 2018) (internal quotation marks omitted).  The Second Amended Complaint contains no non-conclusory allegations that RSM informed the Individual Defendants prior to its resignation in February 2021, let alone in or before November

2020, that it had identified a material weakness in Ebix's internal control.  *See* SAC ¶¶ 93-95, 97,

102.  Nor does Saraf allege that any of the confidential witnesses brought their concerns about

Ebix's accounting to either Raina or Hamil before they issued the Form 10-Q.  SAC ¶¶ 73, 77;

*cf. Dobina v. Weatherford Int'l Ltd.*, 909 F. Supp. 2d 228, 246-48 (S.D.N.Y. 2012) (finding that

the plaintiff plausibly pleaded scienter in part because a confidential witness who was an audit

executive had informed the individual defendants about the deficiencies in internal control prior

to the defendants attesting to their effectiveness).[5]  And, without any showing that Raina or

Hamil had access to information suggesting material weaknesses in Ebix's internal control, the

fact that they were "continually monitoring" the effects of COVID-19 on their internal controls

does not suggest that they were aware of facts contradicting their Form 10-Q statements.  Put

simply, Saraf fails to allege that Raina or Hamil knew that the Form 10-Q statements were false

or otherwise misleading.  *See Rombach*, 355 F.3d at 176.

Nor, absent evidence of contemporaneous knowledge of falsity, do Raina's and Hamil's

SOX certifications support a finding of scienter.  *See* Pl.'s Opp'n 20-21.  Courts in this District

have uniformly held that SOX certifications will not support an inference of scienter where, as

here, a plaintiff does not allege that the defendants had contemporaneous awareness of falsity.

*See, e.g.*, *Lefkowitz v. Synacor, Inc.*, No. 18-CV-2979 (LGS), 2019 WL 4053956, at *10

---

[5]     Saraf's reliance on confidential witnesses is misplaced for other reasons as well.  First, Saraf does not allege that two of the confidential witnesses (CW1 and CW2) had access to information that could have demonstrated the falsity of the Form 10-Q statements.  *See In re Am. Express Co. Sec. Litig.*, No. 02-CV-5533 (WHP), 2008 WL 4501928, at *7 (S.D.N.Y. Sept. 26, 2008) (citing *Novak*, 216 F.3d at 314).  CW1 was a "Technical Accounts Manager" in Utah until December 2018, well before the start of the class period.  SAC ¶ 68.  CW2 was a Financial Controller, but he lacked "visibility into Ebix's operations or finances in India."  *Id.* ¶¶ 69, 73.  Moreover, none of the confidential witnesses describe specific weaknesses with Ebix's internal control, their statements are entirely undated or ascribed to a general timeframe, and none report speaking with the Individual Defendants prior to the relevant Form 10-Q.  *Id.* ¶¶ 68-80; *see In re Wachovia Equity Sec. Litig.*, 753 F. Supp 2d. 326, 352 (S.D.N.Y. 2011).

(S.D.N.Y. Aug. 28, 2019) (holding that allegations that the defendants knew their company lacked relevant personnel did not support an inference that they knew their SOX certifications regarding the effectiveness of their internal control were false), *aff'd sub nom. Shreiber v. Synacor, Inc.*, 832 F. App'x 54 (2d Cir. 2020) (summary order); *Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*, 89 F. Supp. 3d 602, 615 (S.D.N.Y. 2015) ("The plaintiff cannot raise an inference of fraudulent intent based on the signing of a certification without alleging any facts to show a concomitant awareness of or recklessness to the materially misleading nature of the statements."); *cf. In re Eletrobras Sec. Litig.*, 245 F. Supp. 3d 450, 468 (S.D.N.Y. 2017) (inferring scienter where, at the time the individual defendants signed SOX certifications attesting to the validity of financial reports, internal audits identified material weaknesses in internal controls).  In the final analysis, Saraf fails to point to any document, report, or oral statement showing that the Individual Defendants knew at the time that their statements regarding the effectiveness of Ebix's internal control were false or misleading.  Accordingly, Saraf does not adequately plead scienter on that basis.

