CALCATERRA POLLACK LLP
Regina Calcaterra
1140 Avenue of the Americas, 9th Floor
New York, NY 10036-5803
Tel: (212) 899-1765
Email: rcalcaterra@calcaterrapollack.com

BERGER MONTAGUE PC
Sherrie R. Savett
Michael Dell'Angelo
Barbara A. Podell
Andrew Abramowitz
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3000
Email: ssavett@bm.net
       mdellangelo@bm.net
       bpodell@bm.net
       aabramowitz@bm.net

*Attorneys for Lead Plaintiff*
*Rahul Saraf and the Proposed Class*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| RAHUL SARAF, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> EBIX, INC., ROBIN RAINA, and STEVEN M. HAMIL <br><br> Defendants. | Case No. 1:21-cv-01589-JMF <br><br> CLASS ACTION <br><br> Hon. Jesse M. Furman <br> Courtroom 1105 <br><br> <u>JURY TRIAL DEMANDED</u> |

## THIRD AMENDED CLASS ACTION COMPLAINT

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.   NATURE OF THE ACTION AND OVERVIEW ............................................................. 1

II.  JURISDICTION AND VENUE ...................................................................................... 17

III. PARTIES ....................................................................................................................... 17

IV.  SUBSTANTIVE ALLEGATIONS ................................................................................ 20

    A.   Background ........................................................................................................... 20

        1.   Ebix, Inc. Overview ................................................................................ 20

        2.   EbixCash Limited Overview.................................................................... 21

    B.   Throughout the Class Period (and Presently), Ebix Was Laboring Under a
        Massive Debt Burden That Its Surging Revenues Could Not Solve, But Could
        Serve as a Basis to Take EbixCash Public to Infuse Ebix with Desperately Needed
        Cash to Pay Down Its Looming February 2023 Payment Deadline ..................... 23

        1.   Ebix's Net Revenues Abruptly and Substantially Declined as a Result of
            the COVID-19 Pandemic Further Pressuring the Company's Ability to
            Pay Its Debt When Due............................................................................ 24

        2.   Despite the Drop in Overall *Net* Revenues, During the Pandemic Ebix's
            *Gross* Revenues Unexpectedly Surged 590% Because EbixCash Reported
            Massive Growth in Its Gift Card Business, But the Sure Yielded
            Immaterial *Net* Revenues ........................................................................ 25

        3.   Without EbixCash's "Payment Solutions" Segment – GiftCards –
            Revenues Declined By 30% During The 2-Year Period From 2019-2021
            ........................................................................................................... 29

        4.   The Purported Drivers of EbixCash's Pre-paid Gift Card Sales Are
            Dubious ................................................................................................... 30

    C.   Ebix Advances Plans to Spinoff EbixCash in an Initial Public Offering as A Race
        Against the Insolvency Clock .............................................................................. 33

    D.   RSM Abruptly Resigns and Identifies a Material Weakness in Internal Control in
        the Gift Card Business ......................................................................................... 36

    E.   RSM's Resignation from the Ebix Audit Was an Extraordinary Event .............. 43

    F.   Defendants Raina and Hamil Knew or Recklessly Disregarded that RSM Was Not
        Able to Obtain Sufficient Audit Evidence Through Raina's Role as CEO and
        Chairman of the Ebix Board of Directors, and Hamil's Role as CFO and Senior
        Financial Management Where They Were Tasked with Communicating with the
        Audit Committee in Connection with Internal Control ....................................... 44

    G.   Acquainted With "Opinion Shopping," Instead of Addressing RSM's Concerns,
        Defendants Allowed RSM to Resign, Quickly Engaged an Ill-equipped
        Replacement and Promised Lucrative Work on the EbixCash IPO Regardless of

the Realities of EbixCash's Business ............................................................ 48

H.   When RSM's Clean 2019 Audit Opinion, Including the Effectiveness of Internal Control, Was Reissued in the 2020 10-K, RSM's Prior Reference to Internal Control Was Completely Removed ................................................ 55

I.   Confidential Witnesses Confirm Plaintiff's Allegations ...................................... 56

V.   MATERIAL POST CLASS PERIOD EVENTS CONFIRM DEFENDANTS' CLASS PERIOD FRAUD ................................................................................................ 60

A.   EbixCash Files a Draft Red Herring Prospectus With the Securities and Exchange Board of India on March 9, 2022 ...................................................... 60

B.   Raina and Hamil Admit in the DRHP a Material Weakness in Internal Control at EbixCash as a Result of the Need to Improve Internal Control, Including Keeping Adequate Records of Daily Transactions ............................................. 63

C.   Failure To Keep Adequate Records of Daily Transactions is a Per Se Material Weakness in Internal Control ........................................................................ 65

D.   Hindenburg Research Publishes a Damning Short Seller Report ........................ 72

5.   Hindenburg Research Issues a Report Focused on EbixCash's Gift Card Business -- "Ebix: This House of 'Cards' Seems to Have a Glaring Fake Revenue Problem" ......................................................................... 72

6.   Ebix' Response to the Hindenburg Research Report Reveals That Somani's "Clean Audit" Was Anything But and the Company's Independent Investigations Were Equally Ineffective ............................. 73

a.   Ebix Purports to Refute the Allegations in the Hindenburg Report on June 16, 2022, But Refuses to Address Specific Allegations .. 73

b.   Ebix Provides a Purported "Clarification on the Nature & Metrics of Its EbixCash Businesses" on June 21, 2022 ............................ 76

c.   Ebix Sued to Block Publication of the Hindenburg Report in India and Removed the Materials on Which it Relies from EbixCash's Website ........................................................................... 77

7.   Somani and Ebix's Independent Investigation Failed to Even Superficially Question or Investigate Sales Channels and Distribution Locations for Pre-Paid Gift Cards, the Company's Much Touted "Leading" Driver of Revenue ................................................................................... 79

VI.   SCIENTER ALLEGATIONS ................................................................................ 86

A.   Raina's and Hamil's Admission in the DRHP of a Material Weakness in Internal Control Establishes that Defendants' Scienter—That They Knew of or Recklessly Disregarded the Existence of the Same Material Weakness During 2020, Including 3Q20 and Concealed it During the Class Period ................................ 87

1.   Raina's and Hamil's Scienter is Established by Their Admission of the Existence of a Material Weakness ........................................... 87

2.      Raina's and Hamil's Scienter is Established by Their Admission of the Same Material Weakness which RSM Identified .................................... 88

3.      Raina's and Hamil's Scienter is Established Because They Knew That the Same Material Weakness Which They Admitted on March 9, 2022 Existed During 3Q20 and Throughout 2020............................................. 89

4.      Raina's and Hamil's Scienter is Established Because They Designed, Evaluated and Monitored Internal Control ............................................... 90

5.      Raina's and Hamil's Scienter is Established by Offering Highly Lucrative IPO Audit Business to Somani, a Small Indian Auditor Which Was Ill Equipped to Audit a Global Company of Ebix's Size and Complexity ... 92

B.      Raina's and Hamil's Scienter is Established by Their Strong Motivation to Conceal the Material Weakness to Win Ebix's Race Against the Solvency Clock .................................................................................................................. 93

C.      Raina's and Hamil's Scienter is Established by Their Willingness to Say What is Expedient Under the Circumstances, Regardless of Its Truth .............................. 93

1.      Raina's and Hamil's Inconsistent and Misleading Representations about Sales Channels for EbixCash Establish their Scienter and Lack of Truthfulness When Representing Facts about EbixCash's Business to Investors ................................................................................................. 93

2.      Raina's and Hamil's Inconsistent and Misleading Representations about Internal Control for EbixCash Establish their Scienter and Lack of Truthfulness When Representing Facts about the Effectiveness of Internal Control ................................................................................................. 95

        a.      Raina and Hamil Permitted Two Mutually Contradictory and Inconsistent Statements To Be Filed in the Same Document--The DRHP ............................................................................................. 95

        b.      Raina and Hamil Permitted Two Mutually Contradictory and Inconsistent Statements to Be Filed One Day Apart in The DRHP and in Ebix's 2021 Form 10K ....................................................... 96

3.      Defendants' Scienter for Concealing the Material Weakness In 3Q20 Is Established By Burying Their March 9, 2022 Admission Of The Material Weakness In The DRHP, Knowing That It Would Remain Virtually Unnoticed ............................................................................................. 97

4.      Raina's and Hamil's Inconsistent and Misleading Representations About EbixCash's Gift Card Gross Revenue Establish their Scienter and Lack of Truthfulness When Representing Facts to Investors ................................ 98

D.      Raina's Scienter is Established by His Strong Personal, Financial Motivation to Conceal the Existence of a Material Weakness in Internal Control .................... 99

1.      Raina's Transition in His Compensation from Stock Awards in 2019 and 2020 to Cash in 2021 and 2022 Establishes that He Acted with Scienter to Protect His Own Financial Self Interest Because He Knew about RSM's Inability to Obtain Sufficient Audit Evidence Arising from the Material

        Weakness in Internal Control That He Designed and Monitored ............. 99

    2.    Raina's Scienter is Established by Additional Strong Financial
        Motivations to Conceal the Material Weakness ..................................... 102

  E.    Raina's and Hamil's Scienter is Established From Their Positions at Ebix and
      EbixCash .......................................................................................................... 103

VII.    MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE
      CLASS PERIOD AND OMISSIONS OF MATERIAL FACT ..................................... 107

VIII.   CLASS ACTION ALLEGATIONS ............................................................................... 112

IX.     UNDISCLOSED ADVERSE FACTS ........................................................................... 114

X.      LOSS CAUSATION ....................................................................................................... 115

XI.     APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET
      DOCTRINE) ................................................................................................................... 117

XII.    NO SAFE HARBOR ..................................................................................................... 120

FIRST CLAIM  Violation of Section 10(b) of The Exchange Act and Rule 10b-5 Promulgated
      Thereunder Against All Defendants .................................................................. 121

SECOND CLAIM  Violation of Section 20(a) of The Exchange Act Against the Individual
      Defendants ......................................................................................................... 124

PRAYER FOR RELIEF ............................................................................................................. 125

JURY TRIAL DEMANDED ...................................................................................................... 125

Lead Plaintiff Rahul Saraf ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief are based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Ebix, Inc. ("Ebix" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of regulatory filings made by EbixCash Limited ("EbixCash") with the Securities and Exchange Bureau of India ("SEBI"); (c) review and analysis of press releases and media reports issued by and disseminated by Ebix and information on Ebix's website; (d) review and analysis of other publicly available information concerning Ebix and EbixCash in the United States and India; (e) consultation with experts; (f) interviews of confidential witnesses in the United States and India; (g) review and analysis of investor conference calls conducted by Ebix; and (h) review and analysis of analyst reports about Ebix. Plaintiff believes that discovery will further support the allegations in this Third Amended Complaint.[1]

## I.      NATURE OF THE ACTION AND OVERVIEW

1.      This is a class action on behalf of persons and entities that purchased or otherwise acquired Ebix securities during the period from November 9, 2020 to February 19, 2021, inclusive (the "Class Period"). Plaintiff's claims arise under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      This case is about a scheme of opportunity effected by Ebix's Chief Executive Officer ("CEO"), Defendant Robin Raina ("Raina") and Global Chief Financial Officer ("CFO")

---

[1] Pursuant to the Court's INDIVIDUAL RULES AND PRACTICES IN CIVIL CASES, 1.B., a redline showing all differences between Plaintiff's Second Amended Complaint (ECF 51) and the instant Third Amended Complaint is attached hereto as Exhibit A.

Defendant Steven M. Hamil ("Hamil"), that has transformed Ebix from a COVID-19 era stock market darling—hailed for bringing contactless pre-paid gift cards to India to facilitate remote bill paying during the worst ravages of the pandemic through its fast-growing subsidiary EbixCash— to a fallen angel brought to earth by the abrupt resignation of its auditor, RSM US LLP ("RSM") on February 15, 2021 due to serious accounting irregularities.  According to RSM, such accounting issues related to EbixCash's gift card business in India and RSM's identification in 4Q20 of a material weakness in internal control which existed throughout 2020 and thereafter, as designed by Raina and Hamil. Defendants' concealment of their failure to design, create and maintain adequate internal controls over financial reporting—in particular record keeping of transactions— allowed them to capitalize on a once in a lifetime growth opportunity afforded by the pandemic to solve Ebix's crushing debt problem: effectuating an Initial Public Offering ("IPO") of EbixCash to pay down Ebix's debt while, at the same time, enriching themselves through the IPO and the surging price of Ebix's shares. The debt was considerable and urgent ($716 million, 90% of which was due in February 2023), and the potential for personal gain was sky-high (Raina himself owned approximately 14% of Ebix's common stock, with options to purchase 176,000,000 shares).

3.    This scheme to exploit EbixCash's value of between $4.5 billion and $5 billion could only be accomplished by concealing the material weakness in internal control that existed within EbixCash before, during and after the Class Period. If the material weakness had been disclosed, it not only would have precluded an auditor's issuance of an unqualified audit opinion, thereby causing the price of Ebix stock (of which he owned 14%) to plummet (which is what ultimately happened when this disclosure was belatedly made), but, most disastrously for Raina— personally and financially—it would have derailed his plans for the lucrative IPO of EbixCash to rescue Ebix from insolvency, which was practically guaranteed with the looming $716 million of

debt.

4.      It was not until March 9, 2022 that Raina and Hamil belatedly admitted in EbixCash's so-called Draft Red Herring Prospectus ("DRHP") filed with the SEBI,[2] consented to by Raina and Hamil, and certified as true and correct by Raina, that a material weakness in internal control existed in EbixCash. However, while Defendants acknowledged a material weakness, they were short on details as to what it consisted of and how it impacted the Company's finances. Specifically, this disclosure stated that: "***as a listed company, we will need to improve the effectiveness of [EbixCash's] disclosure controls and procedures and internal control over financial reporting, including keeping adequate records of daily transactions.***" This admission appears to have gone unnoticed by the market because it was buried in a single sentence in the 457-page single-spaced DRHP filed in India and generally unavailable in the U.S.

5.      Importantly, the material weakness admitted by Raina and Hamil on March 9, 2022 is the same one identified by RSM more than a year earlier, as communicated to the SEC in its February 22, 2021 letter: "as a result of being unable, despite repeated inquiries, to obtain sufficient appropriate audit evidence that would allow it to evaluate the business purpose of significant unusual transactions that occurred in the fourth quarter of 2020, including whether such transactions have been properly accounted for and disclosed in the financial statements subject to the Audit." This material weakness (the inability to "obtain sufficient appropriate audit evidence) is, in fact, the same material weakness disclosed by Raina and Hamil on March 9, 2022 as a "need to improve" internal control (*i.e.*, "keeping adequate records of daily transactions.").

6.      Raina and Hamil knew of or recklessly disregarded the existence of the third quarter

---

[2] *See* https://www.sebi.gov.in/sebi_data/attachdocs/mar-2022/1646902016643.PDF (last visited October 30, 2022).

of 2020 ("3Q20") material weakness during the Class Period because they certified in Ebix's 10Qs, 10Ks and Sarbanes-Oxley Act of 2002 ("SOX") Certifications that they designed, evaluated and monitored internal control, including designing internal control so that material information would be promptly communicated to them. The same material weakness that existed in the third quarter of 2020 *still exists today* because Raina and Hamil confirmed in the Forms 10-K for 2020 and 2021, as well as the most recent Form 10-Q in 2Q22 filed with the SEC on August 9, 2022, that "*there were no changes in our internal control over financial reporting identified in management's evaluation.*" Above all, Raina and Hamil *knew* about the longstanding existence of a material weakness because they admitted it on March 9, 2022—and have confirmed that internal control has not changed throughout 2020, 2021 and up through today.

7.      Astoundingly, Ebix has never acknowledged that it remediated the same material weakness existing during 2020 which was identified by RSM on February 15, 2021. Rather, it has continued to maintain that no action was necessary and that there have been no changes to internal control. The ongoing existence of this material weakness would have precluded the issuance of unqualified audit opinions by Ebix's outside auditors. Yet, KG Somani & Co. ("Somani" or "KGS") issued unqualified audit opinions for Ebix in 2020 and 2021 and for EbixCash in the DRHP, casting serious doubt on the accuracy and validity of those opinions. In effect, Raina and Hamil knowingly used Somani, the replacement auditor for RSM after RSM's resignation on February 15, 2021, as a tool to cover up the material weakness. Indeed, concurrent with its unlikely retention of Somani to immediately step in for RSM and audit Ebix, it also engaged Somani for the highly lucrative role as the statutory auditor for the EbixCash DRHP. In turn, the work would likely lead to Somani's engagement as the auditor for EbixCash after the IPO which, according to estimates of its value, would be the largest IPO in Indian history. Thus, Ebix's retention of Somani

4

smacks of the very same "opinion shopping" the SEC identified when it sanctioned a prior Ebix auditor during Raina's tenure. The head-spinning rapidity with which Somani delivered a clean audit of the entire Ebix group—only seven weeks after the preceding auditor, RSM, resigned amid concerns regarding the integrity of the financials, and delivering this curiously clean report with far fewer resources (one office in India, only 17 accounting partners, no prior experience with U.S. companies)—only raises questions, as opposed to answering them.

8.      Throughout the Class Period, Ebix touted the astronomical growth of EbixCash's pre-paid gift card business. During 3Q20, Ebix reported that EbixCash experienced spectacular growth. Its gross revenues reportedly grew astronomically during that quarter, skyrocketing 268% compared to the third quarter of 2019. On a sequential basis, EbixCash's overall revenues grew a staggering 82% in the 3Q20 over the second quarter of 2020. The increase in 2020 total revenue compared 2019 was due primarily to strong demand for Ebix's payment solutions offerings in India (primarily pre-paid gift cards), which increased by more than $200 million year-over-year to approximately $256 million—a year-over-year increase of 590%. Ebix attributed the sudden and massive increase in demand for its gift cards and the corresponding astronomical growth in *gross* revenues to the sudden demand for contactless digital money in India during the COVID-19 pandemic.

9.      As a result of the COVID-19-fueled growth, Ebix saw its share price soar over *150%* between November 2020 and February 2021.

10.      During the Class Period, Defendants Raina and Hamil signed Ebix's SEC filings and certifications pursuant to the SOX, which were materially misleading when the statements were made and omitted material facts because: (a) they omitted, as the Company's independent auditor, RSM, later confirmed that there was a material weakness in internal control over financial

reporting—specifically, Ebix's failure to design controls over the gift or pre-paid card revenue transaction cycle sufficient to prevent or detect a material misstatement; (b) as a result, they omitted the material fact that a change in Ebix's internal control over financial reporting was, in fact, necessary to remediate the material weakness, thus rendering misleading the statement that no changes were made; (c) they falsely represented that they "have concluded that these disclosure controls and procedures are effective," when in fact, they were ineffective due to a material weakness; and (d) they omitted that absent a change in internal control over financial reporting, there would be a material impact on the fairness or reliability of the financial statements. These misstatements and omissions were made in the 3Q20 10-Q, which Defendants Raina and Hamil signed, and the SOX certifications they signed attesting to the truth of their statements.

11.     In 2019 and 2020, when Ebix's gift card business was growing, the Company's Board of Directors (of which Raina was a member) announced that Defendant Raina's salary would be paid entirely in Ebix stock, valued in 2020 alone at $3,600,000. However, in 4Q20 and early 2021, as a substantial undisclosed disagreement was brewing between Ebix and the Company's auditor, RSM, over the sufficiency of internal control in the gift card business, Raina's compensation scheme abruptly changed from all stock to all cash, such that he no longer received a base salary paid in common stock, but instead received his compensation entirely in cash in the form of a cash retention bonus with a three-year tenure. The temporal proximity between (a) the abrupt change in Raina's compensation from all stock to all cash and (b) a substantial disagreement between RSM and Ebix which caused RSM to resign and the price of Ebix stock to plummet is not coincidental. Because Raina knew that Ebix's stock price would be decimated by the disclosure of RSM's resignation and identification of a material weakness in internal control, compensation paid in stock was no longer attractive to him, so he acted in his own financial self-interest to change

his compensation to cash. But Raina did not give unsuspecting investors the same opportunity to protect their financial interests. Raina's change in compensation at the same time that he knew an undisclosed material fact, the disclosure of which would have a negative impact on Ebix's stock price is akin to insider selling and raises a cogent inference of Raina's scienter.

12.     Despite its astronomical growth and surging share price during the Class Period, Ebix was drowning in $716 million of debt that it had little hope of ever paying, particularly because over 90% of it—approximately $672 million—was due in full in February 2023. Ebix's situation was dire because the cash flow needed to satisfy Ebix's debt vastly exceeded the Company's net income and cash. Ebix's net income was just $97 million and $92 million in 2019 and 2020, respectively. Its cash and cash equivalents were just $73 million and $105 million at year-end 2019 and 2020, respectively. Importantly, RSM also resigned because Ebix, despite being "repeatedly told" by RSM that it could not classify a $30 million transfer as cash or a cash equivalent, Ebix did not comply. Ebix's refusal to comply with RSM's audit advice is telling because, given the vast gap between the roughly $105 million in cash on hand and $672 million in debt that was coming due, it was in Ebix's interest to aggressively characterize the $30 million as cash or a cash equivalent to bolster the perceived state of its cash on hand.

13.     Even worse, despite Defendants' hype surrounding the unprecedented growth of EbixCash's pre-paid gift card business and corresponding surging revenues—the headline numbers which grabbed the market's attention were *gross revenue*—the corresponding *net* income derived from all of that reported growth in gross revenue was immaterial to operating profit and, therefore, would do virtually nothing to solve Ebix's looming debt problem. For example, Ebix's 4Q20 gift card business operating income was less than $1 million. For the full year 2020, operating income from the gift card business was ***less than $1.4 million***. Even worse, without the

pre-paid gift card sales, Ebix's revenue had declined by 32% during the 2-year period from 2019 to 2021. And the Company's overall trends offered no better promise—from 2019 to 2021, EbixCash's revenues would have declined by approximately 50% without the pre-paid card division.

14.     Without sufficient revenues (or any reasonable near-term prospects to generate sufficient revenues) to satisfy its looming debt obligations, Defendants seized upon the pandemic-fueled growth of its EbixCash subsidiary to hasten ongoing efforts to take the company public through what Defendant Raina colorfully characterized as a "multibagger" initial public offering ("IPO") in India. EbixCash, valued between $4.5 and $5 billion, would generate $787 million in desperately needed cash. A successful IPO of EbixCash had repeatedly been stymied since at least 2019 as Ebix had been plagued with accounting and regulatory issues and the "conditions" were reportedly not right for a successful IPO.

15.     Of the $787 million in IPO cash proceeds, Ebix later revealed in a March 10, 2022 press release that "approximately $350 million is … proposed to be used towards reduction of Ebix Inc.'s outstanding debt." That is, a successful IPO of EbixCash could wipe out 50% of Ebix's debt, despite declining overall revenues and the paltry net revenues of $1.4 million delivered by the only segment of the business (pre-paid gift cards) that was materially growing.

16.     Ebix and Defendant Raina—who personally owned approximately 14% of Ebix's common stock—stood to reap massive rewards from a successful IPO of EbixCash. For example, reports suggest that the IPO of EbixCash would quadruple the enterprise value of Ebix and cause its share price to soar. Indeed, when EbixCash filed its DRHP, a preliminary registration for the prospective IPO, with the SEBI, Ebix's stock ***rose as much as 75% over the course of 2 days, from $25.37 to an intraday high of $44.42***. Raina, who serves a Director of EbixCash and

Chairman of EbixCash's IPO Committee, personally owned options to purchase 176,000,000 shares (with a 1:1 ratio of options to common stock) in addition to his existing 4,000 equity shares. Critically, based on the reported expected valuation of the EbixCash IPO, Defendant Raina's 176,000,000 options were deeply "in the money," meaning that he stood to reap an enormous financial windfall if the IPO was ultimately launched.

17.    Ebix's surge in share price abruptly ended on February 19, 2021 when the Company's auditor, RSM, unexpectedly quit shortly before completing Ebix's 2020 audit. RSM shocked the market by revealing that it was "unable, despite repeated inquiries, to obtain sufficient appropriate audit evidence that would allow it to evaluate the business purpose of significant unusual transactions that occurred in the fourth quarter of 2020" related to the Company's gift card business in India, that there was a material weakness related to Ebix's failure to design controls "over the gift or prepaid card revenue transaction cycle sufficient to prevent or detect a material misstatement" and, despite being "repeatedly told", Ebix failed to properly characterize $30 million.

18.    Predictably, in the wake of RSM's revelations about accounting irregularities at EbixCash and its abrupt resignation, Ebix's share price plummeted—***losing approximately 40% of its value in a single trading day***—declining $20.24 per share to close at $30.50 on February 22, 2021, on unusually heavy trading volume of more than 11 million shares (by comparison, trading volume on the prior trading day, February 19, 2021, was a mere 289,000 shares).

19.    The story does not end at the conclusion of the Class Period, though, because Defendants actively and affirmatively engaged in a cover up for over a year to continue to conceal from investors the material weakness in internal control in EbixCash in order to proceed apace with the IPO.  For instance, on February 19, 2021, immediately after RSM's resignation, Ebix

issued a press release in which it "emphasize[d] a strong current business outlook." Defendants further actively prevented the market from learning the truth about their fraud by issuing a press release on February 22, 2021 in which it stated:

- the "Company's financial health is in better shape than ever."

- "The Company is not aware of any wrongdoing in any manner nor is aware of any such aspersion being made by anyone."

- "The Company believes that the accounting, including for our gift card business, is consistent with GAAP."