Saraf's other effort to establish conscious misbehavior or recklessness — on the ground that Defendants recklessly disregarded red flags regarding the Company's insufficient internal control — fares no better.  In support of that effort, Saraf points to various changes in the EbixCash business during 2020.  For example, EbixCash experienced "astronomical growth" due to COVID-19, changes in Indian regulations, and increased marketing efforts; EbixCash outperformed key competitors in India; and the pandemic allegedly "ravaged" Ebix's workforce, so people were working remotely, creating disruptions to the business.  SAC ¶ 5.  The expansion of the EbixCash business occurred, Saraf contends, without a corresponding strengthening of the

Company's internal control.  SAC ¶¶ 6, 18.  And, he continues, Raina and Hamil turned a blind eye to these dynamics and developments.  *Id.* ¶ 18, 134.[6]

Even taken together, however, these supposed red flags do not show that Raina or Hamil acted recklessly — that is, that any danger to Ebix's internal control was "so obvious that [they] must have been aware of it."  *Kalnit*, 264 F.3d at 142 (internal quotation marks omitted).  First, Saraf's conclusory assertion that COVID-19 "ravaged" Ebix's workforce in India, without any details about what percentage of its employees were affected, does not amount to a red flag suggesting a material weakness in the internal control over financial reporting.  In that regard, *In re Veeco Instruments, Inc. Sec. Litig.*, 235 F.R.D. 220 (S.D.N.Y. 2006), upon which Saraf relies, Pl.'s Opp'n 17, is easily distinguished.  There, the court determined that the defendant's reduction of its internal accounting staff by 75% "constitute[d] strong circumstantial evidence of recklessness" because the defendants were ignoring obvious red flags regarding the lack of adequate internal controls.  *See* 235 F.R.D. at 232.  Here, by contrast, Saraf makes no allegations at all about a reduction in the size of the EbixCash accounting team.  The fact that COVID-19 affected Ebix's workforce generally is not enough of a red flag regarding EbixCash's lack of sufficient internal accounting controls.

In addition, Saraf's allegations regarding Ebix's growth do not support an inference of scienter that is at least as cogent as a non-fraudulent inference — namely, that EbixCash grew quickly during COVID-19 and that, as of November 2020, Raina and Hamil had not identified a material weakness in their internal control.  Indeed, the fact that EbixCash outperformed its

---

[6]     Saraf also points to Ebix's statements in its Form 10-K, issued in April 2021, that the gift card business was experiencing "new types of consumer fraud."  SAC ¶ 21.  But Saraf makes no allegation that Raina or Hamil were aware of such fraud when they issued the challenged Form 10-Q statements in November 2020.

competitors may have been perfectly reasonable given that, as the Second Amended Complaint notes, it was "the only profitable payment solutions provider out of all its peers" when Ebix purchased it.  SAC ¶ 40.  Saraf does not point to any specific facts suggesting that the Company's accounting staff was unprepared to handle EbixCash's growth.  Moreover, because Saraf does not describe with particularity the nature of the alleged material weakness, citing only RSM's determination that Ebix had failed "to design controls over the gift or prepaid card revenue transaction cycle sufficient to prevent or detect a material misstatement," SAC ¶ 4, he is unable to tie the purported red flags to any alleged misstatement.

More broadly, Saraf does not describe the types of red flags that could support an inference of recklessness.  *See, e.g.*, *In re Oxford Health Plans, Inc. Sec. Litig.*, 51 F. Supp. 2d 290, 295 (S.D.N.Y. 1999) (finding recklessness where the defendants disregarded red flags regarding the lack of internal controls, including a failure of the company's accounting system to track basic financial information and the fact that government investigators fined the company for their deficient accounting practices).  As such, Saraf fails to show that Raina or Hamil "should have known that they were misrepresenting" the strength of the company's internal control in their SOX certifications.  *See Novak*, 216 F.3d at 308.  Contrary to Saraf's argument, Pl.'s Opp'n 20-21, the mere fact that Raina and Hamil designed and implemented the internal control procedures, without corresponding evidence that they knew or should have known about weaknesses in the controls, does not support an inference of recklessness.  *Cf. Dobina*, 909 F. Supp. 2d at 246 (noting that the "personal participation" of the individual defendants in "designing and evaluating the internal controls is relevant to the inquiry" of recklessness where there were other facts showing that the internal controls were insufficient).