20.     Defendants further attempted to whitewash their fraud by engaging Somani, which was ill equipped to reliably audit Ebix's financial statements, to provide lucrative IPO work, while, at the same time, hiring it as a replacement auditor for Ebix. Although Ebix is based in the U.S. state of Georgia, incorporated in Delaware and listed on the U.S.-based Nasdaq, on March 8, 2021, just 14 days after RSM's resignation before completing the audit, Ebix announced that, 3 days earlier, it had retained the small Indian accounting firm, Somani, as its independent registered public accounting firm to audit the Company's 2020 financial statements and that it "intend[ed] to retain KGS [Somani] as a statutory auditor for the EbixCash IPO." Ebix is Somani's *only* U.S. audit client. Ebix further announced that it planned to complete its annual 10-K filing with the SEC as soon as April 20, 2021.

21.     Few, if any, accounting firms are equipped to adequately audit the financial statements of a U.S.-listed, publicly traded company from scratch in 46 days. That is all the more so as to Ebix where the previous auditor, RSM, had resigned before completing the audit and had identified a material weakness in internal control at a client that refused to properly characterize funds, failed to respond to "repeated" warnings and failed to comply with "repeated inquiries" to provide sufficient audit evidence. Further complicating such a dauting task was that Ebix's new

auditor needed to audit vast international operations reaching hundreds of thousands of locations globally during the height of the COVID-19 pandemic when travel was largely at a standstill. Somani was particularly ill-suited to the unprecedented task of auditing Ebix's far-flung global operations.

22.     For example, as of the end of 2020: EbixCash processed more than 6 million transactions that year; Ebix conducted domestic and international operations across approximately 200 offices and maintained operating facilities and offices in, among others, Australia, Brazil, Canada, India, Indonesia, New Zealand, the Philippines, Singapore, the United Arab Emirates, the United Kingdom, and the United States of America; Ebix employees provide products and support and consultancy services to thousands of customers in over 70 countries across six continents; Ebix leased approximately 100 facilities across India and owned six facilities in India; Ebix had 9,802 employees worldwide; subsidiary EbixCash Exchanges utilized over 650,000 physical distribution outlets in India and many ASEAN countries; and EbixCash's travel exchange business alone claimed over 500,000 agents and approximately 18,000 registered corporate clients. However, Somani employed a mere seventeen (17) accounting partners in a single office in India of which *only one* was a licensed CPA well-versed with Generally Accepted Accounting Principles. RSM, by contrast, is a highly respected international accounting firm that maintains dozens of offices in the U.S. and around the world, has more than 11,000 employees, and provides dozens of accounting service offerings, including auditing, tax, and consulting.

23.     Astonishingly, in what would typically take several months to a year, Somani gave Ebix a clean audit opinion on April 27, 2021, just over 7 weeks after being hired and knowing that RSM had identified a material weakness in internal control over financial reporting which would preclude a clean audit opinion. Nevertheless, Somani represented, in part, that in "our opinion, the

Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2020." Based on Somani's clean audit, Ebix filed its 2021 Form 10-K thereafter.

24.    The unprecedented speed with which Somani, a small firm ill-equipped and insufficiently staffed to audit a large, complex U.S.-based company with offices and operations at hundreds of thousands of locations spread across six continents, completed the audit, and issued a clean opinion is not plausible. Ebix's hiring of Somani was an attempt to bury the material weakness identified by RSM and raises a strong inference of Defendants' scienter to conceal the material weakness, not only during the Class Period, but for as long as possible.

25.    A more plausible explanation for Somani's hiring and rapid "clean" audit lies in an earlier SEC Order in which the SEC leveled sanctions against one of Ebix's accountants early in Raina's tenure, citing "Ebix's very aggressive accounting policies, and possible *opinion shopping*." Concurrent with Ebix's March 8, 2021 announcement that it had hired Somani, Ebix also announced that it "intend[ed] to retain KGS [Somani] as a statutory auditor for the EbixCash IPO." Ebix did in fact hire Somani to conduct the lucrative audit work in connection with the preparation of EbixCash's DRHP. And, if the IPO is successful, there is no doubt that Somani will be in line to serve as EbixCash's auditor. Reports that EbixCash's IPO may be valued at $4.5 to $5 billion would make it the largest IPO in Indian history and a highly lucrative and prominent audit engagement for Somani's 17 accounting partners.

26.    Somani was the perfect device for Defendants to employ to continue the concealment of the material weakness identified by RSM. Confirmation of this fact came after the Class Period, when Ebix and EbixCash made at least two disclosures that clearly demonstrate that Somani's work was fundamentally unreliable, and that Defendants knew it. In fact, glaring inconsistencies and errors revealed in the form of public "clarifications" by Ebix in June 2022 help

reveal that Somani's audit and the surrounding investigation by experts failed to identify obvious and fundamental inconsistences between Ebix's representations about its revenue streams for the gift card business and reality.

27.     *First*, just over one year after RSM's resignation, Defendant Raina (CEO and Chairman of Ebix and a Director of EbixCash, Chairman of EbixCash's IPO Committee responsible for approving the DRHP, and member of its Audit Committee) and EbixCash quietly acknowledged the validity of RSM's revelations regarding the insufficiency of its internal controls, including the need to improve adequate record keeping of daily transactions, by burying the admission on page 75 of the 495-page document—the DRHP—filed only in India. On March 9, 2022, EbixCash filed its DRHP with the SEBI in which it stated that as a listed company, EbixCash "***will need to improve the effectiveness of [EbixCash's] disclosure controls and procedures and internal control over financial reporting, including keeping adequate records of daily transactions,***" thereby admitting what Raina and Hamil knew during the Class Period, RSM had long since identified and Defendants and Somani had long since denied and white-washed.

28.     *Second,* Somani's inability to credibly audit Ebix's financial statements in only 46 days was confirmed after the Class Period because Somani appears to have been oblivious to the most fundamental composition of EbixCash's sales channels. Somani failed to notice or simply ignored that Ebix repeatedly incorrectly claimed that it sells gift cards in two channels: "corporate customers and consumers." ("EbixCash issues general purpose gift cards ***to corporate customers and consumers*** that can be later redeemed at various merchants.") This representation was included in the "EbixCash" section of the "APPLICATION OF CRITICAL ACCOUNTING POLICIES" discussion of Ebix's Forms 10-Q and 10-K, including the 2020 Form 10-K to which Somani's purported clean audit opinion was attached. This fact is crucial. Ebix repeatedly

represented throughout and after the Class Period in Forms 10-K and 10-Q that its most important, fastest growing business segment, EbixCash, that precipitated RSM's resignation and was the catalyst for the hiring of Somani, derived its record-breaking gross revenues of hundreds of millions of dollars from *two distribution* streams "corporate customers *and* consumers." A devasting research report by Hindenburg Research (the "Hindenburg Report") published on June 16, 2022, alleged that any revenues associated with the consumer channel were fake. In response, Ebix issued "Clarifications" in a press release on June 21, 2022, stating that "EbixCash gift cards are sold to Corporate clients only." Had Somani and Ebix's other legal and forensic advisors hired in the wake of RSM's resignation adequately examined this fundamental contradiction between the Company's repeated representations regarding the revenue streams of its most important business segment and the actual audit evidence and books and records of the Company it would have been immediately apparent that Ebix did not sell to gift cards to consumers. Hindenburg's extensive investigation determined that any gift card revenue attributable to "consumers" was "fake." As it turns out, there simply was no such revenue because there were no sales to consumers, a fact that Somani appears to have missed entirely in its 2020 and 2021 "clean" audits. Had it identified this basic inconsistency, Ebix would not have had to issue a public clarification in response to the Hindenburg Report. In view of this gross discrepancy, it is utterly implausible that Somani conducted a reliable audit of Ebix and EbixCash if it failed entirely to even notice that one of EbixCash's two gift card sales channels—the consumer channel—simply did not exit and, apparently, there was not a single associated consumer transaction.

29.     *Third*, Defendants have repeatedly insisted, despite RSM's identification of a material weakness, that Ebix's internal controls are effective and there are no material weaknesses. For instance, immediately after the publication of the Hindenburg Report on June 16, 2022

suggesting that "Ebix Seems To Have A Fake Revenue Problem," Ebix issued a press release stating that it "refutes the report's grossly misleading and erroneous allegations and reiterates that its financial reporting, including but not limited to all transactions from and within its EbixCash payment solutions offerings in India, and revenue recognition policies thereof, are accurate and appropriate and in compliance with GAAP and SEC reporting requirements." Ebix further stated that "the Board of Directors [which includes Defendant Raina] was satisfied that no steps were necessary with respect to the gift card business." Since then, Somani completed the audit of the related consolidated statements of income, comprehensive income, stockholders' equity, and cash flows of the Company for two calendar year periods ending December 2020 and December 2021, while expressing an unqualified opinion for each year. Ebix also claimed: "As the Company's Indian subsidiary is currently under review for an initial public offering in India, Ebix is limited in its ability to respond to the article's specific contents." Despite that claim, as part of its continuing plan to white-wash efforts to call out Defendants' fraud, in July 2022, Ebix successfully petitioned a Delhi court to block publication of the Hindenburg Report in India. In announcing that effort, Ebix touted that it had "provid[ed] a detailed rebuttal with proof to the Court, the Company provided the Court with audit reports from India's financial regulatory body and two independent auditors, for the last 3 years." Upon information and belief, although those materials are supposed to be available to the public for inspection, the Delhi court has refused release them for inspection.

30.     In addition, two independent joint statutory auditors—one of whom is Somani— have issued unqualified opinions for the period ended March 2021 and the interim period from April 1, 2021 to September 30, 2021 for both the consolidated India business and the Indian gift card subsidiary. The audited financial statements of the Indian businesses for the three years ended March 31, 2021 and the six months ended September 30, 2021 are included within the DRHP filed

with the SEBI for regulatory review on March 9, 2022.

31.     Incredibly, there are material discrepancies within the same document—the DRHP—which casts serious doubt on the credibility of Somani's audits, including the audit of EbixCash included in the DRHP. It is significant that the unqualified audit opinions filed in the DRHP on March 9, 2022 are inconsistent with the admissions of EbixCash, Raina and Hamil in the DHRP that it will "need to improve the effectiveness of our disclosure controls and procedures and internal control over financial reporting, including keeping adequate records of daily transactions." The significance of this fact is that one document—the DRHP—contains two mutually inconsistent facts—unqualified audit opinions of EbixCash by two auditors, one of whom is Somani, *and* an admission of a material weakness in internal control in EbixCash, which would preclude an unqualified audit opinion.

32.     The only conclusion is to discount the validity, accuracy, and integrity of Somani's unqualified audit opinion of EbixCash included in the DRHP—and indeed, its unqualified audit opinions of Ebix for 2020 and 2021 as well, which were Defendants' devices to white-wash and continue to conceal the material weakness in EbixCash in 3Q20, as later identified by RSM. Defendants' admission in the DHRP regarding EbixCash's internal control problem—a single sentence in a document spanning 457 single-spaced pages—went unnoticed, even to the well-trained and highly motivated researchers and analysts at Hindenburg Research. Although Hindenburg produced a copious report on EbixCash, it did not address the internal control issue directly. The conclusion of fraud is not merely plausible; it is compelling. In breach of their U.S. disclosure requirements, these Defendants used an inexperienced accounting firm that was in their back pocket—seduced by the promise of IPO fees—to aggrandize the value of their enterprise and attempt to reap enormous personal gains.

## II.     JURISDICTION AND VENUE

33.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

34.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

35.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.

36.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III.    PARTIES

37.     Plaintiff Rahul Saraf, as set forth in his certification filed with the Court (ECF No. 13-1), purchased Ebix securities during the Class Period and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

38.     Defendant Ebix is incorporated under the laws of Delaware with its principal executive offices located in Johns Creek, Georgia. Ebix's common stock trades on the Nasdaq exchange under the symbol "EBIX."

39.     Defendant Robin Raina was the Company's CEO at all relevant times. Raina signed

Ebix's quarterly report on Form 10-Q for the period ended September 30, 2020 ("3Q20 10-Q") filed with the SEC, which included the SOX certifications quoted above. Raina has been a director of Ebix since 2000 and Chairman of the Board of Ebix since May 2002. He joined Ebix in October 1997 as Vice President-Professional Services and was promoted to Senior Vice President-Sales and Marketing in February 1998. Raina was promoted to Executive Vice President, Chief Operating Officer in December 1998 and was appointed President effective August 2, 1999, CEO effective September 23, 1999. According to the Ebix Proxy Statement dated August 19, 2020 ("2020 Proxy"), Raina's "strategic direction for the Company and implementation of such direction has proven instrumental for the Company's growth and success."

40.     According to the 3Q20 10-Q, Raina is Ebix's "top operating decision-maker as to performance and allocation of resources:"

> The Company operates within one reportable segment whose results are regularly reviewed by Ebix's Chief Executive Officer, Defendant Robin Raina ("Raina"), *Ebix's top operating decision-maker as to performance and allocation of resources*. (Emphasis added).[3]

41.     According to the 2020 Proxy, Raina is described as the visionary "single leader" of Ebix who:

> *serves as both the Chief Executive Officer and Chairman of the Board*. We combine this traditional leadership structure with a board structure in which Mr. Raina is the only non-independent director. We believe this leadership model, with our Chief Executive Officer also serving as Chairman of our Board, benefits our Company in several ways. *A combined Chairman/Chief Executive Officer role helps provide strong, unified leadership for our management team and Board*. Our customers, suppliers and other business partners view our Chairman/Chief Executive Officer as a *visionary leader* in our industry, and we believe that having a *single leader* for the Company is good for our business.

42.     At the 2016 Annual Meeting, the stockholders approved a Bonus Plan for

---

[3] Unless otherwise noted, all emphasis is added.

Defendant Raina which provides for the payment of annual cash incentive awards to the Company's CEO based upon the achievement by the Company of specified performance goals. Participation in the Bonus Plan is exclusively limited to Raina as CEO of the Company. The Bonus Plan provides that Raina is eligible to receive cash incentives in connection with a particular fiscal year during the term of the Bonus Plan if the Company meets or exceeds certain performance goals set each year by the Compensation Committee.

43.     According to the 2020 Proxy, Defendant Raina beneficially owned 4,378,892 shares of Ebix stock, or 14.3% of the outstanding shares as of that time.

44.     Defendant Raina was described as instrumental to Ebix's success in Ebix's Form 10-K for the fiscal year ended December 31, 2019, filed with the SEC on March 2, 2020 (the "2020 10-K"):

> Our future success is substantially dependent on the continued services and continuing contributions of our senior management and other key personnel, particularly Robin Raina, our President and Chief Executive Officer, and Chairman of the Board. Since becoming Chief Executive Officer of the Company in 1999, Mr. Raina's strategic direction and vision for the Company and the implementation of such direction has been instrumental in our profitable turnaround and growth.

45.     Defendant Steven M. Hamil was the Company's CFO during the Class Period. Defendant Hamil signed the 3Q20 10-Q filed with the SEC, which included the SOX certifications quoted above, which he signed as the "Global Chief Financial Officer (Principal Financial and Accounting Officer)." Hamil also serves as the Company's Corporate Executive Vice President. Earlier in his career, Defendant Hamil was a staff auditor at Ernst & Young LLP and is a certified public accountant (of inactive status in the State of Alabama).

46.     Defendants Raina and Hamil (collectively the "Individual Defendants"), because of their positions with Ebix, possessed the power and authority to control the contents of Ebix's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio

managers and institutional investors, i.e., the market.

47.     On information and belief, the Individual Defendants were provided with copies of Ebix's reports and other statements alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material nonpublic information, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations which were being made were materially false and/or misleading and omitted material facts. The Individual Defendants are liable for the materially false statements and omissions alleged herein.

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     Background

#### 1.     Ebix, Inc. Overview

48.     Founded in 1976 as Delphi Systems, Inc., Ebix provides on-demand software and e-commerce services to the insurance, financial, healthcare and e-learning industries. Ebix employs nearly 10,000 people worldwide who provide products, services, support, and consultancy services to thousands of customers in over 70 countries across six continents. The Company maintains operating facilities and offices in many countries around the world including, among others, Australia, Brazil, Canada, India, Indonesia, New Zealand, the Philippines, Singapore, the United Kingdom, the United Arab Emirates, and the United States of America. As a result, Ebix has reported that it holds material cash and cash equivalent balances in various jurisdictions such as India, the Philippines, Australia, Indonesia, various Latin American countries, Singapore, New Zealand, the United Arab Emirates, Canada, Europe, and Mauritius.

49.     Although it has operations worldwide, Ebix's operations are overwhelmingly weighted in India where the majority of its employees reside. Ebix's revenues and profits are

primarily derived from its EbixCash subsidiary, whose operations are in India, particularly payments solutions such as pre-paid cards and gift cards, as described in detail herein. International revenue accounted for 73.4% and 68.6% of Ebix's total revenue for the twelve months ended December 31, 2020 and 2019, respectively. In 2020 the Company reported that approximately 60% of its revenues were generated in India.

## 2.    **EbixCash Limited Overview**

50.     The main services from which EbixCash derives revenue are gift cards and pre-paid cards, travel exchanges, money transfers, Forex and remittance services, and technology services.

51.     Described as employing a "Phygital" strategy that combines over 320,000 physical distribution outlets in India and many Associations of Southeast Asian Nations ("ASEAN") countries, with an online digital platform, the Company's EbixCash Financial exchange portfolio includes: domestic and international money remittance, foreign exchange (Forex), travel, pre-paid gift cards, utility payments, software solutions for lending and wealth management in India and other markets.

52.     In May 2017, Ebix took a leading position in the digital payments market in India by acquiring an 80% stake in ItzCash, the dominant payment solutions exchange in India. The acquisition, which valued ItzCash (which became EbixCash) at $150 million, was touted as providing the Company with the opportunity to process financial, insurance, and healthcare transactions on an integrated exchange.

53.     In the press release in which Ebix announced the acquisition of ItzCash on May 24, 2017, Ebix stated that "ItzCash is recognized as a leader in the prepaid cards and bill payments space in India" and that "[w]ith an Omni-channel strategy that encompasses a distribution network of 75,000+ physical retail outlets, the Company today is recognized as a leader in the prepaid

21

cards" and "is recognized as a leader in the Gift card space with brand gift cards across all categories with 100+ Brand copartners."

54.     The general-purpose pre-paid gift cards that EbixCash sells can be redeemed at various merchants, to corporate customers. The gift cards are co-branded between EbixCash and its card-issuing banking partner(s) and are affiliated with major payment associations such as VISA, Mastercard, and Rupay. The gift cards are sold to a diversified set of corporate customers from various industries. The gift cards are used by corporate customers to disburse incentives to the end users, which are primarily their employees, agents, and business associates. The gift cards sold by EbixCash are not reloadable, cannot be used at ATMs or for any other cash-out or funds transfer transactions, and are subject to maximum limits per card (approximately $130, depending on the exchange rate). Gift cards issued by EbixCash are valid for a period of 15 months from the date of issuance for virtual cards and three years for physical cards. EbixCash has entered into arrangements with banks and financial institutions to settle payments to merchants based on utilization of the gift cards.

55.     The Company's gift card business grew dramatically and unexpectedly as a result of the COVID-19 pandemic.

56.     Revenues from EbixCash are primarily derived from the sales of pre-paid gift cards and consideration paid by customers for financial transaction services, including services like transferring or exchanging money. Its gift card business is largely based in India. The significant majority of EbixCash's revenue is for a single performance obligation and is recognized at a point in time. These revenues vary by transaction based upon channel, send, and receive locations, the principal amount sent, whether the money transfer involves different send and receive currencies, and speed of service. EbixCash also offers several other services, including payment services and

ticketing and travel services for which revenue is impacted by varying factors. EbixCash acts as the principal in most transactions and reports revenue on a gross basis, as EbixCash controls the service at all times prior to transfer to the customer, is primarily responsible for fulfilling the customer contracts, has the risk of loss, and has the ability to establish transaction prices.

57.     Ebix has end-to-end responsibilities related to the gift cards sold, from the activation and ongoing utilization of the gift cards to customer service responsibilities to risk of loss due to fraud on the gift cards sold. EbixCash acts as a principal in the sale of gift cards, and revenue is recognized on a gross basis (full purchase value at the time of sale) with the corresponding cost of the gift cards recorded as cost of services provided. Unredeemed gift cards at December 31, 2020 were not significant to Ebix's financial results and were recorded as deferred revenues in the financial results.

**B.     Throughout the Class Period (and Presently), Ebix Was Laboring Under a Massive Debt Burden That Its Surging Revenues Could Not Solve, But Could Serve as a Basis to Take EbixCash Public to Infuse Ebix with Desperately <u>Needed Cash to Pay Down Its Looming February 2023 Payment Deadline</u>**

58.     Despite Ebix's surging gross margins, during the Class Period the Company (and to this day) was drowning in debt that comes due in February 2023. Absent a successful IPO of EbixCash, Ebix had few, if any, realistic options to stave off bankruptcy or other severe negative consequences to the business that would very likely result in a significant decline of the Company's share price which was surging on the apparent growth of EbixCash's gift card sales during the COVID-19 pandemic.

59.     Ebix historically carried a large debt load. Ebix has made only small incremental paydowns of its debt from 2019 to present. Ebix owed $716 million in aggregate debt at the beginning of the Class Period. The vast majority of Ebix's debt, approximately $672 million, is due in full in February 2023.

60.     The cash flow needed to satisfy Ebix's debt vastly exceeded the Company's net income, available cash, and its ability to generate free cash. Worse, as discussed below, a substantial portion of the cash Ebix did have was not available to pay down its debt because it was held in a variety of foreign jurisdictions. As the Company has explained, the "free flow of cash from certain countries where we hold [cash and cash equivalent] balances may be subject to repatriation tax effects and other restrictions. Furthermore, the repatriation of earnings from some of our foreign subsidiaries would result in the application of withholding taxes at source and taxation at the U.S. parent level upon receipt of the repatriation amounts." Ebix's net income was just $97 million and $92 million in 2019 and 2020, respectively. Its cash and cash equivalents—before accounting for the tax repatriation and "other restrictions"—were just $73 million and $105 million at year-end 2019 and 2020, respectively.

61.     Given the difficulty servicing its debt and inability, after February 2021, to file its Form 10-K and audited financial statements due to the resignation of RSM, Ebix negotiated a series of amendments to its debt facilities on September 27, 2019, March 30, 2020, May 7, 2020, March 31, 2021, and April 9, 2021, to provide greater flexibility in meeting the original loan terms. Despite those amendments, the vast majority of the debt remains fully due in February 2023.

**1.      Ebix's Net Revenues Abruptly and Substantially
Declined as a Result of the COVID-19 Pandemic Further
<u>Pressuring the Company's Ability to Pay Its Debt When Due</u>**

62.     The COVID-19 pandemic caused a sudden and unexpected decline in Ebix's business operations and net revenues in most areas, which reduced the Company's net revenue. For example, in the Company's 3Q20 10-Q, it stated:

> During the nine months ended September 30, 2020, our total operating revenues decreased $30.9 million, or 7%, to $403.5 million as compared to $434.4 million during the same period in 2019. The decrease in revenues year-over-year was primarily the result of the negative impacts of the COVID-19 global pandemic, particularly within the Company's travel, foreign exchange, remittance, and

consulting business areas. For the nine months ended September 30, 2020 the Company's travel, foreign exchange and remittance business revenues declined by over $100 million year-over-year, a decrease of greater than 60%. . . .

63.     However, the COVID-19 pandemic also created areas of growth, notably in EbixCash's gift card business, which created an unexpected short-term opportunity to save Ebix and vastly enrich the Defendants.

> **2.      Despite the Drop in Overall *Net* Revenues, During the Pandemic Ebix's *Gross* Revenues Unexpectedly Surged 590% Because EbixCash Reported Massive Growth in Its Gift Card <u>Business, But the Sure Yielded Immaterial *Net* Revenues</u>**

64.     As discussed above, Ebix determined it is the "principal" in the gift card transactions conducted by EbixCash. Thus, it books gift card revenue on gross value of gift cards sold, i.e., it books $100 of gross revenue on the sale of a $100 gift card even though the same $100 will eventually be spent by the consumer and will not be net revenue to Ebix. Rather, the Company's net revenue associated with the gift cards that it sells is derived from the processing and transaction fees associated with the card. Booking gross revenue on the sale allows Ebix to book massive revenue on sales. However, the gift card business has razor-thin profit margins that ultimately contributed approximately 1% or less to Ebix's operating income, or about $1.4 million during all of 2020.

65.     During the COVID-19 pandemic EbixCash emerged as the main driver of Ebix's gross revenue stream. Following is a breakout of EbixCash revenue relative to all other revenue sources in 2019 and 2020:[4]

---

[4] Source: 2020 10-K at 39.

| (In thousands) | For the Year Ended December 31, | |
|---|---|---|
| | **2020** | **2019** |
| EbixCash Exchanges | 388,293 | 319,953 |
| Insurance Exchanges | 178,111 | 190,067 |
| Risk Compliance Solutions | 59,205 | 70,595 |
| **Totals** | **$  625,609** | **$  580,615** |

66.     For example, in a November 9, 2020 press release, attached to a Form 8-K, regarding the Company's earnings, Ebix explained that it was able to substantially increase revenues "despite continued significant declines in its travel, forex, e-learning and remittance businesses" at EbixCash. The Company specifically noted that its "global payment solutions business continues to benefit from strong customer demand for prepaid cards."