Saraf attempts to bolster his scienter argument by citing to previous instances in which Ebix was accused of misconduct, including undisclosed tax investigations, accounting irregularities, and misleading statements about the status of the Company's contracts.  SAC ¶¶ 58-65.  But Saraf "does not explain how any of these actions or offenses are tied" to the allegedly misleading Form 10-Q statements.  *Plumbers & Pipefitters Nat'l Pension Fund*, 89 F. Supp. 3d at 611.  Nor does he allege that Ebix has either admitted to weakness in its internal controls or restated its 2020 financials.  *See In re SunEdison, Inc. Sec. Litig.*, 300 F. Supp. 3d 444, 468, 493 (S.D.N.Y. 2018) (holding that the plaintiffs did not allege recklessness where they described a "failure to integrate different accounting platforms," causing "inefficient and cumbersome controls," but did not show knowledge that such inefficiencies resulted in inaccurate financial reporting); *cf. Dobina*, 909 F. Supp. 2d at 246 (finding scienter based on recklessness where the company executives admitted to inadequate staffing and insufficient review processes only four months after certifying that the company had sufficient internal controls).  Thus, Saraf's allegations about other actions or wrongs do not support an inference that the Individual Defendants knew about or recklessly disregarded material weaknesses in internal control.

Finally, Saraf points to the resignation of RSM to support his scienter arguments.  *See* Pl.'s Opp'n 22-24.  But RSM's resignation in February 2021 says nothing about the knowledge (or lack thereof) of Raina and Hamil three months earlier, in November 2020.  That is, there is no evidence or allegation that RSM advised Defendants of weaknesses in Ebix's internal control in or before November 2020.  To the contrary: RSM's audit *began*, at the earliest, in November 2020.  SAC ¶ 71.  For these reasons, the cases cited by Saraf are inapposite.  In addition to the resignation of an independent auditor, each of these cases also included well-pleaded facts

showing that the defendant company was aware of weak internal controls over their financial reporting. *See, e.g.*, *In re Top Tankers, Inc. Sec. Litig.*, 528 F. Supp. 2d 408, 415-16 (S.D.N.Y. 2007) (finding a plausible inference of scienter where the company agreed to restate its financials, but the auditor still resigned because of disputes over the company's accounting practices, suggesting that the auditor told the individual defendants that they were not following proper accounting procedures); *In re Akorn, Inc. Sec. Litig.*, 240 F. Supp. 3d 802, 819 (N.D. Ill. 2017) (finding sufficient allegations of recklessness where the company had fired two independent audit firms that identified "deficiencies" in the company's internal controls instead of "remediating the weaknesses").  In short, RSM's resignation alone does not support an inference of scienter.

In sum, Saraf does not adequately plead scienter with respect to either Raina or Hamil.  It follows that no scienter can be "imputed to Ebix."  SAC ¶ 154; *see, e.g.*, *City of N. Miami Beach Police Officers' & Firefighters' Ret. Plan v. Nat'l Gen. Holdings Corp.*, No. 19-CV-10825 (JPO), 2021 WL 212337, at *11 (S.D.N.Y. Jan. 21, 2021) (holding that the plaintiffs failed to plead corporate scienter "because they have not proven that anyone 'whose intent could be imputed to the corporation acted with the requisite scienter'" (quoting *Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*, 531 F.3d 190, 195 (2d Cir. 2008))).  Accordingly, Saraf's claims all fail as a matter of law.  *See, e.g.*, *Stratte-McClure*, 776 F.3d at 108 (dismissing Section 10(b) and Rule 10b-5 claims for failure to adequately plead scienter); *Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 356 (2d Cir. 2022) (dismissing a Section 20(a) claim for failure to plead a "primary violation" of Section 10(b)).

## CONCLUSION

For the reasons stated above, Saraf's claims under the Exchange Act and SEC Rule 10b-5 must be and are dismissed.  That leaves only the question of whether Saraf should be granted leave to amend his complaint, which he has requested.  *See* Pl.'s Opp'n 1 n.2.  Notably, Saraf already had two opportunities to amend, *see* ECF Nos. 54, 62, and he does not identify facts in his possession that would cure the defects discussed above.  That said, mindful that leave to amend a complaint should be freely given "when justice so requires," Fed. R. Civ. P. 15(a)(2), and that "[c]omplaints dismissed under Rule 9(b)" or the PSLRA "are almost always dismissed with leave to amend," *Pasternack v. Shrader*, 863 F.3d 162, 175 (2d Cir. 2017) (internal quotation marks omitted), the Court will grant Saraf one final chance to amend.  Saraf shall file any Third Amended Complaint **within thirty days of the date of this Opinion and Order**.

The Clerk of Court is directed to terminate ECF No. 64.

SO ORDERED.

Dated: September 30, 2022
      New York, New York

JESSE M. FURMAN
United States District Judge

17