67.     In its Form 10-Q for Q3, 2020 Ebix reported that its losses in gross revenue were buoyed by strong gift card sales and cited COVID-19 as a driver of demand: "Revenues [adversely] impacted by COVID-19 through September 30, 2020 were substantially offset by an approximately $98 million increase in payment solutions revenues, primarily in India. This substantial increase reflects the strong demand for prepaid cards and other electronic payment solutions since the COVID-19 pandemic arose."

68.     Ebix also reported the substantial revenue growth in EbixCash's payment solutions segment (primarily pre-paid gift cards) in the Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A") in the 3Q20 10-Q, which stated in relevant part:

> While our travel, foreign exchange and remittance businesses continue to be materially negatively impacted by COVID-19, total revenues increased year-over-year during the third fiscal quarter of 2020 due primarily to strong demand for the Company's payment solutions offerings in India.
>
> *              *              *
>
> For the nine months ended September 30, 2020 the Company's travel, foreign exchange and remittance business revenues declined by over $100 million year-over-year, a decrease of greater than 60%. ***Revenues impacted by COVID-19 through September 30, 2020 revenues were substantially offset by an***

26

> *approximately $98 million increase in payment solutions revenues, primarily in India. This substantial increase reflects the strong demand for prepaid cards and other electronic payment solutions since the COVID-19 pandemic arose.*

69. During the Company's November 9, 2020, earnings call, Jeffrey Lee Van Rhee, Partner & Senior Research Analyst, Craig-Hallum Capital Group LLC, Research Division, asked about the importance and potential of the payments business. Defendant Raina answered as follows:

> ROBIN RAINA: Well, Jeff, first of all, I mean, look at our competition. Meaning I have worthy competitors out there who only do payment solutions, are presently -- and are presently getting valued in -- up between $10 billion and $20 billion with way lesser revenues, $450 million, $400 million of revenue and $600 million, $700 million of lost sales. *So clearly, market seems to still like the payments business. So having said that, from our perspective, being in payment business is very important because it makes us completely -- it spreads our reach virtually across the country. It is -- this is amazing marketing for us.*

70. The same trends noted in the Company's 3Q20 10-Q continued through year-end 2020. In its 2020 10-K Ebix attributed the astronomical revenue growth to EbixCash's payment solutions business (primarily gift cards) in India during 2020. According to the 2020 10-K:

> During the twelve months ended December 31, 2020, our total revenue increased $45.0 million, or 8%, to $625.6 million compared to $580.6 million in 2019.
>
> \*    \*    \*
>
> While our travel, foreign exchange, remittance and e-learning businesses continue to be materially negatively impacted by COVID-19, the increase in 2020 total revenue year-over-year was due primarily to strong demand for the Company's payment solutions offerings in India (primarily prepaid gift cards), which increased by more than $200 million year-over-year to approximately $256 million, or 590% year-over-year growth.
>
> \*\*\*
>
> The Company's travel, foreign exchange, remittance and e-learning businesses had a year-over-year decline in revenues in 2020 in excess of $150 million, an approximately 65% decline year-over-year, which offset the growth in the payments solutions business.

71.     Ebix's gross revenues from gift card sales increased nearly six-fold from 2019 to 2020, expanding from $56 million in 2019 to $256 million in 2020, as stated in the 2020 10-K. ("During 2020, our revenue from the payment solutions offerings in India (primarily prepaid gift cards) increased by more than $200 million year over year to approximately $256 million, a 590% year-over-year growth.").

72.     The $256 million in gift card revenue for 2020 represented 41% of Ebix's total revenue of $626 million in 2020. Thus, gift card revenue was a leading component of the Company's overall financial position.

73.     The increase in gift card revenue at year-end 2020 was a continuation of the trend noted in the September 30, 2020 10-Q: "[There were] revenue mix changes year over year, particularly gift cards sold within the EbixCash India operations. . . . Payment solutions revenues increased by greater than 350% year-over-year for the . . . [nine-month] period ended September 30, 2020." 3Q20 10-Q at 39. Thus, as investors were told of the gift card revenue growth at the beginning of the Class Period, the growth continued through year-end 2020. The growth reportedly continued through year-end 2021 as well: "During the twelve months ended December 31, 2021, our total revenue increased $369.3 million, or 59%, to $994.9 million compared to $625.6 million in 2020. The growth in revenues was due primarily to strong demand for the Company's payment solutions business in India (primarily prepaid gift cards)."

74.     The foregoing illustrates the importance of EbixCash itself and, in particular, its surging gift card revenue, to the perception of the Company's overall financial position when viewed on a gross basis. As a result of EbixCash's surging gross revenue—attributable to its pre-paid gift card business—the Company's share price rose from below $20 per share just before the start of the Class Period to as high as $52.07 on January 29, 2021, shortly before the end of the

Class Period.

75.     Despite the importance of EbixCash's growth to the more than doubling of Ebix's stock share price, the revenues derived from that growth would do nothing to solve Ebix's looming debt problem. For example, as the Company stated on June 16, 2022, "Ebix's gift card business…generated operating income of 1% or lower in the 12-month period ending December 2020 and December 2021, which were not material to Ebix's operating profit or net income in each of the two periods." Translated into cash available to pay down Ebix's looming $672 million debt payment in February 2023, operating income from the surging gift card business was less than $1.4 million for the full year 2020 and less than $1 million for Q4 2020.

### 3.     Without EbixCash's "Payment Solutions" Segment – GiftCards – Revenues Declined By 30% During The 2-Year Period From 2019-2021

76.     Absent the growth in *gross* revenues attributable to the EbixCash's pre-paid gift card business, no other segment of the business was poised to generate the growth and certainly not the badly needed *cash* necessary to alleviate Ebix's looming debt problem.

77.     Ebix reported overall revenue growth of 71% during the 2-year period of 2019-2021. Ebix's total revenue increased from $581 million in 2019, to $626 million in 2020, to $995 million in 2021. 2021 10-K at 57.

78.     Much of that growth was attributed to gift card sales. Ebix's payment solutions revenue (primarily gift card revenue) was $56 million in 2019, $256 million in 2020, and $630 million in 2021. 2020 10-K at 20; 2021 10-K at 14.[5]

---

[5] Ebix did not specify its 2019 payment solutions revenue in its SEC filings. However, Ebix's 2020 10-K noted that its payment solutions revenue "increased by more than $200 million year over year to approximately $256 million" in 2020. 2020 10-K at 20. Backing out the $200 million growth results in approximately $56 million in payment solutions revenue for 2019.

79.     Excluding the benefit of payment solutions revenue, Ebix's overall gross revenue would have *declined* by 30% in the 2-year period of 2019-2021, thus further illustrating the importance of gift card revenue to Ebix's overall financial position and that an IPO of EbixCash was likely the only option to pay down the Company's looming debt.

80.     EbixCash's surging revenues also served to substantially increase the value of Ebix's share price—of which Defendant Raina owned approximately 14% in addition to his ownership of 176,000,000 options to purchase shares of EbixCash on a 1:1 basis in the IPO.

### 4.     The Purported Drivers of EbixCash's Pre-paid Gift Card Sales Are Dubious

81.     Defendants knew or recklessly disregarded that the rapid growth in gift card revenue in the third quarter of 2020 was not only the result of actual growth in the sales of gift cards but also attributed to EbixCash's inability to keep adequate records of daily transactions which had experienced sudden and unexpected astronomical growth in gift card sales.

82.     As alleged, throughout 2020, Ebix claimed that the surge in gift card sales was attributable to the COVID-19 pandemic.

83.     Following the resignation of RSM, the Company's explanation for the growth in demand evolved beyond just Covid-19 as a driver. For example, on February 19, 2021, Ebix issued a press release, included in a Form 8-K, in which it stated: "The growth in the gift card business revenues was driven by the increased use of digital money in India during the COVID-19 pandemic and the renewed push by the Company to grow its payment solutions business."

84.     Two months later when the Company released its s 2020 10-K at the end of April 2020, prepaid gift cards had experienced a sharp and sudden decline in India as illustrated by an analysis by India's Central Bank, the Reserve Bank of India ("RBI"). The RBI reported that the volume of pre-paid card transactions in India decreased from December 2019 to the date of the

3Q20 10-Q, continued to languish through the end of the Class Period, and increased only after

the Class Period ended. The RBI's analysis, with its "Note" is reproduced here: [6]



***Note***: *Cards include debit and credit card payment transactions (excl. cash withdrawal) and PPIs include wallet and PPI card payment transactions (excl. cash withdrawal).*

85.     Aware of the sudden and sharp decline in gift card activity in India and emerging

trends that the market and investing public would eventually learn, Ebix shifted its explanation for

the surge in gift card sales so that it was (a) no longer solely attributable to COVID-19; and (b)

tied to events that, if true, may drive continued growth. Specifically, the Company claimed in its

2020 Form 10-K:

> The increased demand for prepaid gift cards in India was primarily due to: (i)
> changes in regulations by the Reserve Bank of India related to debit cards, which
> has shifted demand in the market towards prepaid gift cards; (ii) COVID-19,
> which has facilitated increased online and electronic commerce due to restrictive
> lockdowns in 2020; and (iii) the Company's increased marketing efforts around

---

[6]  *See* https://www.rbi.org.in/Scripts/TrendsPSIUserView.aspx?Id=1 at chart 3 (last visited
October 30, 2022).

the prepaid gift card business.

86.     The findings of the RBI illustrated above do not support Ebix's first new factor for growth, the claim that changes in the RBI's regulations shifted demand to its gift cards.

87.     The purported impact of the other new factor—increased marketing efforts—is dubious. Ebix's marketing and advertising costs decreased by a wide margin from 2019 to 2020. According to Ebix's Form 10-K for 2020, "[s]ales and marketing expenses decreased $5.7 million, or 29%, from $19.6 million in 2019 to $13.8 million in 2020. This decrease is primarily due to reduced advertising and marketing costs in response to COVID-19." The Form 10-K also stated that "[a]dvertising costs amounted to $4.8 million [and] $9.7 million . . . in 2020 [and] 2019 . . . respectively and are included in sales and marketing expenses." Given the decline in Ebix's marketing and advertising costs, it is unlikely that *increased* marketing efforts were a material cause of the increased gift card revenue.

88.     Also calling into doubt Ebix's reported gift card sales growth is that according to the RBI, pre-paid cards and instruments only grew by approximately 10% per year during the period, far below Ebix's reported rate of growth, for which it would have had to vastly outperform the industry.

89.     Rather, recognizing that the driver of the all-important gift card sales Ebix had repeatedly touted—COVID-19—may be waning, Defendants sought to steer the market's perception to other systemic or sustainable drivers such as changes in regulations and marketing.

90.     Defendants knew or recklessly disregarded that the exorbitant increase in gift card revenue was caused in part by something other than legitimate business practices. The increase was a byproduct of a material weakness in internal control, which allowed large increases in revenue to flow through to the income statement without adequate support or justification, as flagged by RSM and known by Raina as a result of his continuous monitoring of internal control

and communications with the Audit Committee.

91.     Ebix disclosed that it specifically reviews revenue growth when evaluating whether its internal controls are effective: "Management focuses on a variety of key indicators to monitor operating and financial performance. These performance indicators include measurements of revenue growth, operating income, operating margin, income from continuing operations, diluted earnings per share, and cash provided by operating activities. We monitor these indicators, in conjunction with our corporate governance practices, to ensure that our business is efficiently managed and that effective controls are maintained." 2019 10-K at 32-33; *accord* 2020 10-K at 37. In light of this practice, the large increase in gift card revenue reflected in the 3Q20 10-Q showed that Defendants knew or recklessly disregarded the existence of inadequate internal controls. Defendants either recklessly failed to evaluate internal controls in response to the well-known revenue increase or turned a blind eye to the internal control weaknesses they detected.

## C.     Ebix Advances Plans to Spinoff EbixCash in an Initial Public Offering as A Race Against the Insolvency Clock

92.     On January 6, 2020, Ebix provided investors with an update on the planned IPO of EbixCash which the Individual Defendants knew could be highly lucrative both for the Company and for themselves personally as, once public, it would buoy the share price of Ebix, of which Raina owned 14%, and result in a massive windfall for Defendant Raina who owned options for 176,000,000 shares of EbixCash.

93.     In a press release titled "EbixCash Announces IPO Update," the Company stated, in pertinent part that it was "continuing to make progress in terms of moving forward with its IPO plans" and had appointed various legal counsel. The press release went on to identify its forthcoming DHRP:

> The Company also said that it will soon announce the appointment of a reputed international industry analyst firm towards analyzing the industry and

EbixCash's relative position in the markets with respect to the industry. All of this detailed analysis would form an integral part of the EbixCash Draft Red Herring Prospectus (DRHP) – the offer document to be filed by the company for its public IPO.

94.     Ebix's Third Quarter 2020 Investor Call took place on November 9, 2020. Defendants Raina and Hamil participated, among others. Defendant Raina explained during the call that EbixCash's rapid revenue growth enhanced the lucrative prospects of the planned IPO of Ebix Cash:

> EbixCash revenues grew 268% in third quarter of 2020 versus the third quarter of 2019. *** EbixCash performance is particularly noteworthy when you compare it to its key competitors with high valuations who collectively lost $1 billion last year in the Indian market and delivered much less top line growth than EbixCash.

> \*       \*       \*

> With regards to the IPO, we are keeping our fingers crossed as we look at the overall IPO climate improve in India. *** We're keeping a close watch on the improving financial markets in India. ***The recent IPOs in India have been heavily oversubscribed, and there seems to be a pent-up demand for solid IPOs. There are a number of big IPOs planned next year. And we hope that we will be one of them.*** We will keep you informed about that.

> We see the IPO as a ***possible multibagger opportunity for the shareholders of Ebix***, as all other financial exchange sector companies in India with billions of dollars in valuation do not have the strong financial metrics that our operation in India has. ***If anything, the COVID-19 period has further shown the strength of our business model.***

95.     Shortly thereafter, Ebix further explained that its already insufficient financial resources were more constrained than the top line numbers may indicate. In its 2020 10-K, Ebix stated: "The Company holds material cash and cash equivalent balances overseas in foreign jurisdictions." Those jurisdictions include India, the Philippines, Australia, Indonesia, countries in Latin America, Singapore, New Zealand, the United Arab Emirates, Canada, Europe, and Mauritius. As such, according to the Company, "[t]he free flow of cash from certain countries where we hold such balances may be subject to repatriation tax effects and other restrictions.

Furthermore, the repatriation of earnings from some of our foreign subsidiaries would result in the application of withholding taxes at source and taxation at the U.S. parent level upon receipt of the repatriation amounts." Therefore, the woefully insufficient capital that Ebix does have is subject to tax effects and other restrictions that may make some of it entirely unavailable and some portion subject to erosion due to repatriation tax obligations before it can service the Company's looming debt obligation.

96.     It is little surprise that Ebix's most recent quarterly report on Form 10-Q for the period ended June 30, 2020 ("2Q22 10-Q"), signed by Defendants Raina and Hamil, suggested that the Company may not have available capital to manage its debt and that the maturity of its credit facility was straining the Company:

> ***To the extent we have available capital***, we intend to continue to utilize cash flows generated by our ongoing operating activities and the refinancing of our Credit Facility, in combinations with the possible issuance of additional debt or equity, to fund organic growth initiatives and capital expenditures, to make strategic business acquisitions, ***to*** retire outstanding indebtedness, and to repurchase shares of our common stock if and as market and operating conditions warrant. However, ***the maturity of the Credit Facility as well as the covenants in that Credit Facility could adversely affect our ability to make strategic acquisitions, fund investments, repurchase shares of our common stock, or engage in other business activities that could be in the Company's interest***.

97.     Indeed, RSM resigned because the Company failed, despite being "repeatedly told" that it could not classify a $30 million transfer as cash or a cash equivalent. Ebix's preferred characterization was incorrect but would have created the impression that the Company had far more cash that it did at a time when its cash and cash equivalents (much of which it could not repatriate or was subject to tax obligations if repatriated) was a fraction of what was required to pay its massive debt obligation coming due in February 2023.

98.     Defendants' most recent acknowledgements reflect what they knew during the Class Period as they ignored internal control problems at EbixCash in the hopes of capitalizing on

a successful IPO of EbixCash to enrich Raina personally by monitizing his 176,000,000 options, save Ebix and maintain or further increase the soaring price of its shares, of which Raina owned approximately 14% of all outstanding shares.

### D.   RSM Abruptly Resigns and Identifies a Material Weakness in Internal Control in the Gift Card Business

99.     RSM was engaged by the Audit Committee on December 21, 2018 to serve as the Company's independent auditor for the fiscal year ending December 31, 2019 and was engaged again on June 12, 2020 to serve as the Company's independent auditor for the fiscal year ending December 31, 2020. RSM performed audit services in connection with that audit until its abrupt resignation on February 15, 2021.

100.    In a Form 8-K filed with the SEC after the market closed on February 19, 2021, Ebix disclosed that "[b]y letter dated February 15, 2021, RSM US LLP ("RSM") notified the Audit Committee of the Board of Directors (the "Audit Committee") of Ebix, Inc. (the "Company") of its resignation as the Company's independent registered public accounting firm." Ebix also issued a press release on February 19, 2021, which was filed as an attachment to an 8K filed with the SEC on February 22, 2021. On February 22, 2021, Ebix issued a press release titled "Ebix Reaffirms Business Outlook for 2021 and Beyond," which was filed as an attachment to an 8K filed on February 22, 2021. .On February 23, 2021, Ebix filed a Form 8-K attaching a letter dated February 22, 2021form RSM to the SEC.

101.    On February 19, 2021, after the market closed, Ebix issued a Form 8-K and press release in which it first highlighted its "strong business outlooks" and then disclosed that its auditor, RSM, had resigned shortly before its audit of the company's financial statements was to be completed and Ebix's Form 10-K for 2020 was to be filed with the SEC. In sum, Ebix reported that RSM resigned because "despite repeated inquiries" it could not "obtain sufficient appropriate

audit evidence that would allow it to evaluate the business purpose of significant unusual transactions that occurred in the fourth quarter of 2020" related to Ebix's gift card business in India; that there was a material weakness related to Ebix's failure to design controls "over the gift or prepaid card revenue transaction cycle sufficient to prevent or detect a material misstatement" and that it disagreed over the accounting treatment of $30 million that had been transferred into a commingled trust account in December 2020. Notably, after having repeatedly touted the growth of its gift card business for months, as detailed above, in the press release Ebix addressed the "materiality" of the issues raised by RSM pointing out explicitly for the first time that its gift card business revenues were *not* material.

102.    Specifically, in the February 19, 2021 press release titled "Ebix Shares Strong Business Outlook and Discusses Recent Events," filed with the SEC on February 22, 2021 as an attachment to an 8-K, Ebix stated:

> **Ebix Shares Strong Business Outlook and Discusses Recent Events**
>
> JOHNS CREEK, GA – February 19, 2021 – Ebix, Inc. (Nasdaq: EBIX), a leading international supplier of On-Demand software and E-commerce services to the insurance, financial, healthcare and e-learning industries, today issued a press release to ***emphasize a strong current business outlook*** while discussing the auditor resignation, ***the income materiality of the issues highlighted***, and the various related steps being taken by the Company.
>
> By letter dated February 15, 2021, RSM US LLP ("RSM") notified the Audit Committee of the Board of Directors (the "Audit Committee") of Ebix, Inc. (the "Company") of its resignation as the Company's independent registered public accounting firm, as the Company explained in its Form 8-K filed today.
>
> RSM stated in its letter that ***its resignation was the "result of being unable, despite repeated inquiries, to obtain sufficient appropriate audit evidence that would allow it to evaluate the business purpose of significant unusual transactions that occurred in the fourth quarter of 2020***." RSM informed the Company that ***the unusual transactions related to the Company's gift card business in India***. RSM also stated in its letter that ***it had identified a material weakness because "management did not design or implement the necessary procedures and controls over the gift or prepaid card revenue transaction***

*cycle sufficient to prevent or detect a material misstatement*."

RSM also informed the Company that there was a ***disagreement with respect to the classification of $30 million held in a trust account for the benefit of the Company***. In connection with a pending acquisition, in December 2020 the Company transferred $30 million to a trust account of its outside legal counsel. There were no restrictions on the Company's ability to have the cash returned, and in fact, after RSM opined on the issue of classification of these funds, the Company had the cash returned on February 2, 2021. RSM informed the Company that it believed that these funds should be classified on the balance sheet under the "Other Current Asset" line item of the financials, instead of being classified as cash as the Company had initially classified it. There were communications with RSM on this issue after which the Company was prepared to classify the $30 million held in the trust account at December 31, 2020 as a current asset. The Company considered this issue to be an initial difference of opinion based on incomplete facts or preliminary information rather than a "disagreement" pursuant to Item 304(a)(1)(iv).

The Company's unaudited results before any one-time unusual items or audit adjustments for the fourth quarter of 2020 includes revenues greater than $220 million and operating income and operating cash flow metrics each in excess of $32 million. Of these amounts, the Company's unaudited gift card business generated in excess of $130 million of revenues in the fourth quarter, representing sequential revenue growth in the gift card business of greater than 95% versus the third quarter of 2020. ***The corresponding Q4 2020 gift card business operating income was less than $1 million.***

***For the full year 2020, operating income from the gift card business was less than $1.4 million. The growth in the gift card business revenues was driven by the increased use of digital money in India during the COVID-19 pandemic and the renewed push by the Company to grow its payment solutions business.***

The Chair of the Audit Committee discussed with RSM the reasons for its resignation. While the Company *does not agree with **certain** statements* made by RSM in its resignation letter dated 2/15/21, the board has engaged outside counsel who, along with accounting experts, will assist the Company with respect to these matters.

*** *

As of February 15, 2021, RSM had not completed its audit procedures or issued any reports on the Company's consolidated financial statements and internal controls over financial reporting for the fiscal year ended December 31, 2020.

The Company intends to move as quickly as possible to replace RSM and to complete its 2020 financial audit. The Company believes that the accounting

for its gift card business is consistent with GAAP requirements. The Company will communicate with its public shareholders as appropriate.

103.    Critically, Ebix did not say that it disagreed with RSM or that it did not agree with *all* of the statements made by RSM. Rather, Ebix acknowledged that it "does not agree with *certain* statements made by RSM in its resignation letter" without specifying what it purported to agree or disagree with.

104.    On this news, the Ebix's share price plummeted $20.24 per share, or approximately 40%, to close at $30.50 on February 22, 2021, on abnormally heavy trading volume.

105.    Defendants actively prevented the market from learning the truth about their fraud. On February 22, 2021, in an effort to confront the continuing fallout from RSM's abrupt resignation and spin the narrative to its advantage, Ebix issued a press release, which was attached to a Form 8-K filed with the SEC on February 22, 2021, reaffirming its business outlook for 2021 and thereafter.

106.    In this release, Defendants continued to downplay the significance of Ebix's gift card business and its materiality to the Company's financial statements stating: "the unaudited operating income from our gift card business was less than $1.4 million for the full year 2020 and less than $1 million for Q4 2020." Additionally, Ebix reassured investors that "[n]o one has made any such aspersion [of fraud or wrongdoing] in any manner whatsoever. The Company is not aware of any wrongdoing in any manner nor is aware of any such aspersion being made by anyone."

107.    Defendants manipulated the meaning of "significant unusual transactions" by characterizing it as the 95% growth in the gift card business. They also took the opportunity to distract investors from the extraordinary event of an auditor resignation by providing an update on the planned IPO for EbixCash. In pertinent part, the Company stated as follows in the February 22 press release, filed as an attachment to a Form 8-K filed with the SEC on February 22, 2021:

***Ebix Reaffirms Business Outlook for 2021 and Beyond***

\*   \*   \*

The Company decided to issue this release in response to investor questions over the weekend. The Company asserted the following in response to specific questions.

- How is the Company's financial health? - The Company's financial health is in better shape than ever, as reflected in our operating cash flows through the end of 2020. The Company continues to generate strong cash flows. As of 15th February 2020, the Company's cash and cash equivalents (***including any restricted cash***) amounted to greater than $140 million, including the $30 million earmarked for a new US acquisition that is back in Ebix's operating bank account.

- When is the EbixCash IPO targeted for? ***The Company is targeting the EbixCash IPO towards the end of 2021***, in consultation with its investment bankers.

- ***Does the Company suspect any fraud or wrongdoing?*** Has any such aspersion been made by anyone? No one has made any such aspersion in any manner whatsoever. ***The Company is not aware of any wrongdoing in any manner nor is aware of any such aspersion being made by anyone***.

- What is the income materiality of the Gift card business? As elaborated in our previous press release, the unaudited operating income from our gift card business was less than $1.4 million for the full year 2020 and less than $1 million for Q4 2020. ***The Company believes that the accounting, including for our gift card business, is consistent with GAAP.***
  \*\*\*
- ***Is the 95% growth in gift card business in Q4 2020 "unusual"?*** The term "significant unusual transactions" is an accounting term, defined as "a transaction that is outside the normal course of business for the company or that otherwise appears to be unusual due to its timing, size, or nature." ***In this regard, we note that our gift card business revenues grew substantially in Q4 2020***. The increase in gift card revenues was driven by the increased use of digital money in India during the COVID-19 pandemic and the renewed push by the Company to grow its payment solutions business.

108.   The following day, on February 23, 2021, Ebix disclosed in Form 8-K filed with the SEC that RSM had furnished the Company with a letter, addressed to the SEC and dated

February 22, 2021, in which RSM identified aspects of Ebix's February 19, 2021 disclosure (regarding the resignation of RSM) with which it disagreed.

109.    RSM disagreed with (a) Ebix's claim that there was a difference of opinion regarding the classification of a $30 million transfer because it "repeatedly told the Company" that it could not treat the funds as cash or cash equivalent; and (b) Ebix's discussion about the material weakness regarding EbixCash's gift card business.

110.    Regarding the classification of the $30 million transfer, RSM stated, in relevant part:

> RSM disagrees that this issue was an initial difference of opinion based on incomplete facts or preliminary information rather than a disagreement pursuant to Item304(a)(i)(iv). RSM repeatedly told the Company that the $30 million that the Company transferred on December 31, 2020 to an account of its outside legal counsel could not be classified as a cash or cash equivalent on its balance sheet. RSM stated this because the $30 million was transferred in connection with a pending acquisition to a commingled trust account that was not under the direct control of the Company. At the time of RSM's resignation, the Company had not communicated that it accepted RSM's position. In addition, RSM did not tell the Company these funds could be classified as "other current assets," nor did RSM concur that the $30 million was "owned by the Company."

111.    The disagreement between RSM and Ebix regarding the treatment of $30 million in funds slated for an acquisition highlights Ebix's strong need to project that it had more cash and cash equivalents than it did given its looming debt obligations. RSM's letter to the SEC clearly demonstrates that at a time when the Ebix's cash was waning, despite being "repeatedly told" by its auditor, it could not classify the $30 million as cash or a cash equivalent. Doing so would create the impression that it had far more cash that it did. Ebix's cash and cash equivalents were just $73 million and $105 million at year-end 2019 and 2020. Thus, $30 million in additional cash or cash equivalents was a very material amount.

112.    Regarding a potential material misstatement of Ebix's financial statements arising from gift card sales at EbixCash, RSM stated, in relevant part:

In its disclosure, the Company states: "RSM *asserts* that on that call it further advised the Chairman that if this requested information was further investigated it might materially impact the fairness or reliability of the financial statements subject to the audit or affect RSMs willingness to be associated with the Company's financial statements, but that since RSM had resigned, no further investigation would occur." (emphasis supplied). RSM disagrees with the use of the term "asserts" to the extent it could create uncertainty as to what RSM communicated. In the call that occurred between RSM and the Chairman of the Company's Audit Committee on February 15, 2021, **RSM stated clearly and unequivocally that if the information repeatedly requested by RSM — but which was not provided by the Company —related to gift cards issued by ItzCash/EbixCash in the fourth quarter of 2020 was further investigated, it might materially impact the fairness or reliability of the financial statements subject to RSM's audit or affect RSM's willingness to be associated with the Company's financial statements**, and that, as a result of RSM's resignation, further investigation has not occurred.

113.   Defendants' failure to accurately characterize its communications with RSM regarding their repeated failure to provide information necessary for the audit of the gift card business, the absence of which may result in a material misstatement of Ebix's financial statements highlights their desperation to suppress the issue. As alleged, the success of the gift card business was critical to maintaining the massive run up in the price of shares, of which Defendant Raina owned approximately 14%, facilitating a successful IPO of EbixCash to generate desperately needed cash to meet Ebix's looming debt burden and to vastly enrich Defendant Raina who owned options for 176,000,000 shares of EbixCash.

114.   Despite Defendants' attempts to reassure investors as to the sufficiency of Ebix's internal control over financial reporting and the reliability of its accounting, Ebix's shares have remained depressed. Having fallen from a closing price of $50.74 on February 19, 2021 to $23.20 per share on February 23, 2021, Ebix shares currently trade at approximately $20 per share—below where they traded before the short-lived growth in EbixCash's pre-paid gift card business, and it still has not affected the IPO of EbixCash.

### E.   RSM's Resignation from the Ebix Audit Was an Extraordinary Event

115.   Accounting literature provides that an auditor should consider withdrawing from an audit in the following circumstances: (1) when the client limits the scope of an audit and does not permit the auditor to access all of the components of the business due to the possibility of a qualified or unclean audit opinion; (2) the identification of fraudulent activity by a client that jeopardizes the integrity of the engagement; (3) the audit client lacks integrity, is dishonest, and/or misstates audit evidence; and (4) the auditor loses independence during the audit due to a conflict of interest and/or intimidation, and the integrity of the audit is compromised rendering it unreliable. Moreover, it is well-accepted that auditing firms should avoid withdrawing from an audit unless absolutely necessary for the firm to maintain the integrity of its deliverables, business, and the larger auditing profession.

116.   An auditor's resignation from an engagement shortly before the completion of an audit is a rare and extraordinary event. Doing so suggests that the client is associated with greater risk, one with which the auditor does not wish to be associated.

117.   Large, sophisticated, well-staffed auditors, like RSM, have both the incentives and the ability to detect hidden risks and when they detect those risks are sufficiently high, they resign from the engagement. Resignations by such auditing firms signal that those engagements have high litigation risk, high audit risk, and/or high business risk. By contrast, Somani had every incentive *not* to detect hidden risks or, if it did, to overlook them so that it could obtain the highly lucrative statutory audit work for EbixCash's DRHP and IPO, as promised by Ebix.

118.   RSM's evaluation of the significant unusual transactions with no apparent business purpose, for which Ebix did not, despite repeated requests, provide sufficient appropriate audit evidence explaining their business purpose, and the material weakness in internal control over financial reporting related to the gift or pre-paid card business revenue transaction cycle provided

sufficient basis for RSM to determine that the Ebix audit had high litigation risk, high audit risk, and/or high business risk that made RSM's further engagement or work on the audit untenable.

119.    RSM's resignation as independent auditor of Ebix in February of 2021, in the middle of an audit, was a drastic measure. RSM stated in its letter dated February 22, 2021, filed with the SEC on February 23, 2021, that even if Ebix had provided the information sought by RSM related to the significant unusual transactions, RSM may have still decided to resign because such information may have "materially impact[ed] the fairness or reliability of the financial statements subject to RSM's audit."

> **F.    Defendants Raina and Hamil Knew or Recklessly
> Disregarded that RSM Was Not Able to Obtain Sufficient
> Audit Evidence Through Raina's Role as CEO and Chairman
> of the Ebix Board of Directors, and Hamil's Role as CFO and Senior
> Financial Management Where They Were Tasked with Communicating
> with the Audit Committee in Connection with Internal Control**

120.    By virtue of their positions within the Company, Defendants knew or recklessly disregarded the internal control problems identified by RSM during the Class Period and later acknowledged by Defendant Raina and Ebix's subsidiary EbixCash, in conjunction with the auditor for both companies, Somani. During the Class Period Defendant Raina was the Chairman, President, and Chief Executive Officer of Ebix and a Director and member of the Audit Committee of EbixCash. Defendant Hamil was the Corporate Executive Vice President & Chief Financial Officer of Ebix.

121.    Ebix has a standing Audit Committee. The Audit Committee's principal responsibility is to assist the Board in its general oversight of Ebix's financial reporting, internal controls, ethics compliance and audit functions. Specifically, the Audit Committee's Charter provides that its "principal responsibility is to assist the Board in its general oversight of the Company's financial reporting, internal controls," and "the Committee will facilitate discussions

among the Board, the Auditors and the Company's management."

122.    Specifically, Ebix's Audit Committee duties include:

**_Audit Committee and Audit Committee Financial Expert_**

The Company has a standing Audit Committee. The Audit Committee's principal responsibility is to assist the Board in its general oversight of the Company's financial reporting, internal controls, ethics compliance and audit functions. This committee is directly responsible for the appointment, compensation and oversight of the work of the Company's independent public accounting firm, reviews the annual financial results and the annual audit of the Company's financial statements and approves the inclusion of the audited financial statements in the Company's Annual Report on Form 10-K.

The Audit Committee assists the Board in monitoring: (a) the integrity of our financial statements, (b) the effectiveness of our internal control over financial reporting, (c) the effectiveness of our disclosure controls, (d) the qualifications and independence of our independent registered public accounting firm, (e) the performance of our independent registered public accounting firm, and (f) our compliance with legal and regulatory requirements. The Audit Committee is also responsible for oversight of the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures, including the Company's risk assessment and risk management policies."

123.    The Audit Committee's principal responsibility is to assist the Board in its general

oversight of Ebix's financial reporting, internal controls, ethics compliance and audit functions.

The Audit Committee Charter states its purpose as follows:

The Audit Committee (the "Committee") of the Board of Directors (the "Board") of Ebix, Inc. (the "Company") shall oversee the Company's accounting and financial reporting processes and the audits of the Company's financial statements, and **_shall otherwise exercise oversight responsibility, and assist the Board in fulfilling its oversight functions, with respect to matters involving the accounting, auditing, financial reporting and internal control functions of the Company_**. In so doing, **_it shall be the goal of the Committee to maintain free and open means of communication between the members of the Board, the Company's independent public accountants who audit the Company's financial statements (the "Auditors") and the Company's financial management._** While it is not the Committee's responsibility to certify the Company's financial statements or to guarantee the Auditors' report, **_the Committee will facilitate discussions among the Board, the Auditors and the Company's management._**

124.    The Audit Committee Charter states that one of the Audit Committee's functions

is "reviewing internal controls established by management." The Audit Committee discusses with the independent registered public accounting firm the matters required to be discussed under auditing standards generally accepted in the United States, including those matters set forth in Statement on Auditing Standards No. 1301 (Communication with Audit Committees), as currently in effect. The Audit Committee also receives from, and discusses with, its independent registered public accounting firm the matters required to be discussed under the applicable requirements of the PCAOB, the SEC and the Audit Committee's charter.

125.   The Audit Committee Charter requires it to:

   a. ***"[m]eet with the Auditors and the Company's management to discuss, review and comment upon the interim financial statements*** to be included in each of the Company's Quarterly Reports on Form 10-Q prior to the public announcement of financial results and the filing of the Form 10-Q with the SEC.);

   b. "[b]e directly responsible for the appointment, compensation, retention and oversight of the work of the Auditors, including ***resolution of disagreements between management and the Auditors regarding financial reporting***, for the purpose of preparing or issuing an audit report or performing other audit, review or attest services for the Company. The Auditors shall report directly to the Committee;

   c. "[i]nquire ***of the Auditors and the Company's management about significant risks or exposures*** and assess the steps which management has taken to minimize such risks and monitor control of these areas;

   d. "[r]eview ***with the Auditors and the Company's management their findings on the adequacy and effectiveness of internal controls and their recommendations for improving the internal control environment***, including management's controls and security procedures with respect to the Company's information systems;

   e. "[e]stablish procedures for the receipt, retention, and ***treatment of complaints*** received by the Company regarding accounting, internal accounting controls, or auditing matters; and

   f.  "[c]onduct ***or authorize investigations*** into any other matters within the Committee's scope of responsibilities."

126.   The Audit Committee Charter further states that "[t]he Committee plays a critical

role in serving as a check and balance for the Company's financial reporting system. *In carrying out its functions, the Committee's goal is to help ensure that management properly develops and adheres to a sound system of internal controls and that the Auditors, through their own review, objectively assess the Company's financial reporting practices.*"

127.    The mandated responsibilities and goals of the Audit Committee, as stated in its Charter, raise a strong inference that RSM's inability to obtain sufficient appropriate audit evidence of significant unusual transactions in the gift card and pre-paid card business in India, despite repeated requests, and its identification of a material weakness in internal control were highly significant topics discussed by the Audit Committee, the Board, and Defendants Raina and Hamil during the course of RSM's 2020 audit and interim audit, thus providing Defendants with actual knowledge of RSM's frustrations and resulting conclusions, to which Defendants turned a blind eye.

128.    The Audit Committee's mandate is to "[m]eet with the Auditors and the Company's management to discuss, review and comment upon the interim financial statements" ¶D(1)(a), resolve "disagreements between management and the Auditors regarding financial reporting," ¶D(2)(a), "[r]eview with the Auditors and the Company's management their findings on the adequacy and effectiveness of internal controls and their recommendations for improving the internal control environment," ¶D(3)(c) "[e]stablish procedures for the receipt, retention, and treatment of complaints received by the Company regarding accounting, internal accounting controls, or auditing matters," ¶D(4)(a) and "to help ensure that management properly develops and adheres to a sound system of internal controls and that the Auditors, through their own review, objectively assess the Company's financial reporting practices," ¶E.

129.    Because Defendants Raina and Hamil designed and monitored internal control and

47

were required to communicate with the Audit Committee, both Raina and Hamil as members of management and Raina as a Director of the Company, about numerous aspects of internal control, it is not plausible that Raina and Hamil did not know that RSM was unable to obtain sufficient audit evidence for significant unusual transactions in the gift card business during 4Q20.

130.    It is also not coincidental that Raina's abrupt change from stock compensation in 2019 and 2020 to cash in 2021 coincides precisely with RSM's vocal frustration and repeated requests for and inability to obtain sufficient audit evidence. The temporal proximity of events raises a strong inference that Raina's transition from stock to cash compensation was a product of his knowledge of RSM's inability to complete the audit and the material weakness in the internal control he designed and monitored, all of which he knew about or recklessly disregarded, at the very least, through his communications with the Audit Committee.

**G.    Acquainted With "Opinion Shopping," Instead of Addressing RSM's Concerns, Defendants Allowed RSM to Resign, Quickly Engaged an Ill-equipped Replacement and Promised Lucrative Work on the EbixCash IPO Regardless of the Realities of EbixCash's Business**

131.    Following RSM's resignation on February 15, 2021, Ebix engaged Somani as its replacement auditor on March 5, 2021. Ebix has a history of "opinion shopping." The facts here strongly suggest that (a) Ebix's hiring of Somani was a *quid pro quo* – a clean opinion in exchange for lucrative auditing work in connection with the EbixCash DRHP and the prospect of serving as EbixCash's auditor if the IPO was successful; and (b) Somani lacked the resources and expertise to conduct the audit under any circumstances and which was completed weeks.

132.    In a complete about-face from RSM's challenges, only seven weeks later, on April 27, 2021, Somani apparently determined it had obtained sufficient evidence to explain the business purpose behind the significant unusual transactions concerning Ebix's gift card business in India. Despite all of the concerns raised by RSM regarding the 2020 Ebix audit—concerns so serious

that RSM had resigned, effectively walking away from a lucrative engagement with a rapidly expanding client—Somani signed off on its new client's financial statements without a hint of trouble. A mere seven weeks after RSM's resignation, Somani provided Ebix with a clean, unqualified audit opinion without mentioning either the material weakness in internal control identified by RSM or any remediation efforts.

133. Pursuant to PCAOB AS 2610.09, the successor auditor should make specific and reasonable inquiries of the predecessor auditor regarding matters that will assist the successor auditor in determining whether to accept the engagement, and matters subject to inquiry should include, *inter alia*, the predecessor auditor's understanding of the nature of the company's relationships and transactions with related parties and significant unusual transactions. Thus, upon information and belief, Somani was well informed by RSM of the significant unusual transactions, their lack of business purpose, RSM's identification of a material weakness in internal control and the fact that Ebix failed to or could not provide, despite repeated inquiries by RSM, sufficient and appropriate audit evidence explaining and supporting the business purpose of these transactions.

134. Somani is a firm based in India that according to its website has only seventeen (17) partners across just six (6) practice groups, and only one (1) office located at 3/15, Asaf Ali Road, New Delhi, 110002, and upon information and belief, only one (1) partner holding the certified public accountant ("CPA") designation and license who was well versed with Generally Accepted Accounting Principles ("US GAAP").

135. RSM, by contrast, according to its website, has dozens of offices in the U.S. and around the world, more than 11,000 employees, and provides dozens of accounting service offerings, including auditing, tax, and consulting. Yet Somani was able to review all of the significant unusual transactions identified by RSM, for which RSM was forced to resign due to

insufficient audit evidence being available, determine their business purpose, complete Ebix's

December 31, 2020 year-end audit, and issue a clean, unqualified opinion in a period of less than

seven weeks without explaining the material weakness in internal control identified by RSM or

any remediation efforts.

136.    The 2020 10-K explained that because of RSM's resignation without completing

the 2020 audit and Ebix's failure to timely file the 2020 10-K, Ebix received a letter from Nasdaq

Stock Market LLC on March 2, 2021 informing it that it was not in compliance with the

requirements for continued Nasdaq listing. Defendants knew that delisting would have a material

negative effect on Ebix, its business, its shareholders, and its planned IPO of EbixCash. In an effort

to regain compliance by the April 16, 2021 deadline to submit a plan to Nasdaq, Ebix quickly

retained Somani, which produced a clean audit opinion in record time, in view of RSM's reasons

for resignation. With respect to Nasdaq delisting, the 2020 10-K states:

> ***We are not in compliance with the requirements of Nasdaq for continued listing, and if Nasdaq does not concur that we have adequately remedied our non-compliance with Nasdaq Listing Rule 5250(c)(1), our common stock may be delisted from trading on Nasdaq, which could have a material adverse effect on us and our shareholders.***
>
> On March 1, 2021, subsequent to the resignation of RSM from its position on February 15, 2021, we filed a Notification of Late Filing with the SEC pursuant to Rule 12b-25 of the Securities Exchange Act of 1934, as amended ("Rule 12b-25"), indicating that we were unable, without unreasonable effort and expense, to finalize our 2020 Financial Statements by March 1, 2021, the filing due date to file the Company's Annual Report on Form 10-K for the year ended December 31, 2020 (the "2020 Form 10-K"). We indicated at the time that we intended to file the 2020 Form 10-K as soon as practicable and would make every effort to file the 2020 Form 10-K within the fifteen-day extension period afforded by Rule 12b-25.
>
> On March 2, 2021, we received a notification letter from The Nasdaq Stock Market LLC ("Nasdaq") stating that, because the Company had not yet filed the 2020 Form 10-K, ***the Company was no longer in compliance with Nasdaq Listing Rule 5250(c)(1), which requires listed companies to timely file all required periodic financial reports with the SEC. Nasdaq's notification letter states that we have 45 calendar days, or until April 16, 2021, to submit to***

***Nasdaq a plan to regain compliance with the Nasdaq Listing Rules***. If Nasdaq accepts the Company's plan, then Nasdaq may grant the Company up to 180 days from the prescribed due date for filing the 2020 Form 10-K to regain compliance. If Nasdaq does not accept the Company's plan, then the Company will have the opportunity to appeal that decision to a Nasdaq hearings panel.

The Company has provided its plan to Nasdaq, and as described in more detail above, the Company has retained KGS as its independent registered public accounting firm to audit the Financial Statements. However, there can be no assurance that Nasdaq will concur that we have remedied our non-compliance with Listing Rule 5250(c)(1), in which case our common stock could remain subject to delisting by Nasdaq. If our common stock is delisted, there can be no assurance whether or when it would again be listed for trading on Nasdaq or any other securities exchange. Further, the market price of our shares could decline and become more volatile, and our shareholders might find that their investment in our shares has limited liquidity. Moreover, institutions whose charters forbid holding securities in unlisted companies might sell our shares, which could have a further adverse effect on the price of our stock.

137.    Defendants explained the potential material adverse effects of weakness in internal control in the 2020 10-K, thus confirming Ebix's need to obtain a clean, unqualified audit opinion on internal control from Somani—and quickly, by the fast-approaching deadline for Nasdaq delisting. In Ebix's case, the widely touted planned IPO of EbixCash could be jeopardized by RSM's identification of a material weakness in internal control and Defendants knew that Ebix had to change the narrative quickly. The 2020 10-K acknowledges the materiality of a material weakness in internal control, stating in relevant part:

we may discover future deficiencies in our internal controls over financial reporting, including those identified through testing conducted by us or subsequent testing by our independent registered public accounting firm. **If we are unable to meet the demands that have been placed upon us as a public company**, including the requirements of the Sarbanes-Oxley Act, we may be unable to accurately report our financial results in future periods, or report them within the timeframes required by law or stock exchange regulations. Failure to comply with the Sarbanes-Oxley Act, when and as applicable, could also potentially subject us to sanctions or investigations by the SEC or other regulatory authorities. ***Any failure to maintain or implement required new or improved controls, or any difficulties we encounter in their implementation, could result in additional material weaknesses or significant deficiencies, cause us to fail to meet our reporting obligations or result in material misstatements in our financial statements. If we cannot provide reliable***

*financial reports or prevent fraud, our business and results of operations could be harmed, and investors could lose confidence in our reported financial information*.

138.   Ebix's explanation for the hiring of Somani are highly suspect and indicate that Somani was self-interested and motivated to give Ebix a clean opinion in a *quid pro quo*.

139.   In a Form 8-K dated March 8, 2021, Ebix explained the rationale for hiring Somani:

> The Ebix audit committee's decision [to engage Somani] was governed by a number of factors including KGS's financial expertise, its forensic background, depth of partner experience in the finance and insurance industries, its ***ability to dedicate over fifteen certified accountants to the audit immediately***, KGS's regulatory and accounting reputation, and ***its listed company experience***. KGS selection will also ensure a fresh look at the EbixCash payment solutions business from an audit perspective.

140.   According to Public Company Accounting Oversight Board (PCAOB) records, at the time that it was hired by Ebix, Somani did not have a single U.S. publicly listed audit client. Thus, it had not "listed company expertise" relating to U.S. listed companies, such as Ebix. Somani had 17 partners, apparently 15 of whom were available "immediately" and only one of whom was a CPA. That is, Somani appears to have little, if any, directly relevant experience, and that the entire firm could immediately devote nearly 100% of its audit staff to an engagement suggests Somani was hardly in demand.

141.   Ebix's March 8, 2021 press release went on to state:

> Ebix also said that it is continuing to explore the engagement of an international named audit firm to be its consolidated worldwide auditors for 2021, while it ***intends to retain KGS as a statutory auditor for the EbixCash IPO*** jointly with a top-tier international audit firm.

> The Company also announced that it has decided to continue with the services of KPMG for business combination valuation, and Ernst & Young for tax advice, tax provisioning and internal SOX services, for the year 2020 and beyond.

142.   Ebix's statements suggest that it knew Somani was not the appropriate auditor for its needs and that Somani had a strong financial interest to take the audit work and quickly give

Ebix a clean audit, regardless of its internal control problems.

143.    ***First***, Ebix clearly recognized that what it required was an "international named audit firm" to serve as its worldwide auditors, not a small Indian firm with no U.S. listed company experience. Notably, Ebix had ongoing relationships with *two* "international named audit firm[s]" —KPMG and Ernst & Young. Both firms, by virtue of their non-audit work for Ebix would have been familiar with Ebix's business and, given their massive size relative to Somani, surely could have devoted 15 certified accountants to the audit. It is not surprising, however, that large international audit firms would not want to follow RSM's resignation. Indeed, with RSM's resignation, Ebix had cycled through seven auditors, including KPMG who resigned in 2004.

144.    ***Second***, Ebix revealed that it intended to retain Somani as its statutory auditor for the EbixCash IPO. At an estimated $4.5 - $5 billion valuation, the IPO of EbixCash would be the largest in the history of India providing Somani with an incredibly lucrative and high-profile engagement. Thus, it is reasonable to infer that Ebix dangled the prospect of the EbixCash IPO business to convince Somani to take the engagement and provide it with a clean audit. Indeed, Ebix lived up to its end of the bargain—according to the EbixCash DRHP, Somani was its "statutory auditor" in connection with the preparation of the DRHP.

145.    Under Raina's tenure, the SEC cited, in an Order sanctioning one of Ebix's accountants early in Raina's tenure, "Ebix's very aggressive accounting policies, and possible opinion shopping." The facts surrounding Ebix's hiring of Somani strongly indicate that it again engaged in "opinion shopping." Early in Raina's tenure at Ebix, the SEC charged Ebix's former audit engagement partner over allegations of fraud involving Ebix.[7] The SEC's Order found that, among other things, Ebix engaged in "possible opinion shopping by Ebix among accounting firms"

---

[7] *See* https://www.sec.gov/litigation/admin/33-8172.htm (last visited on October 30, 2022).

—exactly what the facts suggest here regarding Ebix's hiring of Somani. The SEC's Order charging Ebix's former auditor leave little doubt.[8] In relevant part, the SEC's Order states:[9]

> 5.    Putnam served as the audit engagement partner for Andersen's audit of Ebix for the nine-month period ended December 31, 1998 ("1998 transition period"). During his audit work for the company, Putnam received indications of possible fraud at Ebix including earnings management, high involvement in accounting decisions by non-financial management, commitments made to analysts, the expectation of possible equity funding, the desire to maintain a high stock price, Ebix's very aggressive accounting policies, and possible opinion shopping by Ebix among accounting firms, among others. In particular, Putnam became aware that Ebix's management had taken an extremely aggressive approach to recognizing revenue from the company's software sales.

***

> 64.    In addition to noting Ebix's extremely aggressive approach to software revenue recognition, the March 15, 1999 memorandum also observed that Andersen became aware of a number of factors that increased the risk of fraud in Ebix's financial statements:

>> The fraud indicators relate to such areas as possible earnings management, high involvement in accounting decisions by non-financial management (i.e. CEO), commitments made to analysts, expectation of possible equity funding, desire to maintain a high stock price, very aggressive accounting policies, possible "opinion shopping," disputes over adjustments, etc.

146.    Against that backdrop, inexplicably, although Ebix failed to, or could not, provide RSM with the audit evidence and information necessary to explain the business purpose behind each significant unusual transaction identified by RSM relating to Ebix's gift card business in India, only weeks after RSM's resignation, by April 27, 2021, all of the serious issues that caused RSM to resign and surrender a lucrative engagement were apparently resolved by Somani, an auditing firm with far less resources and experience than RSM in just seven weeks—an audit that would typically take several months to a year.

---

[8] *See* https://www.sec.gov/litigation/admin/2008/33-8912.pdf (last visited on October 30, 2022).
[9] *See* https://www.sec.gov/litigation/admin/2008/33-8912.pdf#page=3 (last visited on October 30, 2022).

147.    Somani was miraculously able to accomplish what RSM—a firm with far greater resources and experience—could not: obtain sufficient appropriate audit evidence from Ebix concerning each significant unusual transaction identified by RSM and issue a clean, unqualified audit opinion. Troublingly, Somani's clean opinion, dated April 27, 2021, did not even mention any material weakness in internal control or any remediation of the material weakness identified by RSM. The most compelling inference raised by this timeline and sequence of events is that, hampered by RSM's thorough audit that uncovered a multitude of accounting concerns, Ebix turned to an auditor which would not look too closely at the significant unusual transactions, lack of sufficient appropriate audit evidence, and material weakness in internal control, and instead deliver a clean audit opinion promptly to avoid Nasdaq delisting and to preserve the viability of the lucrative planned IPO of EbixCash.

**H.    When RSM's Clean 2019 Audit Opinion, Including the Effectiveness of Internal Control, Was Reissued in the 2020 10-K, RSM's Prior Reference to Internal Control Was Completely Removed**

148.    RSM delivered a clean audit opinion on Ebix's 2019 financial statements, which was included in the 2019 Ebix Form 10-K filed with the SEC on March 2, 2020. This opinion included an "unqualified opinion on the effectiveness of the Company's internal control over financial reporting" and stated explicitly:

> We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the Company's internal control over financial reporting as of December 31, 2019, based on criteria established in Internal Control - Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission in 2013, and ***our report dated March 2, 2020 expressed an unqualified opinion on the effectiveness of the Company's internal control over financial reporting.***

149.    RSM's 2019 audit opinion was reissued in the 2020 10-K filed with the SEC on April 27, 2021, after RSM's resignation on February 15, 2021, and its disclosure of a material weakness related to Ebix's failure to design controls "over the gift or prepaid card revenue

transaction cycle sufficient to prevent or detect a material misstatement." Tellingly, however, the reissued version of the 2019 audit opinion was altered such that it deleted RSM's crucial language attesting to the effectiveness of Ebix's internal control over financial reporting. The language quoted above in the 2019 audit opinion appears nowhere in the reissued 2019 audit opinion included in Ebix's 2020 10-K.

150.    This deletion speaks volumes. RSM's omission of its 2019 unqualified opinion on the effectiveness of Ebix's internal control over financial reporting in the reissued version filed in the 2020 10-K was intentional and not coincidental or accidental. In the context of RSM's resignation as Ebix's auditor, in part as a result of finding a material weakness in internal control, the reissued 2019 opinion omitting any reference to internal control raises an inference that the material weakness disclosed by RSM in its February 15, 2021 resignation letter may be more extensive than disclosed in that resignation letter. At the very least, the omission of such language in RSM's reissued 2019 opinion raises an inference that RSM was no longer comfortable with its prior unqualified opinion on internal control for the previous fiscal year of 2019 or opining on Ebix's internal control at all.

## I.    **Confidential Witnesses Confirm Plaintiff's Allegations**

151.    Former Ebix employees have come forward to attest to the lack of internal control over the Company's financial reporting. For example, Confidential Witness 1 ("CW1"), a former Technical Accounts Manager who worked at Ebix's Salt Lake City, Utah location from August 2011 to December 2018, reported that, from the very beginning of CW1's tenure with the Company in 2011, fellow employees described Ebix's CEO, Defendant Raina, as "unethical" and an executive who "mix[ed] his own personal interests in India with the company's."

152.    Likewise, Confidential Witness 2 ("CW2") had serious concerns about the Company's finances when RSM resigned in February 2021. CW2 was Ebix's Financial Controller

and SEC Reporting Manager from August 2020 to March 2021, the entirety of the Class Period, after which he served as SEC Reporting Consultant until May 2021. CW2 reported directly to CFO Defendant Hamil, who reported directly to the CEO, Defendant Raina. CW2's job responsibilities included reconciling Ebix's accounting for the year and preparing SEC filings.

153.    According to CW2, each Ebix business had its own accounting team, including its own CFO. The gift card business revenue was recorded by the EbixCash team in Noida, India. Local accounting teams typically ran disparate accounting systems. CW2 found it difficult to manage his team in India because of the time difference and the difference between accounting systems.

154.    According to CW2, an internal audit for 4Q20 began in November 2020, conducted by both the Ebix internal audit team and Ebix's outside auditor, RSM. The formal audit for 2020 began after the books were closed in late January or early February 2021.

155.    In his role, CW2 had direct visibility into the auditor function and was aware of RSM's resignation in February 2021. According to CW2, "[a]uditors just don't quit, unless there's fraud or something. I used to be an external auditor, so I understand it. They will not just resign for no reason. I've never experienced resigning from a client." Critically, CW2 stated that Defendant Hamil—to whom CW2 directly reported— "was devastated [over RSM's resignation] because that's a disaster. He said we had to find a new auditor. So I started thinking about leaving."

156.    Although CW2 did not have visibility into Ebix's operations or finances in India, CW2 "wasn't comfortable" remaining at Ebix after RSM resigned because of CW2's concerns over the internal control over financial reporting: "We have controls in place on the U.S. side, however I'm not sure what other controls are in place in India for that matter." CW2 therefore resigned: "When I gave my resignation, Steve [Defendant Hamil] didn't want to let me go, so he

asked me what he could do. I said, 'Either you hire an internal auditor in the U.S. who is under our supervision who will oversee the India operations, or I'm gone.'" CW2 told Defendant Hamil that Ebix needed to have someone from the U.S. handling the testing of internal control, and that they needed to "look into the revenue process most definitely, because that's why they were having issues." According to CW2, this function needed to be conducted in the U.S.: "It's a different culture here in the U.S., especially for auditors. That person would be working under our supervision and it's different. If the internal auditor is there in India and the CEO is there—that's a different scenario, especially because of the culture." According to CW2, this decision did not lie with Defendant Hamil, but with Defendant Raina in India.

157.    Confidential Witness 3 ("CW3") confirmed CW2's observations about Ebix's disparate accounting systems. CW3 worked for Ebix from May 2015 through June 2020 in the Ebix Health business, including serving as Executive Director of Information Technology for the Ebix Health Administration Exchange from March 2016 through June 2017 and Vice President for the Ebix Benefits Administration and Wellness group from June 2017 through June 2020 at the Johns Creek, Georgia office. From June 2017 through June 2020, CW3 reported directly to Raina. Among CW3's responsibilities were reporting revenue on a quarterly basis to "corporate." According to CW3, Ebix's structure allowed different businesses and groups to function autonomously and there was no corporate structure, per se. CW3 explained Ebix's businesses in India did not operate on the same systems that were used at Ebix headquarters in Johns Creek, Georgia. CW3 noticed differences in accounting between India and the US and that the "Indian accounting people did things that did not make sense to the US accounting team," such as for example, allocating revenue across accounts in a manner that did not make sense and was not in line with the expectations of the US accounting representatives.

158.     According to CW3, Ebix had grown through acquisitions and the different businesses operated on disparate information systems. Ebix did not integrate acquired businesses by migrating their information systems onto common or corporate information systems. CW3 explained that Ebix's strategy entailed buying companies, laying off the legacy employees and not investing in systems. The acquired entities were immediately accreted just after the deals closed, but Raina did not invest in the acquired businesses.

159.     According to CW3, Ebix had a "broken" accounting system. CW3 discovered problems during the last 6 months of his employment at Ebix during the first half of 2020. For example, CW3 discovered receivables going back "12 years that had not been resolved" and a "couple million dollars" of receivables that "needed to be written off" because of the age of the accounts and that the customers no longer did business with Ebix. CW3 discovered a problem with the invoicing function of the accounting system because the system could only produce an invoice for the receivable for the current month and could not bill for past periods. That led to the accumulation of past due receivables and accordingly, the failure to write off the accounts. In addition to being unable to invoice for past due receivables, there was a problem with payment application. According to CW3, if a customer did not put an invoice number on a check sent to Ebix, no one knew how to apply the payment when it was received.

160.     CW3 discussed the problems with Vice President of Finance Robert Ferris sometime in 2020. Ferris explained that he was making "substantial changes" to the accounting function, including the problem with past due receivables. CW3 believed that Ebix would have to "open up previous quarters" that had "already been reported to the SEC" to write off the past due and uncollectable receivables. CW3 believed that "the last thing they wanted to do was to open up a quarter and restate revenue."

161.    CW3 explained that despite the lack of structure and the autonomy of the different businesses, everything was "tightly" controlled by Raina—down to the smallest details. For example, Raina even approved purchases of laptops for new employees. Purchases could not be made until Raina signed off on them.

162.    According to CW3, Raina was equally attuned to revenue for each of the Ebix groups. CW3 explained that all businesses, including EbixCash, sent at least quarterly revenue updates to Raina via Excel spreadsheets, as CW3 did. With respect to the gift card business, CW3 stated that Raina was "very proud" that Ebix was going into that business and was "betting the ranch on EbixCash." CW3 explained that there was no doubt that Raina "kept track of the numbers."

163.    According to CW3, previous auditors were fired by Raina because he disagreed with them over "statement of revenues."

164.    Hindenburg Research similarly indicated in its June 16, 2022 report, "Ebix: This House of 'Cards' Seems to Have a Glaring Fake Revenue Problem" similar sentiments:

> As a former executive of EbixCash told us, "The financial reporting was a very controlled thing. It's very difficult for anybody running the company to have much visibility on the financial side. It's very centrally controlled by (Chairman & CEO) Robin (Raina) and his close team. They've been working with him for a very very long time."

## V.    MATERIAL POST CLASS PERIOD EVENTS CONFIRM DEFENDANTS' CLASS PERIOD FRAUD

### A.    EbixCash Files a Draft Red Herring Prospectus With the Securities and Exchange Board of India on March 9, 2022

165.    After RSM's resignation on February 15, 2021, the Company issued a February 20, 2021 press release announcing that the Board had engaged counsel, Skadden, Arps, Slate, Meagher & Flom LLP to, along with accounting experts from the consulting firm, AlixPartners LLP, assist the Company with respect to matters raised by RSM's resignation. Subsequently, Ebix announced

in the DRHP: "Having reviewed the work performed by the consulting firm and based on the advice of the law firm and having considered their observations, Ebix, Inc's board was satisfied that no corrective steps were necessary with respect to the gift card business issue raised by the accounting firm in their resignation."

166.     The Company issued a press release on April 16, 2021, updating investors on the EbixCash IPO. In that release, Defendants announced that the India-based subsidiary had decided to commence work on the IPO following a meeting with four investment banks, including ICICI Securities, Axis Capital, SBI Capital, and Edelweiss Financial Services. Those four financial institutions were expected to be the lead managers of the proposed IPO. Ebix stated that it was "targeting the filing of the DHRP by the fourth quarter of 2021 with a targeted IPO in the first quarter of 2022."

167.     On March 9, 2022, Ebix reported in an 8K signed by Defendant Hamil:

> **Subsequent Event:** Pursuant to the approval of its Board of Directors, the Company's Indian subsidiary, EbixCash Limited intends to file the Draft Red Herring Prospectus (DRHP) with the Securities and Exchange Board of India soon, in order to offer its equity shares in an initial public offering. Under the Indian regulatory guidelines, the details of the offering and the use of proceeds will be disclosed, once the DRHP is filed.

168.     Hamil added, "The Company continues to produce substantial operating cash flows in the face of COVID-19 headwinds, generating $69.5 million in 2021. Despite the cumulative spending of approximately $124 million on repayments of debt, cash interest payments, capital expenditures and capitalized software development costs, dividend payments, cash taxes and reduction of outstandings in India working capital facilities, our total cash and cash equivalents, restricted cash and short-term investments was $125.2 million at December 31, 2021, as compared to $138.6 million at December 31, 2020. As of December 31, 2021, our total debt was $52.5 million lower than total debt as of December 31, 2020. Additionally, our working capital

was a $161.4 million as of December 31, 2021 as compared to $170.5 million as of December 31, 2020.

169.    On March 9, 2022, Ebix announced in a press release attached to a Form 8-K that EbixCash filed a DRHP with the SEBI on March 9, 2022, for an IPO aggregating up to ₹60,000 million or $787 million (the "IPO"). Reports analyzing the IPO at the time estimated it to value EbixCash at between $4.5 and $5 billion. At the time, the largest IPO in India was the $2.5 billion IPO of PayTM, another Indian payment company that went public in November 2021. Notably, the PayTM IPO failed miserably. PayTM shares opened below the issue price before closing down 27% and are since down approximately 40% further.

170.    The March 9, 2020 press release also stated that "[o]f the IPO proceeds, approximately $350 million is proposed to be utilized towards purchase of outstanding compulsorily convertible debentures from Ebix Asia Holdings Inc, Mauritius and in turn payment to Ebix, Inc., which is proposed to be used towards reduction of Ebix Inc.'s outstanding debt. Approximately $130 million is proposed to be utilized for working capital requirements of EbixCash Limited and its subsidiaries. The remaining proceeds would be utilized towards, *inter alia*, growth-related initiatives of EbixCash Limited, including acquisitions and other investments."

171.    The DRHP stated that the Equity Shares to be offered "are proposed to be listed on the Stock Exchanges being BSE Limited and National Stock Exchange of India Limited." In a "Notice to Prospective Investors in the United States," the DRHP stated: "The Equity Shares have not been recommended by any U.S. federal or state securities commission or regulatory authority. Furthermore, the foregoing authorities have not confirmed the accuracy or determined the adequacy of this Draft Red Herring Prospectus or approved or disapproved the Equity Shares. . . .

The Equity Shares offered in the Issue have not been and will not be registered under the United States Securities Act of 1933, as amended (the "U.S. Securities Act") or any other applicable law of the United States and, unless so registered, may not be offered or sold within the United States except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the U.S. Securities Act and applicable state securities laws." The IPO will remove EbixCash from scrutiny by the SEC, U.S. regulators and U.S. investors, rendering its business even more opaque than it currently is as a subsidiary of Ebix.

172.    As of October 31, 2022, according to the SEBI, on July 19, 2022 it sought comments from an unidentified "other Regulator / Agency" and was "awaiting reply," and the March 9, 2022 DRHP is still under review by Indian regulators.

### B.    Raina and Hamil Admit in the DRHP a Material Weakness in Internal Control at EbixCash as a Result of the Need to Improve Internal Control, Including Keeping Adequate Records of Daily Transactions

173.    Raina, as a Director of EbixCash, and Hamil, as its Chief Financial Officer, consented to the filing of the DRHP:

> Consents in writing of (a) our Directors, Company Secretary and Compliance Officer, Chief Financial Officer, Statutory Auditor, the BRLMs, legal counsel to the Company as to Indian law, legal counsel to the BRLMs as to Indian law, International Legal Counsel to the BRLMs, bankers/ lenders to our Company, CRISIL and the Registrar to the Issue, in their respective capacities have been obtained; and consents in writing of (b) the Syndicate Members, the Banker(s) to the Issue and the Monitoring Agency to act in their respective capacities, will be obtained and filed along with a copy of the Red Herring Prospectus with the RoC as required under Sections 26 and 32 of the Companies Act, 2013. Further, consents received prior to filing of this Draft Red Herring Prospectus have not been withdrawn up to the time of delivery of this Draft Red Herring Prospectus with SEBI.

174.    In addition to certifying the truth of the statements in the DRHP, according to the DRHP, Defendant Raina as Chairman of EbixCash's IPO Committee had responsibility to:

> To finalize, settle, approve, adopt, and file in consultation with the BRLMs where applicable, the DRHP,

To negotiate, finalize and settle and to execute and deliver or arrange the delivery of the DRHP.

175.    Critically, the DRHP acknowledged, in relevant part:

**78. The requirements of being a listed company may strain our resources.**

We are not a listed company and have not, historically, been subjected to the increased scrutiny of our affairs by shareholders, regulators and the public at large that is associated with being a listed company.

\*\*\*

Further, as a listed company, **we will need to** maintain and **improve the effectiveness of our disclosure controls and procedures and internal control over financial reporting, including keeping adequate records of daily transactions.**

176.    Raina's admissions in the DRHP are all the more shocking because Somani—Ebix's ill-equipped substitute auditor, failed to even notice that Ebix claimed EbixCash generated gift card revenues from sales to corporate customers only and did not "issue general purpose gift cards to corporate customers and consumers." Yet, Somani served as one of two auditors for EbixCash in connection with the preparation of financial statements submitted to the SEBI in support of the DRHP.

177.    The DRHP contains admissions and concessions which give credibility to RSM's identification of a material weakness in internal control relating to the gift card business and render suspect Somani's clean audit opinion on Ebix's 2020 financial statements and internal control on April 27, 2021, only seven weeks after RSM's February 15, 2021 resignation.

178.    Although Ebix has repeatedly denied that any corrective steps were necessary in the gift card business as a result of RSM's identification of a material weakness in internal control and resignation, the DRHP indicates otherwise by stating that "as a listed company, we will need to maintain and improve the effectiveness of our disclosure controls and procedures and internal control over financial reporting, including keeping adequate records of daily transactions."

179.    The acknowledgement that EbixCash will have to "improve" internal control, including "keeping adequate records of daily transactions," constitutes an admission that there is a material weakness in internal control, at EbixCash, precisely as RSM stated when it was unable to obtain "sufficient audit evidence" of unusual transactions in 4Q20. Further, "keeping adequate records of daily transactions" is a basic element of internal control, which is a given for any business, regardless of its size, location or the nature and metrics of its business. The fact that EbixCash mentioned this particular requirement in the DRHP is a concession that it had not been complying with it, which confirms the truth of RSM's statements made when explaining its resignation.

180.    Taken together, the statements alleged above in the DRHP cast serious doubt on the accuracy and thoroughness of Somani's clean 2020 audit opinion issued on April 27, 2021, shortly after RSM's resignation, and give credibility to RSM's identification of a material weakness in internal control in the gift card business. Although RSM identified a material weakness, it appears that Somani did not follow through to uncover or investigate the obvious discrepancies in EbixCash's story or the lack of audit evidence which caused RSM to resign, nor did its experts.

### C.    Failure To Keep Adequate Records of Daily Transactions is a Per Se Material Weakness in Internal Control

181.    Raina's and Hamil's acknowledgement that EbixCash will need to "improve" its internal controls is telling, particularly that the improvement is needed in "keeping adequate records of daily transactions." As an Ebix division akin to a subsidiary, EbixCash was already required to maintain effective internal controls. For example, the 2019 10-K states "We [RSM] have audited Ebix, Inc. *and subsidiaries'* (the Company) internal control over financial reporting as of December 31, 2019 . . . ." The 2020 10-K states ("We [Somani] have audited Ebix, Inc. *and*

*subsidiaries'* (the Company) internal control over financial reporting as of December 31, 2020 . . . .."). The Sarbanes-Oxley Act of 2002 Section 302(a), 15 U.S.C. § 7241(a) states: "The [Securities and Exchange] Commission shall, by rule, require . . . that the principal executive officer . . . certify in each annual or quarterly report . . . that . . . (4) the signing officers . . . (B) have designed such internal controls to ensure that material information relating to the issuer and its consolidated subsidiaries is made known to such officers by others within those entities . . . ;" Robin Raina's and Steven Hamil's SOX Certifications for 3Q20, filed as Exhibits to the 3Q20 10-Q state: "The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures . . . and internal control over financial reporting . . . and have: (a) *designed such disclosure controls and procedures . . . to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities. . . .*"

182.    Accordingly, the notion that EbixCash's internal controls will need to "improve" when EbixCash becomes a listed company infers those internal controls were deficient prior to that time while EbixCash was a subsidiary of Ebix.

183.    The internal control standards Ebix needed to meet remained consistent from 3Q20, as well as throughout 2020, to the present. There were no intervening rule changes requiring Ebix to "improve" its internal controls to meet a new or heightened standard. Thus, the language in EbixCash's DRHP noting that EbixCash must "improve" its internal controls cannot be attributed to a new internal control rule.

184.    Similarly, there were no apparent changes in Ebix's or EbixCash's business operations that triggered new or heightened internal control standards. Ebix's and EbixCash's business models remained generally consistent from 2020 and throughout the Class Period to the

present.

185.    Ebix's and EbixCash's financial results ebbed and flowed over time, but nothing in their performance triggered a new or heightened internal control rule. Ebix's total revenue ranged from $110 million to $290 million per quarter from 2019 to present. Its net income ranged from $15 million to $25 million per quarter during that period. The chart below illustrates Ebix's revenue and net income from 2019 to the present. The chart allocates revenue among the three business groups Ebix utilized in its SEC filings: "EbixCash Exchanges" (which includes gift card revenue), "Insurance Exchanges," and "Risk Compliance Solutions."[10]

| | Revenue | | | | |
|---|---|---|---|---|---|
| | EbixCash Exchanges (Includes Gift Cards) | Insurance Exchanges | Risk Compliance Solutions | Total Revenue | Net Income |
| **2019 Total** | $ 319,953,000 | $ 190,067,000 | $ 70,595,000 | **$ 580,615,000** | **$ 96,720,000** |
| **Q1 2020** | $ 77,855,000 | $ 44,001,000 | $ 16,020,000 | **$ 137,876,000** | **$ 24,723,000** |
| **Q2 2020** | $ 53,240,000 | $ 42,959,000 | $ 15,113,000 | **$ 111,312,000** | **$ 23,475,000** |
| **Q3 2020** | $ 96,772,000 | $ 42,382,000 | $ 15,151,000 | **$ 154,305,000** | **$ 24,682,000** |
| **Q4 2020** | $ 160,426,000 | $ 48,769,000 | $ 12,921,000 | **$ 222,116,000** | **$ 19,497,000** |
| **2020 Total** | $ 388,293,000 | $ 178,111,000 | $ 59,205,000 | **$ 625,609,000** | **$ 92,377,000** |
| **Q1 2021** | $ 232,552,000 | $ 43,235,000 | $ 14,266,000 | **$ 290,053,000** | **$ 21,591,000** |
| **Q2 2021** | $ 189,947,000 | $ 41,916,000 | $ 14,459,000 | **$ 246,322,000** | **$ 15,721,000** |
| **Q3 2021** | $ 135,284,000 | $ 42,199,000 | $ 14,253,000 | **$ 191,736,000** | **$ 15,451,000** |
| **Q4 2021** | $ 191,991,000 | $ 46,843,000 | $ 27,993,000 | **$ 266,827,000** | **$ 15,425,000** |
| **2021 Total** | $ 749,774,000 | $ 174,193,000 | $ 70,971,000 | **$ 994,938,000** | **$ 68,188,000** |
| **Q1 2022** | $ 224,152,000 | $ 43,764,000 | $ 18,337,000 | **$ 286,253,000** | **$ 19,191,000** |
| **Q2 2022** | $ 188,641,000 | $ 42,302,000 | $ 19,838,000 | **$ 250,781,000** | **$ 19,343,000** |

[10] The figures in the chart are derived from the 2019 10-K at 34, 55; 1Q20 10-Q at 2, 18; 2Q20 10-Q at 2, 19; 3Q20 10-Q at 2, 20; 2020 10-K at 39, 57; 1Q21 10-Q at 2, 19; 2Q21 10-Q at 2, 19; 3Q21 10-Q at 2, 19; 2021 10-K at 4, 57; 1Q22 10-Q at 2, 18; 2Q22 10-Q at 2, 19.

186.    Thus, the language in EbixCash's DRHP noting that EbixCash must "improve" its internal controls cannot be attributed to changes in EbixCash's business operations. No other external factors explain why EbixCash would need to "improve" its internal controls when becoming a listed company, other than that there was in fact a material weakness during 2020, as identified by RSM. The inference is that improvements are needed because the existing internal controls were deficient, and the Defendants knew that during 2020, because they designed and monitored internal control, and as of November 9, 2020, at the latest.

187.    Above all, keeping adequate records of daily transactions is the most basic foundational building block of internal control over financial reporting, as required by statute and recognized by Ebix management. Failure to keep adequate records of daily transaction is a per se material weakness in internal control over financial reporting. There is no gray area for such a failure, which is not merely a significant deficiency or a weakness in internal control, but instead is always a material weakness in internal control, which must be reported by an auditor and precludes an auditor from issuing a clean, unqualified audit opinion.

188.    Ebix's Management's Reports on Internal Control over Financial Reporting in the 10Ks for 2020 and 2021, filed with the SEC on April 27, 2021 and March 10, 2022, respectively, explicitly recognize that maintaining and recording records of daily transactions is an essential function of internal control over financial reporting:

> The term "internal control over financial reporting" is defined as a process designed by, or under the supervision of, our principal executive and principal financial officers, or persons performing similar functions, and effected by our board of directors, audit committee, management and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of consolidated financial statements for external purposes in accordance with generally accepted accounting principles and includes those policies and procedures that:
>
> (1)  Pertain to *the maintenance of records that in reasonable detail accurately and fairly reflect our transactions* and dispositions of assets;

(2)  Provide reasonable assurance that *transactions are recorded* as necessary to permit preparation of consolidated financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures are being made only in accordance with authorizations of our management and directors; and

(3)  Provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of our assets that could have a material effect on our consolidated financial statements.

189.   The Sarbanes-Oxley Act of 2002, 15 U.S.C 7213(a)(2)(iii)(II)(aa) and (bb), requires an auditor to test and report on the issuer's "*maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of the assets of the issuer*" and to "*provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the issuer are being made only in accordance with authorizations of management and directors of the issuer.*"

190.   The Foreign Corrupt Practices Act of 1977, as amended, 15 U.S.C. §§ 78dd-1, *et seq.* ("FCPA") also requires issuers to maintain accurate books and records and have a system of internal controls sufficient to, among other things, provide reasonable assurances that transactions are executed, and assets are accessed and accounted for in accordance with management's authorization. The FCPA, 15 U.S.C. § 78m, also requires companies whose securities are listed in the United States to meet its accounting provisions. These accounting provisions, which were designed to operate in tandem with the anti-bribery provisions of the FCPA, require corporations covered by the provisions to (a) *make and keep books and records that accurately and fairly reflect the transactions of the corporation* and (b) devise and maintain an adequate system of internal accounting controls.

191.   EbixCash admitted a material weakness in internal control when it stated in the DRHP filed on March 9, 2022 that "as a listed company, we will need to maintain and improve

the effectiveness of our disclosure controls and procedures and internal control over financial reporting, including keeping adequate records of daily transactions." The need to improve the effectiveness of internal control, including specifically, "keeping adequate records of daily transactions" is a material weakness in internal control over financial reporting which existed not only at the time of the admission in the DRHP on March 9, 2022, but also existed during 2020, including 3Q20 and thereafter because management stated in the 10K for 2020 filed with the SEC on April 27, 2021 that "[t]here were no changes in our internal control over financial reporting identified in management's evaluation during the year ended December 31, 2020 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting" and made the same representation in the 10K for 2021 filed with the SEC on March 10, 2022. Therefore, the material weakness RSM identified for 4Q20 existed throughout 2020 and 2021.

192.    Not only did the material weakness identified in the DRHP as the need to improve internal control, including "keeping adequate records of daily transactions" exist during 2020 and 2021, but it is also the *same one* which RSM identified when it resigned as a result of being unable, despite repeated inquiries, to obtain sufficient appropriate audit evidence that would allow it to evaluate the business purpose of significant unusual transactions that occurred in the fourth quarter of 2020 related to the Company's gift card business in India. The same material weakness existed in 2020, including 3Q20, and still exists today, as Defendants belatedly admit in the DRHP.

193.    Somani's Opinions on Internal Control Over Financial Reporting contained in Ebix's 10K for 2020 filed with the SEC on April 27, 2021 and the 10K for 2021 filed with the SEC on March 10, 2022 both stated that "in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting." In sharp contrast, the DRHP, which

was filed in India on March 9, 2022, only one day before the filing of the 10K for 2021 with the SEC on March 10, 2022, stated the opposite—that internal control needed to be improved, "including keeping adequate records of daily transactions." These contemporaneous inconsistent statements about the effectiveness of internal control on March 9 and 10, 2022 cast serious doubt on the credibility of Raina and Hamil, who signed SOX Certifications attached to the 2021 10K, as well as the accuracy of Somani's 2020 and 2021 audits of Ebix and the clean audit opinions it rendered for fiscal years 2020 and 2021.

194.    Even more astounding is the fact that  two independent joint statutory auditors—one of whom is Somani—issued unqualified audit opinions on EbixCash for the period ended March 2021 and the interim period from April 1, 2021 to September 30, 2021 for both the consolidated India business and the Indian gift card subsidiary. These audited financial statements of the EbixCash Indian businesses for the three years ended March 31, 2021 and the six months ended September 30, 2021 are included within the DRHP filing that was filed with the SEBI for regulatory review on March 9, 2022.

195.    Incredibly, there are *material discrepancies within the same document—the DRHP—* which casts serious doubt on the credibility of Somani's audits, including the audit of EbixCash included in the DRHP. Specifically, the unqualified audit opinions of EbixCash filed in the DRHP on March 9, 2022 are inconsistent with EbixCash's and Raina and Hamil's admission in the DHRP that it will "need to improve the effectiveness of our disclosure controls and procedures and internal control over financial reporting, including keeping adequate records of daily transactions." One document—the DRHP—contains two mutually inconsistent facts—unqualified audit opinions of EbixCash by two auditors, one of whom is Somani, ***and*** an admission of a material weakness in internal control in EbixCash, which would preclude an unqualified audit opinion. These

inconsistent statements in the same document about the effectiveness of internal control cast serious doubt on the lack of attentiveness, accuracy, thoroughness, and credibility of Somani's audits of Ebix and EbixCash, in particular the unqualified 2020 audit opinion which Somani issued shortly after RSM's identification of a material weakness and resignation.

### D.     Hindenburg Research Publishes a Damning Short Seller Report

### 5.     Hindenburg Research Issues a Report Focused on EbixCash's Gift Card Business -- "Ebix: This House of 'Cards' Seems to Have a Glaring Fake Revenue Problem"

196.     On June 16, 2022, Hindenburg Research, which took a short position in Ebix, issued a scathing report titled "Ebix: This House of 'Cards' Seems to Have a Glaring Fake Revenue Problem."[11] The Hindenburg Report concluded that Ebix's IPO of EbixCash is a "race against the solvency clock," reflecting a desperate attempt to remain solvent. Hindenburg's belief is that the IPO will fail because "a substantial portion of EbixCash's gift card revenue is non-existent."

197.     Specifically, Hindenburg reported that, based on its research, "EbixCash's gift card subsidiary has two customers that comprised a total of [approximately] $89 million in 2021 revenue (almost 10% of Ebix's topline revenue)" but that "[n]either customer's business appears to be functional, and the top customer appears to have an undisclosed prior relationship with the entity." In addition, based on Hindenburg's research, the Hindenburg Report questions the truth of Ebix's claims that EbixCash has "a large retail distribution network," "970 supposed EbixCash independent distributors" and that "its app has 1.5 million downloads." Hindenburg also observed that Ebix has cycled through 7 different auditors since 2004, which it identified as "a classic hallmark of accounting irregularities."

198.     The Hindenburg Report focused heavily on its belief that Ebix's claims that

---

[11] *See* https://hindenburgresearch.com/ebix/ (last visited October 31, 2022).

EbixCash sold its gift cards through a vast network of physical retail locations and on-line was simply untrue. Hindenburg reported that it "visited the featured branch outlet highlighted in an EbixCash corporate presentation and found it doesn't exist at the address." The Hindenburg Report indicated that EbixCash claimed 970 independent distributors, but Hindenburg "called every one of them: 403 didn't pickup, 527 told us they didn't sell Ebix cards, and 40 (~7% of those who picked up) told us they sold the cards. Many who sold the cards told us they were selling fewer now than prior to the pandemic, contrary to Ebix's claims." Hindenburg's inability to verify Ebix's purported retail network led it to conclude "We think a substantial portion of EbixCash's gift card revenue is non-existent."

199.    As a former executive of EbixCash told Hindenburg, "The financial reporting was a very controlled thing. It's very difficult for anybody running the company to have much visibility on the financial side. It's very centrally controlled by (Chairman &CEO) Robin (Raina) and his close team. They've been working with him for a very very long time."

**6.    Ebix' Response to the Hindenburg Research Report Reveals That Somani's "Clean Audit" Was Anything But and the <u>Company's Independent Investigations Were Equally Ineffective</u>**

200.    Ebix responded to the Hindenburg Report on at least three occasions.

**a.    Ebix Purports to Refute the Allegations in the Hindenburg Report on June 16, 2022, <u>But Refuses to Address Specific Allegations</u>**

201.    On June 16, 2022, Ebix issued a press release titled, "Ebix Reaffirms Strong Business Outlook and Responds to Short Seller Report." In the press release, "Ebix refutes the report's grossly misleading and erroneous allegations and reiterates that its financial reporting, including but not limited to all transactions from and within its EbixCash payment solutions offerings in India, and revenue recognition policies thereof, are accurate and appropriate and in compliance with GAAP and SEC reporting requirements." However, Ebix did not respond to the

Hindenburg Report's specific allegations, claiming that "[a]s the Company's Indian subsidiary is currently under review for an initial public offering in India, Ebix is limited in its ability to respond to the article's specific contents."

202.    The limited response which Ebix provided relied on the investigations of two independent auditors (including Somani), Skadden, Arps Meagher & Flom, LLP and accounting experts from AlixPartners, LLP to conclude that "no steps were necessary with respect to the gift card business" Ebix also relied on "clean" audit opinions for EbixCash and Ebix, as well as its claim that EbixCash's gift card subsidiary "generated operating income of 1% or lower in the 12-month period ending December 2020 and December 2021, which were not material to Ebix's operating profit or net income in each of the two periods." In other words, the essence of the "Response" is that the gift card business is immaterial, and any alleged discrepancies can be ignored. Ultimately, Ebix's response will establish that reliance on Somani and Ebix's lawyers and advisors is misplaced.

203.    The June 16, 2022 press release containing Ebix's response stated:

### *Ebix Reaffirms Strong Business Outlook and Responds to Short Report*

JOHNS CREEK, Ga., June 16, 2022 (GLOBE NEWSWIRE) -- Ebix, Inc. (Nasdaq: EBIX), (the "Company") a leading international supplier of On-Demand software and E-commerce services to the insurance, financial, travel, healthcare and e-learning industries today issued a response to an article published on June 16, 2022 by a short-selling position holder in Ebix common stock. As the Company's Indian subsidiary is currently under review for an initial public offering in India, Ebix is limited in its ability to respond to the article's specific contents.

Ebix refutes the report's grossly misleading and erroneous allegations and reiterates that its financial reporting, including but not limited to all transactions from and within its EbixCash payment solutions offerings in India, and revenue recognition policies thereof, are accurate and appropriate and in compliance with GAAP and SEC reporting requirements.

Since March 2021, the Company has engaged the services of two independent auditors to audit the Company's India businesses jointly, in addition to the

engagement of counsel, Skadden, Arps, Slate, Meagher & Flom LLP, along with accounting experts from the consulting firm, AlixPartners LLP, to assist the Company with respect to any issues related to the Gift card business.

Having reviewed the work performed by AlixPartners and considering all their observations, the Board of Directors was satisfied that no steps were necessary with respect to the gift card business. Since then, the Company's consolidated independent auditors have completed the audit of the related consolidated statements of income, comprehensive income, stockholders' equity, and cash flows of the company for two calendar year periods ending December 2020 and December 2021 while expressing an unqualified opinion.

In addition, two independent joint statutory auditors for the consolidated India business have audited the India business for the period ended March 2021 and the interim period from April 1, 2021 to September 30, 2021 and expressed an unqualified opinion on both - the consolidated India business and the Indian gift card subsidiary. The audited financial statements of the Indian businesses for the three years ended March 31, 2021 and the six months ended September 30, 2021 are included within the DRHP filing that was submitted for regulatory review in March 2022.

RSM's previously issued reports on the Company's consolidated financial statements and the Company's internal controls over financial reporting for the fiscal year ended December 31, 2019 did not contain an adverse opinion or a disclaimer of opinion; nor were they qualified or modified as to uncertainty, audit scope, or accounting principles.

Ebix's gift card business, which received the bulk of the report's attention, generated operating income of 1% or lower in the 12-month period ending December 2020 and December 2021, which were not material to Ebix's operating profit or net income in each of the two periods.

204.     First, Ebix does not identify the fact that one of the "two independent joint statutory auditors for the consolidated India business have audited the India business" is Somani—the same entity that was hired to conduct the EbixCash IPO audit work at the same time it was hired to conduct a rapid-fire audit in the wake of RSM's resignation and identification of a material weakness.

205.     Second, Ebix's claim that "As the Company's Indian subsidiary is currently under review for an initial public offering in India, Ebix is limited in its ability to respond to the article's specific contents" is entirely inconsistent with its conduct. As discussed in more detail below, on

July 5, 2022, Ebix reported that it petitioned a Delhi court to block publication of the Hindenburg Report until the final disposal of Ebix's suit regarding the report—which remains pending. In the July 5, 2022 release, Ebix claimed that it "provid[ed] a detailed rebuttal with proof to the Court, the Company provided the Court with audit reports from India's financial regulatory body and two independent auditors, for the last 3 years." Upon information and belief, those materials are supposed to be available to the public for inspection, but the Delhi court has refused to allow them to be inspected.

### b. Ebix Provides a Purported "Clarification on the Nature & Metrics of Its EbixCash Businesses" on June 21, 2022

206. Despite Ebix's purported inability to respond to the "article's specific comments," only five days later on June 21, 2022, Ebix provided a "Clarification on the Nature & Metrics of Its EbixCash Businesses" in response to Hindenburg. Ebix's second response was in the form of a "Clarification" —rather than another full-throated denial—regarding key aspects of its business, including the most fundamental aspects of EbixCash's gift card business.

207. The "Clarification" provided specific factual claims which contradicted Ebix's representations in SEC filings and representations to investors, serving to further obfuscate, rather than clarify, the very "nature & metrices" of EbixCash's elusive gift card business. Such ambiguities were apparent to investors, including Hindenburg, and should have been apparent to Ebix's and EbixCash's auditor, Somani, and the its "experts"  who were retained to investigate the serious issues which RSM raised about the gift card business.

208. In particular, the "Clarification" obfuscated two major aspects of the gift card business: (1) the nature of EbixCash's sales channels and whether it sold to corporate customers and consumers, as represented in Ebix's SEC filings, or only to corporate customers, as the "Clarification" stated; and (2) the nature and purpose of the 650,000 physical retail locations and

whether they sold gift cards to customers, as represented to investors, or whether the 650,000 locations did not sell gift cards to actual gift card consumers, as the Clarification represented.

209.    Specifically, the purported "Clarification" stated as follows:

***Ebix Provides Clarifications on the Nature & Metrics of its EbixCash Businesses***

\*\*\*

Gift Card Sales - Ebix clarified that ***EbixCash gift cards are sold to Corporate clients only*** for their employees, partners, affiliates or distribution network.

\*\*\*

The Company does pursue a direct-to-consumer channel however that is currently accomplished primarily through providing digital technology and services to approximately 650,000 retail locations across South-east Asia. These "phygital" EbixCash outlets are designed to provide "last mile" digital solutions to a ***prospective*** base of hundreds of millions of people across the length and breadth of Southeast Asia.

210.    Although Ebix had consistently represented to investors that it sold gift cards through two separate customer bases: consumers and corporate clients, the June 21, 2022 "Clarification" disavowed that longstanding representation. Ebix now claimed gift cards were only sold to corporate clients. This "Clarification" amounts to a complete about-face from prior representations about the basic functionality of the gift card business.

### c.    Ebix Sued to Block Publication of the Hindenburg Report in India and Removed the Materials on Which it Relies from EbixCash's Website

211.    Not content to simply refute parts of the Hindenburg Report, on July 7, 2022, Ebix announced that it successfully petitioned a Delhi Court to "block the publishing of the Hindenburg Report in India" and to direct "Google LLC and Twitter, Inc to take down relevant URLs from the Indian domain pertaining to the Hindenburg Report."

212.    According to Ebix, on July 5, 2022, the Delhi court blocked publication of the

Hindenburg Report until the final disposal of Ebix's suit, which remains pending. Thus, the investing public in India who viewed the DRHP would be unable to see the claims in the Hindenburg Report. Ebix also represented that it "provid[ed] a detailed rebuttal with proof to the Court," and "the Company provided the Court with audit reports from India's financial regulatory body and two independent auditors, for the last 3 years."

213.    On information and belief, Ebix's complaint or "plaint," as it is called in India, which spans 300 pages and contains an additional 300 pages of materials. However, Ebix has not provided a single page of those materials to the investing public in the United States or India. None of the materials are available on the Delhi Court's docket and, upon information and belief, numerous attempts to access the materials at the Delhi Court, in person, have been refused either without explanation or on the basis of a judge's "note" on the file.

214.    In addition to attempting to screen the Hindenburg Report from public view, Ebix has also sanitized the EbixCash website by removing materials relied upon in the Hindenburg Report for which URLs were provided in the Report to the EbixCash website. For example, the Hindenburg Report states the following and provides links (indicated in **bold** in the quoted text below) to the supporting materials on the EbixCash website (https://ebixcash.com/):

> According to its website, EbixCash cards are **co-branded** with payment companies Visa, Mastercard, and Rupay. Given that the 3 payment companies already offer co-branded cards of their own to corporate customers, it is unclear what value EbixCash could even offer as a middleman.

> EbixCash has claimed to have a massive retail distribution **network** of 650,000 physical distribution outlets in India, ostensibly giving it a major competitive advantage in its effort to sell cards directly to consumers.

> As noted earlier, EbixCash's foray into the gift card business kicked off when it purchased Itzcash in 2017. At the time, the company reported a vast distribution network of 75,000+ retail outlets. Ebix has since **claimed** to have expanded that number over 8-fold to an astonishing 650,000 retail outlets.

Ebix's investor presentation and SEBI prospectus describe EbixCash's mobile application as a core component of its strategy. Each has claimed the app has 1.5 million downloads to date. **[Pg. 197]**

**Ebix's website** also repeats the same 1.5 million downloads claim, and links directly to the app, called "Money Transfer, Recharge, DTH, Bill Payment, Travel".

215.    In each instance the materials have been removed from the EbixCash website which now returns the following result when any of the links are visited:



216.    Ebix's efforts to block the Hindenburg Report and sanitize the EbixCash website of information that contradicts its longstanding misstatements regarding the existence of its non-existent sales of gift cards to "consumers" during the Class Period is further indicia of Defendants' scienter.

### 7.    Somani and Ebix's Independent Investigation Failed to Even Superficially Question or Investigate Sales Channels and Distribution Locations for Pre-Paid Gift Cards, the Company's Much Touted "Leading" Driver of Revenue

217.    From the inception of the Class Period to the present, Ebix has repeatedly and misleadingly—according to Ebix itself—claimed that EbixCash sells its gift cards to consumers, stating that: "EbixCash issues general purpose gift cards to corporate customers and consumers that can be later redeemed at various merchants."

218.    Prior to the filing of its Form 10-Q for Q3 2002, Ebix claimed that it sold gift cards to consumers.

219.    Defendants represented that EbixCash sold its gift cards to "consumers" only. Ebix

made this representation as follows:

> 2019 – 10K: "Gift Cards. EbixCash resells gift cards to *consumers* that can be later redeemed at various merchants. Gift cards are recorded as inventory until sold to the consumer."

> Q1 – 2020, 10-Q*: "*Gift Cards. EbixCash resells gift cards to *consumers* that can be later redeemed at various merchants."

> Q2 – 2020, 10-Q: "Gift Cards. EbixCash resells gift cards to *consumers* that can be later redeemed at various merchants."

220.    Beginning on the first day of the Class Period, as Ebix was reporting astronomical

growth in its gift card business, it changed the identification of the channels through which it sold

what had then become its most important, fastest growing business segment that was at the center

of RSM's audit and the catalyst for the hiring of Somani.

221.    On November 9, 2020, Defendants represented that EbixCash sold its gift cards to

"corporate clients and consumers" as follows:

> Q3 – 2020: "Gift Cards. EbixCash sells gift cards to *corporate clients and consumers* that can be later redeemed at various merchants. A majority of gift card sales are virtual card sales versus physical card sales. EbixCash acts a principal in the gift card sales transactions."

> 10-K – 2020: "Gift Cards. EbixCash issues general purpose gift cards to *corporate customers and consumers* that can be later redeemed at various merchants."

> Q1 – 2021 10-Q: "Gift Cards EbixCash sells general purpose prepaid gift cards to *corporate customers and consumers* that can be later redeemed at various merchants."

> Q2 – 2021 10-Q: "Gift Cards EbixCash sells general purpose prepaid gift cards to *corporate customers and consumers* that can be later redeemed at various merchants."

> Q3 – 2021 10-Q: "Gift Cards EbixCash sells general purpose prepaid gift cards to *corporate customers and consumers* that can be later redeemed at various merchants."

Q3 – 2021 10-Q: "EbixCash sells general purpose prepaid gift cards to *corporate customers and consumers* that can be later redeemed at various merchants."

10K – 2021: "EbixCash sells general purpose prepaid gift cards to *corporate customers and consumers* that can be later redeemed at various merchants."

Q1 – 2022 10-Q (signed May 10, 2022): "EbixCash sells general purpose prepaid gift cards to *corporate customers and consumers* that can be later redeemed at various merchants."

222.    The implication of Ebix's two-pronged strategy was that gift card revenue was more diverse than before because it encompassed two separate sales channels, leading to less concentration of risk. On the consumer side, Ebix touted in its Form 10-Q for Q320 that it reached gift card consumers through a vast array of distributors located in local communities. It stated that "[w]ith a 'Phygital' strategy that combines physical distribution outlets in many . . . countries . . , the Company's EbixCash Financial . . . portfolio of services encompasses . . . money remittance, Forex, travel, pre-paid gift cards, utility payments, lending, and wealth management . . . ."). Similarly, in its Form 10-K for 2020, Ebix stated that its "'Phygital' strategy . . . combines over 320,000 physical distribution outlets . . . in the areas of . . . pre-paid & gift cards, . . . etc."

223.    Ebix also represented in a printed presentation to investors that "EbixCash group through its 'Phygital' strategy combines its presence across 650,000 physical distribution outlets in many Southeast Asian Nations ("ASEAN") countries with robust Omni-channel online digital platform."[12]

---

[12] *See* https://www.slideshare.net/secret/l7tFa8Y1z6Qgp3 (last visited October 30, 2022).



224.    This representation is followed by a photo of an EbixCash gift card, illustrating the "Phygital" * Product Suite, leaving investors to believe that gift cards were sold at the 650,000 physical locations.



225.    On the corporate client side, Ebix stated in its Form 10-K for 2020 that its "gift cards are sold to a diversified set of corporate customers from various industries," and that the gift cards are used by "corporate customers to disburse incentives to the end users, which are primarily their employees, agents and business associates."

226.    In response to the Hindenburg Report that called into question the validity of

EbixCash's revenues theorizing that any revenues associated with the consumer channel were fake and that gift cards were not sold at physical locations, Ebix issued a press release on June 22, 2022, in which it "provided *clarifications* related to nature and metrics of businesses and brands that underlay its overall EbixCash business" and stated "Gift Card Sales - *Ebix clarified that EbixCash gift cards are sold to Corporate clients only*." In short, Ebix "clarified" that it has been telling the market since the inception of the Class Period that it has been selling gift cards through two separate channels when that was not true.

227.     In direct contradiction of this representation to investors and representations in SEC filings alleged above, Ebix's "Clarification" performed another obfuscation and material about-face regarding the essence of the gift card business when it stated that: "The Company does pursue a direct-to-consumer channel however that is currently accomplished primarily through providing digital technology and services to approximately 650,000 retail locations across South-east Asia. These 'phygital' EbixCash outlets are designed to provide 'last mile' digital solutions to a prospective base of hundreds of millions of people across the length and breadth of Southeast Asia." In other words, Ebix now concedes that the 650,000 (or 320,000) physical locations are not in fact involved in the actual sale of gift cards to actual gift card customers.

228.     Like the obfuscation about sales channels to corporate and consumer customers, Ebix's "Clarification" that it does not sell gift cards to actual customers at its 650,000 physical locations is not presented as a change in strategy, does not disclose when it stopped selling gift cards to customers at physical locations and raises fundamental questions about the "nature & metrics" of EbixCash's business which should have been apparent to Somani in the course of its audits.

229.     Ebix's misrepresentation was not buried like its internal control disclosure in the

DRHP. In fact, the statements quoted above appear in the "EbixCash" section of the "APPLICATION OF CRITICAL ACCOUNTING POLICIES" discussion of Ebix's Forms 10-Q and 10-K, including the 2020 Form 10-K to which Somani's purported clean audit opinion was attached. It is utterly implausible that Somani conducted a reliable audit of Ebix and EbixCash if it failed entirely to even notice that one of EbixCash's two gift card sales channels—which were at the center of the material weakness in internal control that led RSM to resign—simply did not exist and, apparently, there was not a single associated transaction.

230.    Somani issued clean audit opinions governing Ebix's 2020 and 2021 financial statements that contained the disclosures listed above. The fact that Somani failed to thoroughly question EbixCash's sales channels and the basic "Nature & Metrics" of its business or detect the inaccuracies and ambiguities calls into question the accuracy, attentiveness and effectiveness of its audits.

231.    Similarly, Ebix retained Skadden Arps, along with accounting experts from AlixPartners, to assist the Company with investigating the gift card business after RSM resigned. Neither of those firms detected Ebix's waffling regarding gift card sales channels and revenue, despite the fact that their engagement was geared specifically toward gift card issues. Their failure to thoroughly question EbixCash's sales channels and the basic "Nature & Metrics" of its business or detect the inaccuracies and ambiguities also calls into question the accuracy, attentiveness and effectiveness of their work.

232.    Astoundingly, even today, EbixCash still cannot tell a coherent story about its sales channels, which should have been apparent to Somani, and the legal and forensic advisors Ebix claims that it hired and relied upon when evaluating RSM's finding of a material weakness in internal control. In the Form 10Q for 2Q22, filed with the SEC on August 9, 2022, approximately

6 weeks *after* Ebix stated in its "Clarification" to the Hindenburg Report that "EbixCash gift cards are sold to Corporate clients only," Ebix repeated its *prior misstatements* that "EbixCash sells general purpose prepaid gift cards to *corporate customers and consumers*, directly contradicting and apparently undoing the "Clarification:"

> EbixCash Exchanges ("EbixCash") *** Gift Cards EbixCash sells general purpose prepaid gift cards to **corporate customers and consumers** that can be later redeemed at various merchants.

233.    Although Ebix's almost contemporaneous June 21, 2022 "Clarifications on the Nature & Metrics of its EbixCash Businesses" stated that gift cards are not sold at the 650,000 distribution network locations, the DRHP filed only 3 months earlier indicates that "all of our offerings," which appears to include gift cards, are sold at the network of more than 650,000 locations:

> [W]e have a large "phygital" distribution network that combines our agent network of **more than 650,000 locations** throughout India and Southeast Asia with a digital omni-channel online platform **for all of our offerings**. . . . A key by-product of our large "phygital" distribution network and ability to operate across industries, including many that are regulated, is our broad and deep customer base that includes **large corporations**, banks, financial institutions, insurance companies, healthcare providers, educational institutions, airports, and ports, **in addition to retail customers**.

234.    The Hindenburg Report found that although "EbixCash claims to have 650,000 retail outlets," "evidence suggests that this number is a massive exaggeration."

235.    The DRHP further indicates that gift cards have been sold in EbixCash's "retail and corporate segments," contrary to the June 21, 2022 "Clarification" that gift cards are only sold to corporate customers "Over Financial Year 2020 and 2021, we experienced significant growth in our *pre-paid cards business in both the retail and corporate segments*, which was mainly driven by increased demand for payment cards during the COVID-19 pandemic."

236.    Ebix's inability to keep straight the basic fact of who its gift card customers are—

even after issuing a public clarification—should have raised a glaring red flag with Somani, Skadden Arps and AlixPartners and casts doubt on their conclusions.

## VI.   SCIENTER ALLEGATIONS

237.   As alleged in this Complaint, the Defendants acted with scienter throughout the Class Period in that each knew or recklessly disregarded that Ebix's publicly reported statements made in the Company's SEC filings, press releases, and conference calls, were false or misleading and omitted material facts necessary to make their statements not misleading. Defendants Raina and Hamil, as the most senior officers of the Company, are liable as direct participants in all of the wrongs complained of in this Complaint. Because of their positions in the Company, as well as Raina's stock ownership, they possessed the power and authority to control the contents of Ebix's public statements to the market. In particular, the Defendants knew or recklessly disregarded that: (i) the adverse facts ultimately disclosed to the market regarding Ebix's material weakness in internal control over financial reporting had not been disclosed to, and was being actively concealed from, the investing public; and (ii) the public documents and statements issued and disseminated in the name of the Company were false or misleading and omitted material facts. By participating or acquiescing in the issuance or dissemination of these statements, the Defendants participated in the fraudulent scheme as primary violators of the federal securities laws. In addition, numerous facts give rise to a strong inference that, throughout the Class Period, each of the Defendants acted with scienter.

238.   Considered in their totality, the facts alleged establish Defendants' scienter.

239.   Because the scienter of Ebix's corporate agents is imputed to Ebix, Raina's and Hamil's scienter, as alleged herein, is imputed to Ebix.

A.   **Raina's and Hamil's Admission in the DRHP of a Material Weakness in Internal Control Establishes that Defendants' Scienter—That They Knew of or Recklessly Disregarded the Existence of the Same Material Weakness During 2020, Including 3Q20 and Concealed it During the Class Period**

1.   **Raina's and Hamil's Scienter is Established by Their Admission of the Existence of a Material Weakness**

240.   Raina, as a Director of EbixCash, and Hamil, as CFO of EbixCash, explicitly consented to the filing of the DRHP.

241.   Raina, as a Director of EbixCash, signed a Declaration dated March 9, 2022 which was attached to the DRHP, stating that "I further certify that all statements, disclosures and undertakings in this Draft Red Herring Prospectus are true and correct."

242.   Raina and Hamil admitted in Section II-Risk Factors of the DRHP that "as a listed company, we will need to maintain and improve the effectiveness of our disclosure controls and procedures and internal control over financial reporting, including keeping adequate records of daily transactions." The "Risk Factors" Section of the DRHP states that "[t]his section should be read in conjunction with …" Management's Discussion and Analysis of Financial Condition and Results of Operations ('MD&A')" and the MD&A directs investors to "[a]lso read Risk Factors."

243.   The admission in the DRHP of the need to "improve the effectiveness of our disclosure controls and procedures and internal control over financial reporting, including keeping adequate records of daily transactions" is directly attributable to Raina and Hamil because they consented to the filing of the DRHP, Raina certified that all statements are "true and correct" and the MD&A of the DRHP explicitly directs investors to read the Risk Factors, where the admission was located.

244.   A need to "improve the effectiveness of our disclosure controls and procedures and internal control over financial reporting, including keeping adequate records of daily transactions"

is a *per se* material weakness in internal control because keeping adequate records of daily transactions is the most basic and fundamental internal control procedure for any business, regardless of its size, nature, metrics, or location.

245.    For example, Ebix's Management's Reports on Internal Control over Financial Reporting in the 10Ks for 2020 and 2021, filed with the SEC on April 27, 2021 and March 10, 2022, respectively, explicitly recognize that maintaining and recording records of daily transactions are an essential function of internal control over financial reporting ("The term 'internal control over financial reporting' . . . includes those policies and procedures that: (1) Pertain to *the maintenance of records* that in reasonable detail accurately and fairly reflect our transactions and dispositions of assets; (2) Provide reasonable assurance that *transactions are recorded* as necessary to permit preparation of consolidated financial statements. . ."). The Sarbanes-Oxley Act of 2002, 15 U.S.C 7213(a)(2)(iii)(II)(aa) and (bb), requires "*maintenance of records* that in reasonable detail accurately and fairly reflect the transactions and dispositions of the assets of the issuer" and to "provide reasonable assurance that *transactions are recorded* as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles." The Foreign Corrupt Practices Act of 1977, as amended, 15 U.S.C. §§ 78dd-1, et seq. ("FCPA") also requires corporations to "*make and keep books and records that accurately and fairly reflect the transactions of the corporation.*"

**2.    Raina's and Hamil's Scienter is Established by Their Admission of the Same Material Weakness which RSM Identified**

246.    Raina's and Hamil's admission of their knowledge and identification of a material weakness in the DRHP of a need to "*improve the effectiveness of our disclosure controls and procedures and internal control over financial reporting, including keeping adequate records of daily transactions*" raises a compelling inference that they knew of or recklessly disregarded

virtually the same material weakness which RSM identified on February 15, 2021 as "*being unable, despite repeated inquiries, to obtain sufficient appropriate audit evidence that would allow it to evaluate the business purpose of significant unusual transactions that occurred in the fourth quarter of 2020, including whether such transactions have been properly accounted for and disclosed in the financial statements subject to the Audit.*"

247.    The virtually identical nature of the material weakness belatedly admitted by Raina and Hamil in the DRHP filed on March 9, 2022 and the material weakness identified by RSM on February 15, 2021 establishes that the same material weakness existed during 2020, including 3Q20, and continues until the present, and there are no compelling or cogent inferences of non-fraudulent intent or plausible non-culpable explanations.

248.    This material weakness admitted by Raina and Hamil on March 9, 2022 is the same one identified by RSM ("as a result of being unable, despite repeated inquiries, to obtain sufficient appropriate audit evidence that would allow it to evaluate the business purpose of significant unusual transactions that occurred in the fourth quarter of 2020, including whether such transactions have been properly accounted for and disclosed in the financial statements subject to the Audit."). Whether the material weakness is called a "need to improve" internal control, particularly, "keeping adequate records of daily transactions," by Raina and Hamil on March 9, 2022 or an inability to "obtain sufficient appropriate audit evidence" by RSM on February 15, 2021, it is the same material weakness.

### 3.    Raina's and Hamil's Scienter is Established Because They Knew That the Same Material Weakness Which They Admitted on March 9, 2022 Existed During 3Q20 and Throughout 2020

249.    Raina and Hamil knew or recklessly disregard the existence of the 3Q20 material weakness during the Class Period because they confirmed in Ebix's 10Qs, 10Ks and certified in their SOX Certifications that they designed, evaluated, and monitored internal control, including

designing internal control so that material information would be promptly communicated to them. The same material weakness that existed in 3Q20 and throughout 2020 still exists today because Raina and Hamil confirmed in the 2020 and 2021 10Ks and the most recent 10Q in 2Q22 filed with the SEC on August 9, 2022 that "there were no changes in our internal control over financial reporting identified in management's evaluation." Therefore, Raina and Hamil knew about the longstanding existence of a material weakness existing in 3Q20 and throughout 2020 because they admitted it on March 9, 2022—and confirmed that internal control has not changed throughout 2020, 2021 and as of the most recent 2Q22 10Q filed with the SEC on August 9, 2022.

250.    Raina and Hamil knew or recklessly disregarded the continuing existence of the same material weakness because they designed, evaluated, and monitored the internal control procedures of Ebix. Every 10-Q and 10K signed by Raina and Hamil from 3Q20 to the present states that "[t]here were no changes in our internal control." Specifically, Raina and Hamil state, using identical language in each 10Q and 10K that internal controls are effective and there have been no changes:

> "Our management, including our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our 'disclosure controls and procedures' (as defined in Rule 13a-15(e) promulgated under the Exchange Act) [as of September 30, 2020.] Based on this evaluation the Company's Chief Executive Officer and Chief Financial Officer have concluded that these disclosure controls and procedures are effective. *There were no changes in our internal control over financial reporting. . . .*"

### 4.    Raina's and Hamil's Scienter is Established Because They Designed, Evaluated and Monitored Internal Control

251.    In virtually identical language in Forms 10Q and 10K signed by Raina and Hamil and filed with the SEC from Nov. 9, 2020 through the present, Raina and Hamil stated that "[m]anagement is responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Rule 13a-15(f) under the Exchange Act)" and "[w]e monitor and

evaluate on an ongoing basis our disclosure controls and procedures in order to improve their overall effectiveness." Not only were they responsible for establishing and maintaining internal control, but they also evaluated and monitored internal control and designed the controls to ensure that they received information required to be disclosed: "*Disclosure controls also are designed to reasonably assure that such information is accumulated and communicated to management, including the Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosures*."

252.    There are no compelling or cogent inferences of non-fraudulent intent or plausible non-culpable explanations to contradict Raina's and Hamil's knowledge of the material weakness during 3Q20. Because EbixCash is a division akin to a subsidiary, EbixCash was already required to maintain effective internal controls. RSM audited EbixCash as part of its audit of Ebix and resigned in the middle of the audit because of its inability to "obtain sufficient appropriate audit evidence" relating to the gift card business in India—i.e., EbixCash. EbixCash's obligations to maintain internal control do not differ as a subsidiary or as a listed company. Raina's and Hamil's admission that EbixCash's internal controls will need to "improve" when EbixCash becomes a listed company is an admission that EbixCash's internal control was deficient prior to that time, while EbixCash was a subsidiary of Ebix. From 3Q20 through the present, internal control standards remained consistent and there were no intervening rule changes. Therefore, the need to "improve" internal control cannot be attributed to external factors. Further, there were no apparent material changes to EbixCash's business that would have triggered a new, different or "improved" internal control.

**5.      Raina's and Hamil's Scienter is Established by
Offering Highly Lucrative IPO Audit Business to
Somani, a Small Indian Auditor Which Was Ill Equipped
to Audit a Global Company of Ebix's Size and Complexity**

253.    Ebix engaged Somani as the replacement auditor after RSM's identification of a material weakness and resignation to finish the audit of Ebix's 2020 financial statements and also to audit the financial statements of EbixCash for its IPO, which would be the largest IPO in Indian history, and would be extremely lucrative for Somani.

254.    Raina and Hamil knew that Somani was likely to overlook the material weakness identified by RSM in issuing its opinion on Ebix's 2020 financial statements, particularly because Raina and Hamil also gave Somani the lucrative engagement to audit EbixCash for the IPO. Raina and Hamil knew that the 2020 audit of Ebix's financial statements was stretching, if not completely beyond, the abilities of Somani and that giving the EbixCash IPO audit to Somani was a once-in-a-lifetime opportunity for a small Indian firm. Somani's desire to complete both audits and retain its engagements as Ebix's and EbixCash's auditors created a conflict of interest for Somani between dealing with the material weakness identified by RSM or covering it up to protect its lucrative retention for the IPO audit, which would not proceed in the face of a disclosed material weakness in internal control. Somani did not identify or disclose a material weakness in any audit opinion it issued for Ebix or EbixCash and issued unqualified audit opinions for all engagements.

255.    According to the SEC and Ebix's former auditor, Andersen, Ebix, under Raina's tenure, has a history of "accountant shopping" that resurfaced in the hiring of Somani. Ebix's announcement concurrently with the hiring of Somani to replace RSM of its "inten[t] to retain [Somani] as a statutory auditor for the EbixCash IPO jointly with a top-tier international audit firm" is strong indicia that Ebix and RSM engaged in a *quid pro quo* whereby Somani provided a "clean" audit opinion in exchange for highly lucrative work as Ebix' auditor on the DRHP—work

for which it was, in fact, hired—and to serve as EbixCash's auditor following a successful IPO of EbixCash which, at reported values, would be largest IPO in India's history.

**B.      Raina's and Hamil's Scienter is Established by
Their Strong Motivation to Conceal the Material
Weakness to Win Ebix's Race Against the Solvency Clock**

256.    Throughout the Class Period and continuing to the present, a mountain of debt—$716 million—most of which was coming due in February 2023 has been posed to bury Ebix. An IPO of EbixCash is Ebix's only lifeline to beat the solvency clock which chimes in February 2023. Other than the IPO of EbixCash, Ebix has few, if any, realistic options to stave off bankruptcy.

257.    Raina and Hamil were the primary participants in this "race against the solvency clock" and an IPO of EbixCash was their goal. It was crucial for them to capitalize on the rapid revenue growth in EbixCash during the pandemic because they knew that the astronomical surge in gift card sales and revenues would subside as the pandemic subsided. Because time would run out, Raina and Hamil had a strong motivation to conceal the 3Q20 material weakness in internal control so that the plans for an IPO could proceed on pace.

**C.      Raina's and Hamil's Scienter is Established by Their Willingness to Say
What is Expedient Under the Circumstances, Regardless of Its Truth**

**1.      Raina's and Hamil's Inconsistent and Misleading
Representations about Sales Channels for EbixCash
Establish their Scienter and Lack of Truthfulness When
Representing Facts about EbixCash's Business to Investors**

258.    In 10Qs and 10Ks signed by Raina and Hamil and filed with the SEC and in press releases also filed with the SEC, Raina and Hamil have exhibited a pattern of unexplained inconsistent statements and misrepresentations about fundamental aspects of Ebix's business, showing a cavalier attitude about accuracy and casting doubt on their credibility and truthfulness. This willingness to say whatever is expedient under the circumstances establishes their scienter and willingness to conceal the 3Q20 material weakness in internal control.

259.     For example, during the Class Period, in 10Ks and 10Qs signed by Raina and Hamil, Ebix had consistently represented to investors that it sold gift cards through two separate customer bases: "corporate customers and consumers" and touted that it reached gift card consumers through a vast array of about 320,000 distribution outlets located in local communities, leading investors to believe that EbixCash had a large consumer customer base.

260.     In response to the scathing allegations in the Hindenburg Report, Ebix issued a "Clarification" on June 22, 2022. In it, Defendants stepped away from this longstanding representation of how Ebix sold gift cards when it stated unequivocally that "EbixCash gift cards are sold to Corporate clients only for their employees, partners, affiliates or distribution network" and its physical distribution centers provide "last mile digital solutions to a prospective base."

261.     In other words, Ebix, through Raina and Hamil, said on June 22, 2022 that EbixCash sells gift cards to corporate clients only and that its physical locations are not involved in sales of gift cards to actual gift card consumers. This "Clarification" amounts to a complete about-face from prior representations about the basic functionality of the gift card business and effectively eliminates the entire consumer channel.

262.     Incredibly, Ebix's Form 10Q for 2Q22, filed with the SEC on August 9, 2022, only approximately 6 weeks after Defendants stated in Ebix's "Clarification" to the Hindenburg Report that "EbixCash gift cards are sold to Corporate clients only," Defendants reverted inexplicably to prior representations, stating that "EbixCash sells general purpose prepaid gift cards to corporate customers and consumers, directly contradicting and apparently undoing the June 21, 2022 "Clarification."

263.     Raina's and Hamil's inability to tell a consistent and coherent story about one of the most fundamental aspects of EbixCash's business—its sales channels and customer base for

gift cards—establishes their scienter, casts doubt on their credibility and exhibits a propensity for making statements that are expedient under the circumstances, including their concealment of the 3Q20 material weakness in internal control in EbixCash.

264.     Ebix's efforts to block the Hindenburg Report and sanitize the EbixCash website of information that contradict its longstanding misstatements regarding the existence of its non-existent sales of gift cards to "consumers" during the Class Period is a further indicium of Defendants' scienter.

> **2.      Raina's and Hamil's Inconsistent and Misleading Representations about Internal Control for EbixCash Establish their Scienter and Lack of Truthfulness When <u>Representing Facts about the Effectiveness of Internal Control</u>**

> **a.      Raina and Hamil Permitted Two Mutually Contradictory and Inconsistent Statements <u>To Be Filed in the Same Document--The DRHP</u>**

265.     Two independent joint statutory auditors—one of whom is Somani—have issued unqualified opinions for EbixCash for the period ended March 2021 and the interim period from April 1, 2021 to September 30, 2021 for both the consolidated India business and the Indian gift card subsidiary. The audited financial statements of the Indian businesses for the three years ended March 31, 2021 and the six months ended September 30, 2021 are included within the DRHP filing that was filed with the SEBI for regulatory review on March 9, 2022.

266.     Incredibly, Raina and Hamil permitted material contradictory statements within the same document—the DRHP. The unqualified audit opinions on EbixCash filed in the DRHP on March 9, 2022, including Somani's, are inconsistent with Raina's and Hamil's admission in the DHRP that it will "need to improve the effectiveness of our disclosure controls and procedures and internal control over financial reporting, including keeping adequate records of daily transactions." The significance of this fact is that one document—the DRHP—contains two

mutually exclusive and inconsistent facts—unqualified audit opinions of EbixCash by two auditors, one of whom is Somani, and an admission of a material weakness in internal control in EbixCash, which would preclude an unqualified audit opinion. Raina's and Hamil's representations in the DRHP, based on an audit by Somani, are also inconsistent with Ebix's 2021 Form 10-K for the period ending December 31, 2021 which repeats that no changes in internal controls were made implying that none were necessary.

267.    The only conclusion is to discount the validity, accuracy, and integrity of Somani's unqualified audit opinion of EbixCash included in the DRHP—and indeed, its unqualified audit opinions of Ebix for 2020 and 2021 as well, all of which were Defendants' tools to cover-up, white-wash and continue to conceal the material weakness in EbixCash existing in 2020, including 3Q20, and later identified by RSM.

> **b.    Raina and Hamil Permitted Two Mutually Contradictory and Inconsistent Statements to Be Filed One Day Apart in The DRHP and in Ebix's 2021 Form 10K**

268.    Raina and Hamil certified in their SOX Certifications dated March 10, 2022 attached to the 10K for 2021 filed with the SEC on March 10, 2022 that "[t]he registrant's other certifying officer [Hamil] and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors:

> all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information. Hamil made an identical SOX Certification. In fact, neither Riana nor Hamil disclosed a material weakness in internal control to Somani or the Audit Committee because Somani issued a clean audit opinion for 2021, stating in its opinion attached to the 2021 10K that "In our opinion, the company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2021."

269.    Yet, on March 9, 2022, only one day before the 2021 10K containing the statements

quoted above about effective internal control was filed with the SEC, Raina and Hamil had stated the opposite in the DRHP, admitting that there was a material weakness by stating that "as a listed company, we will need to maintain and improve the effectiveness of our disclosure controls and procedures and internal control over financial reporting, including keeping adequate records of daily transactions."

270.     Not only does this blatant contemporaneous inconsistency occurring over a one-day period cast doubt on the credibility of Raina and Hamil, but it also throws suspicion on the validity of Somani's audits, including the clean 2021 audit opinion filed in the Ebix 10K. Somani was one of the auditors for the DRHP and knew that the DRHP disclosed a material weakness on March 9, 2022, the day before it signed and filed its 2021 clean audit opinion on March 10, 2022.

**3.     Defendants' Scienter for Concealing the Material Weakness In 3Q20 Is Established By Burying Their March 9, 2022 Admission Of The Material Weakness In The DRHP, <u>Knowing That It Would Remain Virtually Unnoticed</u>**

271.     Raina and Hamil made their admission in the DHRP regarding EbixCash's material weakness in internal control in a single sentence in a document spanning 457 single-spaced pages. The DRHP was filed with SEBI in India and was not readily available in the US. Raina and Hamil knew that their admission would go virtually unnoticed—and it did.

272.     Even though Hindenburg Research performed extensive research and analysis regarding EbixCash for its June 16, 2022 Report, the Hindenburg Report did not address the internal control issue directly and did not mention the admission at all. Nor did Somani mention or address the admission in its unqualified audit opinion filed with Ebix's 2021 10K or its unqualified audit opinion of EbixCash filed with the DRHP.

273.     Raina's and Hamil's effort to bury their admission in the DRHP establishes their scienter as part of a continuing scheme to conceal the longstanding material weakness existing

during 2020, including 3Q20 and later identified by RSM.

      **4.**      **Raina's and Hamil's Inconsistent and Misleading Representations About EbixCash's Gift Card Gross Revenue Establish their Scienter and Lack of Truthfulness When Representing Facts to Investors**

      274.    During the Class Period, Ebix repeatedly touted that its gross revenues from gift card sales increased nearly six-fold from 2019 to 2020, expanding from $56 million in 2019 to $256 million in 2020. The 2020 10-K stated: "During 2020, our revenue from the payment solutions offerings in India (primarily prepaid gift cards) increased by more than $200 million year-over-year to approximately $256 million, a 590% year-over-year growth." The $256 million in gift card revenue for 2020 represented 41% of Ebix's total revenue of $626 million in 2020. Thus, Raina and Hamil's statements in filings with the SEC and earnings conference calls focused on gift card revenue as a leading component of Ebix's overall financial position and made an IPO of EbixCash Raina's and Hamil's only realistic option to beat the solvency clock and save Ebix from default on its debt.

      275.    However, consistent with Raina's and Hamil's pattern of saying what was expedient under the circumstances, Hindenburg's scathing Research Report caused Raina and Hamil to tone down the "hype" and disclose clearly in Ebix's purported "refutation" to the Hindenburg Report issued on June 16, 2022 what had always been true—that the gift card business was extremely low margin and, in fact, gift card revenue was "not material" to Ebix's operating profit or net income ("Ebix's gift card business…generated operating income of 1% or lower in the 12-month period ending December 2020 and December 2021, which were not material to Ebix's operating profit or net income in each of the two periods.").

      276.    Raina's and Hamil's willingness and propensity to mislead investors about the most basic aspects of EbixCash's business raises a strong inference that they knowingly concealed the existence of a material weakness in 2020, including 3Q20.

**D.  Raina's Scienter is Established by His Strong Personal, Financial Motivation to Conceal the Existence of a Material Weakness in Internal Control**

**1.  Raina's Transition in His Compensation from Stock Awards in 2019 and 2020 to Cash in 2021 and 2022 Establishes that He Acted with Scienter to Protect His Own Financial Self Interest Because He Knew about RSM's Inability to Obtain Sufficient Audit Evidence Arising from the Material Weakness in Internal Control That He Designed and Monitored**

277.    In 2019 and 2020, Raina received his base salary in equivalent restricted stock in lieu of cash. On April 10, 2019, Ebix's Board of Directors announced that Raina's salary for 2019 and "going forward" would be paid in shares of common stock of Ebix. In 2019, Raina received a stock award valued at $4,200,000, which reflects the aggregate grant date fair value based on the stock price on the date of grant. On January 2, 2020, Ebix granted Raina 107,655 shares of restricted common stock, which represented his annual salary of $3,600,000 divided by $33.44, the closing price of Ebix's common stock on January 2, 2020.

278.    In an abrupt change of the plan "going forward," no grant of restricted common stock for his base salary in 2021 was made to Raina. Instead, in 2021, he did not receive his base salary in restricted stock, but instead in the form of a cash retention bonus with a three-year tenure.

279.    Raina's compensation from 2019 through 2021 is reflected in the chart below in Ebix's Form 10-K for the year ending December 31, 2021.

| Name and Principal Position | Year | Salary ($) | Bonus ($) | Stock Awards ($) (1) | Option Awards ($) | Non-Equity Incentive Plan Compensation ($) | All Other Compensation ($) | Total |
|---|---|---|---|---|---|---|---|---|
| Robin Raina, President, | 2021 | $   — | 3,600,000  (2) | — | — | — | 4,350  (4) | $  3,604,350 |
| Chief Executive Officer | 2020 | $   — | — | 7,960,000 | — | — | — | $  7,960,000 |
| and Chairman of the Board | 2019 | $   — | 2,000,000  (3) | 4,200,000 | — | 1,584 | 6,000  (4) | $  6,207,584 |

280.    On October 3, 2022, Raina began to receive his 2022 base salary of $3,600,000 in

cash, as disclosed in an 8K filed with the SEC on October 6, 2022.

281.    The about-face in Raina's compensation from stock awards in 2019 and 2020 to cash in 2021 and 2022 establishes his scienter by raising a strong inference that Raina knew on November 9, 2020 that a material weakness existed during 2020, including 3Q20 because he had designed, evaluated, and monitored internal control. This abrupt change in Raina's compensation also establishes his scienter by raising a strong inference that Raina knew or recklessly disregarded RSM's inability, despite repeated requests, to receive sufficient appropriate audit evidence about significant unusual transactions during 4Q20 in Ebix's gift card business in India.

282.    Raina knew, because he had designed the internal control and continuously monitored its effectiveness, that RSM's inability to obtain sufficient audit evidence was a direct manifestation of the material weakness in the internal control which he had designed and monitored, along with designing the controls to ensure that he received information required to be disclosed.

283.    Specifically, Raina and Hamil designed Ebix's disclosure controls to reasonably assure that such information is accumulated and communicated to management, including the Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosures.

284.    Because Raina was intimately involved in the design and monitoring of internal control, his abrupt shift to cash compensation in 2021, at precisely the same time that RSM was unable to obtain audit evidence, raises a strong inference that he knew that the disclosure of the inherent material weakness would have a negative impact on Ebix's stock price and, accordingly, would make stock compensation less desirable for him than cash compensation.

285.    The timing of Raina's change from the stock-based compensation announced in

2019 and anticipated at the time to continue indefinitely "going forward" was abrupt, suspicious, and not coincidental. In view of RSM's frustration during 4Q20, Raina's compensation shift immediately after 4Q20 raises a strong inference that Raina was motivated by self-interest to protect his compensation from the negative impact on Ebix's stock price which he knew would occur when the truth was disclosed.

286.    Stock-based compensation made good sense for Raina during 2019 and the first three quarters of 2020 when Raina was actively touting an imminent IPO of EbixCash, which made stock compensation the more lucrative option for him. However, stock compensation was not as desirable for Raina after he became aware during 4Q20 of RSM's repeated requests for and inability to obtain sufficient audit evidence.

287.    Raina gained this knowledge through his role as Chairman of the Board of Directors of Ebix, where he was tasked with communicating with the Audit Committee in connection with internal control. Specifically, the Audit Committee's mandate is to "[m]eet with the Auditors and the Company's management to discuss, review and comment upon the interim financial statements," resolve "disagreements between management and the Auditors regarding financial reporting," "[r]eview with the Auditors and the Company's management their findings on the adequacy and effectiveness of internal controls and their recommendations for improving the internal control environment," "[e]stablish procedures for the receipt, retention, and treatment of complaints received by the Company regarding accounting, internal accounting controls, or auditing matters," and "to help ensure that management properly develops and adheres to a sound system of internal controls and that the Auditors, through their own review, objectively assess the Company's financial reporting practices."

288.    Because Raina designed and monitored internal control to ensure that he personally

received information required to be disclosed and was required to communicate with the Audit Committee about numerous aspects of internal control, it is not plausible that Raina did not know that RSM was unable to obtain sufficient audit evidence for significant unusual transactions during 4Q020.

289.    It is not coincidental that Raina's abrupt change from stock compensation in 2019 and 2020 to cash in 2021 coincides precisely with RSM's vocal frustration and repeated requests for and inability to obtain sufficient audit evidence. The temporal proximity of events establishes Raina's scienter by raising a strong inference that Raina's transition from stock to cash compensation was a product of his knowledge of RSM's inability to complete the audit and the material weakness in the internal control he designed, evaluated, and monitored, all of which he knew about, at the very least, through his communications with the Audit Committee.

290.    Raina's abrupt change from stock to cash compensation at the same time as he knew about a material weakness in internal control at EbixCash is akin to insider selling because he jettisoned his stock compensation while in possession of undisclosed information at a time when stock compensation no longer appeared as beneficial as cash compensation.

### 2.    Raina's Scienter is Established by Additional Strong Financial Motivations to Conceal the Material Weakness

291.    Raina had a financial incentive and motivation to conceal the material weakness because Raina was the sole beneficiary of a Bonus Plan which provides for the payment of annual cash incentive awards to him alone based upon Ebix's achievement of specified performance goals. Participation in the Bonus Plan, which is limited solely to Raina, provides that Raina is eligible to receive cash incentives in a particular fiscal year during the term of the Bonus Plan if Ebix meets or exceeds certain performance goals set by the Compensation Committee. Disclosure of the material weakness would have revealed the unreliability of EbixCash's and Ebix's reported

revenue and the accuracy of Ebix's financial statements, thus jeopardizing Raina's bonus.

292.     Raina also had a financial incentive and motivation to conceal the material weakness because Raina, as a more than 14% shareholder of Ebix, stood to benefit financially from the potential IPO, which was likely to be extremely lucrative for Raina and Ebix's shareholders and was repeatedly and exuberantly touted by Raina.

293.     Raina had a strong financial motivation to conceal the material weakness because Raina stood to gain handsomely from a successful IPO of EbixCash because he owned 176,000,000 options. Raina, who serves a Director of EbixCash and Chairman of EbixCash's IPO Committee, personally owned 4,000 equity shares plus options to purchase an additional 176,000,000 shares (at a 1:1 ratio of options to common stock). Critically, based on the reported expected valuation of EbixCash, Defendant Raina's 176,000,000 options were deeply "in the money," meaning that he stood to reap an enormous windfall if the IPO was ultimately launched. In addition, Ebix's surging revenues served to substantially increase the value of Ebix's shares— of which Raina owned approximately 14%—in addition to his ownership of 176,000,000 options to purchase shares of EbixCash on a 1:1 basis in the IPO.

E.     **Raina's and Hamil's Scienter is Established From Their Positions at Ebix and EbixCash**

294.     Raina was the CEO, Chairman of the Board, an owner of more than 14% of Ebix's outstanding stock, was described in Ebix public statements as the "single" and "visionary" leader of Ebix and "top operating decision-maker," was intimately familiar with EbixCash's operations in India where the significant unusual transactions in the gift card business were alleged to have occurred, communicated with the Audit Committee and RSM, and was informed about all material aspects of Ebix's business, particularly the EbixCash business, which was Ebix's primary revenue driver and a core business of Ebix. According to CW3, "everything was very tightly controlled"

by Raina and he was "betting the ranch" on EbixCash. Because Raina's positions with Ebix gave him unique access and knowledge of EbixCash's business and internal control, he knew that his statements alleged herein about internal control over financial reporting were materially false and misleading and intended to deceive investors or he recklessly disregarded the substantial risk that his statements were false. His statements were reckless and an extreme departure from the standards of ordinary care to the extent that the danger that his statements were false was known to him or so obvious that he was aware of the falsity:

(a)     Raina and Hamil admitted in the 3Q20 10-Q which they signed that they are personally responsible for internal control over financial reporting, and that they designed it and were continually monitoring the impact of COVID-19 on the operating effectiveness of internal control. Therefore, they knew or recklessly disregarded that there was a material weakness related to Ebix's failure to design "controls over the gift or prepaid card revenue transaction cycle sufficient to prevent or detect a material misstatement." Raina knew that each of Ebix's acquired businesses, including EbixCash, operated under disparate accounting systems which were not coordinated for financial reporting or internal control, resulting in a "broken" accounting system which created a material weakness in internal control during 2020, including 3Q20 in the gift card business in India;

(b)     Raina and Hamil knew or recklessly disregarded the 3Q20 material weakness in internal control over financial reporting as a result of their close and continuous contact with the Audit Committee of the Ebix Board. Raina, in his roles as Chairman of the Board, CEO, and top operating decision-maker, and Hamil as CFO, and as a result of both of their intimate involvement in the financial management of Ebix. Raina, Hamil and the Audit Committee would have been alerted to the findings of the interim audit which began in November 2020. Among other things,

the Audit Committee oversees Ebix's accounting and financial reporting processes and assists the Board in fulfilling its oversight functions with respect to the internal control functions of Ebix with a goal to maintaining free and open communications between the Board, Ebix's independent public accountants who audit Ebix's financial statements and Ebix's financial management, including Raina and Hamil. The fact that RSM made repeated requests for sufficient appropriate audit evidence, which Ebix failed to provide, was a serious matter within the scope of the Audit Committee's oversight function and would have been raised with the Audit Committee and Raina and Hamil, particularly because Raina and Hamil designed internal control so that information would be communicated to them;

(c)     Raina knew or recklessly disregarded that the astronomical growth in the gift card business in the 3Q20 created a material weakness in the existing internal control over financial reporting. At the time he made his false November 9, 2020 statement, the COVID-19 pandemic was ravaging India and Ebix's Indian staff. At the same time, Indians were motivated to use digital payment systems like gift or pre-paid cards rather than in-person payment methods, thus causing skyrocketing growth in Ebix's gift and prepayment card business at the same time that EbixCash's key competitors were losing money and Ebix was trying to operate under a "broken" accounting system, according to CW3;

(d)     A cogent inference of Raina's and Hamil's scienter arises from the fact that Somani, an Indian auditing firm with far less expertise and experience in auditing major companies under U.S. GAAP than RSM, was hired only several weeks after RSM's resignation and delivered a clean audit opinion, with no mention of remediation of the material weakness in internal control identified by RSM. This occurred within only seven weeks after RSM's resignation, despite RSM's repeated inability to obtain sufficient appropriate audit evidence and public disclosure of a

material weakness in internal control. Defendants were motivated to assure the quick turn-around of the audit, which was essential to regain Nasdaq delisting of Ebix and protect the lucrative planned IPO of EbixCash, in which Raina was likely to profit personally and win the race against the solvency clock for Ebix;

(e)     Hamil was CFO of Ebix, designed and monitored internal control over financial reporting and was intimately involved with the financial reporting and internal control in EbixCash, which is the main revenue driver of Ebix and is its core business. Because Hamil's positions with Ebix gave him unique access and knowledge of EbixCash's business and internal control, he knew or recklessly disregarded that his statements alleged herein were materially false and misleading because he concealed the existence of the material weakness. His statements were reckless and an extreme departure from the standards of ordinary care to the extent that the danger that his statements were false was known to him or so obvious that he was aware of the falsity;

(f)     Hamil admitted in the 3Q20 10-Q which he signed that he was continually monitoring the impact of COVID-19 on the operating effectiveness of internal control over financial reporting and therefore, he knew or recklessly disregarded as a result of his continual monitoring that there was a material weakness related to Ebix's failure to design controls "over the gift or prepaid card revenue transaction cycle sufficient to prevent or detect a material misstatement;" and

(g)     Hamil admitted in his SOX certification dated November 9, 2020 that he designed the internal control over financial reporting or caused such internal control over financial reporting to be designed under his supervision, thus giving him actual knowledge of the structure and existing weakness in internal control.

## VII.    MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD AND OMISSIONS OF MATERIAL FACT

295.    The Class Period begins on November 9, 2020, when Ebix filed its 3Q20 10-Q, signed by Raina and Hamil, stating in relevant part:

> We monitor and evaluate on an ongoing basis our disclosure controls and procedures in order to improve their overall effectiveness. In the course of these evaluations, we modify and refine our internal processes and controls as conditions warrant.
>
> Our management, including our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our "disclosure controls and procedures" (as defined in Rule 13a-15(e) promulgated under the Exchange Act) as of September 30, 2020. *Based on this evaluation the Company's Chief Executive Officer and Chief Financial Officer have concluded that these disclosure controls and procedures are effective. There were no changes in our internal control over financial reporting during the quarter ended September 30, 2020 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting. We have not experienced any material changes to our internal controls over financial reporting* despite the fact that all non-essential employees are working remotely due to the COVID-19 pandemic. We are continually monitoring the impact of COVID-19 on the operating effectiveness of our internal control over financial reporting.

296.    The statement that "the Company's Chief Executive Officer and Chief Financial Officer have concluded that these disclosure controls and procedures are effective" was materially false and misleading when made and omitted the material fact that there was a material weakness in internal control over financial reporting in the gift card and pre-paid card business in India during 3Q20, which Raina and Hamil knew or recklessly disregarded.

297.    The statements that "*disclosure controls and procedures are effective*" was materially false and misleading and omitted the material fact a material weakness existed, and internal controls were not effective. Raina, as a Director of EbixCash, and Hamil, as its Chief Financial Officer, both of whom consented to the filing of the DRHP, admitted in the DRHP that "as a listed company, we will need to maintain and improve the effectiveness of our disclosure controls and procedures and internal control over financial reporting, including keeping adequate

records of daily transactions." Regardless of where a company is located and the accounting rules of the country with which it must comply, keeping adequate records of daily transactions is the most basic foundational building block of internal control over financial reporting, as required by statute and recognized by Ebix management. Failure to keep adequate records of daily transaction is a *per se* material weakness in internal control over financial reporting. There is no gray area for such a failure, which is not merely a significant deficiency or a weakness in internal control, but instead is always a material weakness in internal control.

298.    The statement that EbixCash's internal controls will need to "improve" when EbixCash becomes a listed company raises the most plausible inference that those internal controls had been and continued to be deficient since at least 3Q20, when gift card sales and revenue skyrocketed. Every 10Q and 10K signed by Raina and Hamil from November 9, 2020 to the most recent 10Q for 2Q22 filed with the SEC on August 9, 2022 states that "[t]here were no changes in our internal control over financial reporting." Therefore, the same material weakness which existed on March 9, 2022 at the filing of the DRHP also existed during 2020, including 3Q20 and thereafter because Raina and Hamil repeatedly certified that no changes in internal control had been made.

299.    There are no compelling or cogent inferences of non-fraudulent intent or plausible non-culpable explanations to contradict Raina's and Hamil's knowledge of the material weakness during 3Q20.

300.    An Ebix division akin to a subsidiary, EbixCash was already required to maintain effective internal controls. The internal control standards Ebix needed to meet remained consistent from 3Q20 to present. There were no intervening rule changes requiring Ebix to "improve" its internal controls to meet a new or heightened standard, nor were there were any apparent changes in Ebix's business operations that triggered new or heightened internal control standards. Ebix's

business model remained generally consistent from the Class Period to the present. Ebix's financial results ebbed and flowed over time, but nothing in its performance triggered a new or heightened internal control rule.

301.    The material weakness identified in the DRHP as the need to improve internal control, including "keeping adequate records of daily transactions" is essentially the same material weakness which RSM identified when it resigned as a result of being unable, despite repeated inquiries, to obtain sufficient appropriate audit evidence that would allow it to evaluate the business purpose of significant unusual transactions that occurred in the fourth quarter of 2020" related to the Company's gift card business in India. Virtually the same material weakness existed in 3Q20 and still exists today, as Raina and Hamil belatedly admitted.

302.    The 3Q20 10-Q also included a Certification Pursuant to Section 302 of SOX for the Chief Executive Officer, signed and dated by Defendant Raina on November 9, 2020:

I, Robin Raina, certify that:

1. I have reviewed this quarterly report on Form 10-Q of Ebix, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated

subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's third fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors:

(a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

303.    Defendant Hamil signed a substantially identical SOX certification, which was also included in the 3Q20 10-Q as Exhibit 31.2.

304.    The statements by Raina and Hamil that "[b]ased on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" and that they "disclosed in this report any change in the registrant's internal control over financial reporting that occurred

during the registrant's third fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting" were materially false and misleading when made because these statements omitted the material fact that disclosure controls and procedures were not effective, there was a material weakness in internal control, (specifically, the failure to keep adequate records of transactions), the same material weakness which caused Ebix's failure to provide sufficient audit evidence to RSM; and they did not disclose their knowledge of the material weakness in internal control or that there should be a change in internal control to remediate the material weakness. Nor did Raina or Hamil disclose, "based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors . . . all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information."

305.    Defendants Raina's and Hamil's SOX certifications regarding internal control over financial reporting are not opinions or vague expressions of optimism, but instead are certifications of fact based upon their personal knowledge, including their specific certification that they are "responsible for establishing and maintaining internal control over financial reporting," "designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision" and "are continually monitoring the impact of COVID-19 on the operating effectiveness of our internal control over financial reporting."

306.    Moreover, Raina and Hamil certified that they "designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated

subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared," which guaranteed that Raina and Hamil were informed of and knew or recklessly disregarded the need to improve internal control, including "keeping adequate records of daily transactions." Further, the 3Q20 10-Q included as Exhibit 32.1 the following SOX Certification signed and dated by Defendant Raina on November 9, 2020:

> CERTIFICATION PURSUANT TO 18 U.S.C. SECTION 1350,
> AS ADOPTED PURSUANT TO SECTION 906
> OF THE SARBANES-OXLEY ACT OF 2002
>
> I, Robin Raina, state and attest that:
>
> (1)     I am the Chief Executive Officer of Ebix, Inc. (the "Registrant").
>
> (2)     In connection with the Quarterly Report of the Registrant on Form 10-Q for the quarter ended September 30, 2020 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I hereby certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that the Report containing financial statements fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m or 78o(d)); and the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Registrant as of, and for, the periods presented.

307.     Defendant Hamil signed a substantially identical SOX certification, which was included in the 3Q20 10-Q as Exhibit 32.2.

308.     Raina's and Hamil's statements that "the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Registrant as of, and for, the periods presented" were materially false and misleading when made and omitted the material fact that the financial condition of Ebix was not fairly presented because the then-existing material weakness in internal control, specifically, the need to improve internal control, including "keeping adequate records of daily transactions," prevented a fair presentation of Ebix's revenue, sales and financial condition in general.

## VIII.    CLASS ACTION ALLEGATIONS

309.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired Ebix securities between November 9, 2020 and February 19, 2021, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of Ebix and its subsidiaries and divisions, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

310.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Ebix's shares actively traded on the Nasdaq. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Millions of Ebix shares were traded publicly on the Nasdaq during the Class Period. Record owners and other members of the Class may be identified from records maintained by Ebix or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

311.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

312.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

313.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Ebix; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

314.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## IX.    UNDISCLOSED ADVERSE FACTS

315.   The market for Ebix's securities was open, well-developed, and efficient at all relevant times. As a result of these materially false and/or misleading statements, and/or failures to disclose, Ebix's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Ebix's securities relying upon the integrity of the market price of the Company's securities and market information relating to Ebix and have been damaged thereby.

316.   During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Ebix's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the

truth about Ebix's internal control over financial reporting, as alleged herein.

317.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Ebix's internal control over financial reporting. These material misstatements and/or omissions caused Ebix's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements and omissions during the Class Period resulted in Plaintiff and other members of the Class purchasing Ebix's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## X.    **LOSS CAUSATION**

318.    Defendants' wrongful conduct, as alleged herein, directly, and proximately caused the economic loss suffered by Plaintiff and the Class.

319.    During the Class Period, Plaintiff and the Class purchased Ebix's securities at artificially inflated prices and were damaged thereby. The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, thus causing investors' losses.

320.    As alleged herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Ebix's securities and operated as a fraud or deceit on purchasers of Ebix securities. When the truth about Defendants' misconduct was revealed, the value of Ebix's securities declined precipitously as the prior artificial inflation no longer propped up the prices of such securities. The declines in the prices of Ebix shares were the

direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market.

321.    The timing and magnitude of the share price declines negate any inference that the losses suffered by Plaintiff and members of the Class were caused by changed market conditions, macroeconomic or industry factors, or non-Company-specific facts unrelated to the Defendants' fraudulent conduct, as illustrated in the following chart comparing Ebix's stock price performance to relevant comparable indices:



322.    The economic loss, i.e., damages, suffered by Plaintiff and members of the Class, was a direct result of Defendants' fraudulent scheme to artificially inflate the prices of Ebix securities, as well as the subsequent significant decline in the value of the Ebix's securities when Defendants' prior misrepresentations and omissions were revealed.

323.    At all relevant times, Defendants' materially false and misleading statements and omissions alleged herein directly or proximately caused the damages suffered by Plaintiff and the members of the Class. Those statements were materially false and misleading through their failure to disclose a true and accurate picture of the Ebix's finances, accounting, and internal control over financial reporting, as alleged herein. Before and during the time of Plaintiff's and Class members'

purchases of Ebix's securities, Defendants issued materially false and misleading statements and omitted material facts necessary to make those statements not false or misleading, causing the prices of Ebix securities to be artificially inflated.

324.    Plaintiff and members of the Class purchased Ebix securities at artificially inflated prices, causing them to suffer damages, as complained of herein. Specifically, On February 19, 2021, when investors learned the truth about, *inter alia*, the material weakness of its internal control over financial reporting and RSM's resignation before completing the 2020 audit and disclosure of its reasons for resigning, as alleged herein, Ebix's shares immediately lost approximately 40% of their value, declining $20.24 per share in a single trading day, from a February 19, 2021 closing price of $50.74 to a February 22, 2021 closing price of $30.50 on atypically high volume.

## XI.    APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

325.    The market for Ebix's securities was open, well-developed, and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Ebix's securities traded at artificially inflated prices during the Class Period. On January 27, 2021, Ebix's share price closed at a Class Period high of $58.63 per share. Plaintiff and other members of the Class purchased or otherwise acquired Ebix's securities relying upon the integrity of the market price of Ebix's securities and market information relating to Ebix and have been damaged thereby.

326.    During the Class Period, the artificial inflation of Ebix's shares was caused by the material misrepresentations and/or omissions alleged herein, causing the damages sustained by Plaintiff and other members of the Class. As alleged herein, during the Class Period, Defendants made or caused to be made materially false and/or misleading statements and omissions about

Ebix's internal control over financial reporting. These material misstatements and omissions created an unrealistically positive assessment of Ebix and its EbixCash business, thus causing the price of Ebix's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of Ebix's shares. Defendants' materially false and/or misleading statements and omissions during the Class Period resulted in Plaintiff and other members of the Class purchasing Ebix's securities at such artificially inflated prices, and each of them has been damaged as a result.

327.    At all relevant times, the market for Ebix's securities was an efficient market for the following reasons, among others:

(a)    Ebix shares met the requirements for listing, and was listed and actively traded on the Nasdaq, a highly efficient and automated market;

(b)    As a regulated issuer, Ebix filed periodic public reports with the SEC and/or the Nasdaq;

(c)    Ebix regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services, investor conference calls, and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    Ebix was followed by securities analysts employed by brokerage firms who wrote reports about Ebix, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace. The analysts who regularly followed Ebix and published reports regarding Ebix included:

- BMO Capital Markets;

- Craig-Hallum Capital Group, LLC;

- Marketfield;

- CapitalCube;

- Singular Research;

- Sadif Analytics Prime;

- Vermilion Technical Research;

- BuySellSignals Research;

- Minkabu the Infonoid, Inc.;

- Wright Investors' Service, Inc.;

- Litchfield Hills Research, LLC;

- Thomson Reuters;

- MarketLine;

- Validea;

- New Constructs, LLC; and

- CFRA Research.

328.    As a result of the foregoing, the market for Ebix's securities promptly digested current information regarding Ebix from all publicly available sources and reflected such information in Ebix's share price. Under these circumstances, all purchasers of Ebix's securities during the Class Period suffered similar injury through their purchase of Ebix's securities at artificially inflated prices and a presumption of reliance applies.

329.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972),

because the Class's claims are, in large part, grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding Ebix's internal control over financial reporting—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here. Internal control over financial reporting is a material fact that is required to be disclosed in SOX certifications and other SEC filings.

## XII.  **NO SAFE HARBOR**

330.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements alleged herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading and omitted material facts.

## **FIRST CLAIM**

### **Violation of Section 10(b) of The Exchange Act and Rule 10b-5**
### **Promulgated Thereunder Against All Defendants**

331.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

332.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Ebix's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

333.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Ebix's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein and/or as controlling persons as alleged below.

334.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Ebix's internal control and financial condition, as alleged herein.

335.     Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course

of conduct as alleged herein in an effort to assure investors of Ebix's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Ebix and its internal control over financial reporting in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Ebix's securities during the Class Period.

336.    As alleged in detail herein, each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors of Ebix during the Class Period and members of Ebix's management team or had control thereof; (ii) each of these Defendants, by virtue of their responsibilities and activities as senior executives and/or director of Ebix, was privy to and participated in the creation, development, monitoring and reporting of Ebix's internal control over financial reporting; (iii) each Defendant enjoyed significant personal contact and familiarity with the other Defendant and was advised of, and had access to, other members of Ebix's management team, internal reports and other data and information about Ebix's finances, operations, and internal control at all relevant times; and (iv) each of the Defendants was aware of Ebix's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading and omitted material facts when the dissemination was made.

337.    Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such

Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Ebix's financial condition from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' false statements and omissions about internal control over financial reporting throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading or ignoring facts which were obvious to them.

338.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as alleged herein, the market price of Ebix's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of Ebix's securities were artificially inflated and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which Ebix's securities trade, Plaintiff and the other members of the Class acquired Ebix's securities during the Class Period at artificially high prices and were damaged thereby.

339.    At the time of said the alleged misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the Ebix's internal control over financial reporting, which was not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Ebix securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

340.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act

and Rule 10b-5 promulgated thereunder.

341.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of Ebix's securities during the Class Period.

## SECOND CLAIM

### Violation of Section 20(a) of The Exchange Act
### Against the Individual Defendants

342.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

343.    The Individual Defendants acted as controlling persons of Ebix within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership, participation in, and/or awareness of Ebix's operations and intimate knowledge of the statements which they made and were filed by Ebix with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of Ebix, including the content and dissemination of the statements which Plaintiff contends are false and misleading and omitted material facts. The Individual Defendants were provided with or had unlimited access to copies of Ebix's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

344.    In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of Ebix and, therefore, had the power to control or influence the particular statements and omissions giving rise to the securities violations alleged herein, and exercised the same.

345.     As alleged herein, Ebix and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure and certifying Plaintiff as the Class representative and Plaintiff's counsel as Class Counsel;

(b)     Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees, expenses, and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: October 31, 2022                    Respectfully submitted,

                                           _/s/ Regina Calcaterra_____
                                           Regina Calcaterra
                                           CALCATERRA POLLACK LLP
                                           1140 Avenue of the Americas, 9th Floor
                                           New York, NY 10036-5803
                                           Tel: (212) 899-1765
                                           Email: rcalcaterra@calcaterrapollack.com

Sherrie R. Savett
Michael Dell'Angelo*
Barbara A. Podell*
Andrew Abramowitz
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3000
Email: ssavett@bm.net
        mdellangelo@bm.net
        bpodell@bm.net
        aabramowitz@bm.net

*Admitted *Pro Hac Vice*

**Attorneys for Lead Plaintiff Rahul Saraf
and Lead Counsel for the Class**

## **CERTIFICATE OF SERVICE**

I hereby certify that on October 31, 2022, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.

*/s/ Regina Calcaterra*
Regina Calcaterra