```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
                                                                   :
RAHUL SARAF, individually and on behalf of all other               :
similarly situated,                                                :
                                                                   :
                                        Plaintiff,                 :      21-CV-1589 (JMF)
                                                                   :
                       -v-                                         :      OPINION AND ORDER
                                                                   :
EBIX, INC. et al.,                                                 :
                                                                   :
                                        Defendants.                :
                                                                   :
-------------------------------------------------------------------X
```

JESSE M. FURMAN, United States District Judge:

In this putative class action, Lead Plaintiff Rahul Saraf brings securities fraud claims against Ebix, Inc. ("Ebix" or the "Company"), and two Ebix executives, Robin Raina and Steven Hamil (the "Individual Defendants"). Saraf alleges that, between November 9, 2020, and February 19, 2021 (the "Class Period"), Defendants made material misstatements regarding Ebix's internal control over its financial reporting, in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a); and Securities and Exchange Commission ("SEC") Rule 10b-5 ("Rule 10b-5"), 17 C.F.R. § 240.10b-5. In a prior Opinion and Order, the Court granted Defendants' motion to dismiss the Second Amended Complaint, finding that Saraf failed to plead scienter. *See Saraf v. Ebix, Inc.*, — F. Supp. 3d —, 2022 WL 4622676 (S.D.N.Y. Sept. 30, 2022) (ECF No. 71) ("*Saraf I*"). Thereafter, Saraf filed the operative Third Amended Complaint, adding four new sets of allegations in an effort to plug the scienter hole. Defendants now move, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss again, arguing that, even with his new allegations, Saraf

does not establish scienter. The Court agrees. Thus, and for the reasons that follow, Defendants' motion is GRANTED, and the Third Amended Complaint is dismissed.

## BACKGROUND

The following facts, which are (unless noted) taken from the Third Amended Complaint, documents it incorporates, and matters of which the Court may take judicial notice, are construed in the light most favorable to Saraf. *See, e.g.*, *Kleinman v. Elan Corp., PLC*, 706 F.3d 145, 152 (2d Cir. 2013); *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (stating that a court may consider "legally required public disclosure documents filed with the SEC").

Ebix is a Delaware corporation headquartered in Georgia, the common stock of which trades on NASDAQ. ECF No. 72 ("TAC"), ¶ 20. Ebix provides "on-demand software and e-commerce services" and "employs nearly 10,000 people worldwide." *Id.* ¶ 48. Ebix operates in numerous countries, but its "operations are overwhelmingly weighted in India where the majority of its employees reside," and its "revenues and profits are primarily derived from its EbixCash subsidiary, whose operations are in India, particularly payments solutions such as pre-paid cards and gift cards." *Id.* ¶ 49. Raina is Ebix's CEO and Chairman of the Board. *Id.* ¶¶ 39-40. Hamil was, at all relevant times, Ebix's CFO. *Id.* ¶ 45.

In May 2017, Ebix acquired an 80% stake in ItzCash, the "dominant payment solutions exchange in India." *Id.* ¶ 52. ItzCash was subsequently renamed "EbixCash" and rapidly grew during the COVID-19 pandemic. *Id.* ¶¶ 52, 55. In contrast to EbixCash, other areas of Ebix's business declined substantially during the pandemic. *Id.* ¶¶ 62-63. On November 9, 2020, the first day of the Class Period, Raina informed investors during an earnings call that "EbixCash revenues grew 268% in [the] third quarter of 2020 versus the third quarter of 2019." *Id.* ¶ 94. In its 2020 Form 10-K, filed in April 2021, Ebix stated that "[t]he increased demand for prepaid gift

cards in India was primarily due to: (i) changes in regulations by the Reserve Bank of India related to debit cards, which has shifted demand in the market towards prepaid gift cards; (ii) COVID-19, which has facilitated increased online and electronic commerce due to restrictive lockdowns in 2020; and (iii) the Company's increased marketing efforts around the prepaid gift card business." *Id.* ¶ 85. Due to "EbixCash's surging gross revenue," Ebix's "share price rose from below $20 per share just before the start of the Class Period to as high as $52.07 on January 29, 2021, shortly before the end of the Class Period." *Id.* ¶ 74.

In part due to EbixCash's success, Ebix began preparations for a possible initial public offering ("IPO") of EbixCash, and told investors on January 6, 2020, that it was "continuing to make progress in terms of moving forward with its IPO plans." *Id.* ¶¶ 92-93. At the same time, however, Ebix also warned investors in a Form 10-Q for the period ending June 30, 2020, that Ebix had a high debt load and limited liquid capital. *Id.* ¶ 96. In its Form 10-Q for the following quarter, Ebix also made the following representations concerning controls:

> We monitor and evaluate on an ongoing basis our disclosure controls and procedures in order to improve their overall effectiveness. In the course of these evaluations, we modify and refine our internal processes and controls as conditions warrant.
>
> Our management, including our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our "disclosure controls and procedures" (as defined in Rule 13a-15(e) promulgated under the Exchange Act) as of September 30, 2020. Based on this evaluation the Company's Chief Executive Officer and Chief Financial Officer have concluded that these disclosure controls and procedures are effective. There were no changes in our internal control over financial reporting during the quarter ended September 30, 2020 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting. We have not experienced any material changes to our internal controls over financial reporting despite the fact that all non-essential employees are working remotely due to the COVID-19 pandemic. We are continually monitoring the impact of COVID-19 on the operating effectiveness of our internal control over financial reporting.

*Id.* ¶ 295.  Saraf alleges that these statements were "materially false and misleading when made and omitted the material fact that there was a material weakness in internal control over financial reporting in the gift card and pre-paid card business in India during 3Q20, which Raina and Hamil knew or recklessly disregarded."  *Id.* ¶ 296.

In November 2020, Ebix's external auditor, RSM US LLP ("RSM"), began an audit of the company's 2020 financials.  *Id.* ¶¶ 154, 294.  On February 15, 2021, however, RSM resigned without having completed the audit.  *Id.* ¶¶ 99, 101.  Ebix stated that

> RSM resigned because "despite repeated inquiries" it could not "obtain sufficient appropriate audit evidence that would allow it to evaluate the business purpose of significant unusual transactions that occurred in the fourth quarter of 2020" related to Ebix's gift card business in India; that there was a material weakness related to Ebix's failure to design controls "over the gift or prepaid card revenue transaction cycle sufficient to prevent or detect a material misstatement" and that it disagreed over the accounting treatment of $30 million that had been transferred into a commingled trust account in December 2020.

*Id.* ¶ 101.  After this disclosure, Ebix's share price "plummeted $20.24 per share, or approximately 40%, to close at $30.50 on February 22, 2021."  *Id.* ¶ 104.

Soon after RSM resigned, Ebix hired a new auditor — K.G. Somani & Co. ("Somani").  *Id.* ¶ 131.  Somani is an accounting firm "based in India that according to its website has only seventeen (17) partners across just six (6) practice groups, and only one (1) office."  *Id.* ¶ 134.  (By contrast, RSM, "according to its website, has dozens of offices in the U.S. and around the world, more than 11,000 employees, and provides dozens of accounting service offerings."  *Id.* ¶ 135.)  On April 27, 2021, after only about seven weeks, Somani issued a clean audit opinion.  *Id.* ¶¶ 146-47.  Somani's clean audit opinion stated that Ebix "maintained, in all material respects, effective internal control over financial reporting."  *Id.* ¶ 193.

Approximately one year later, on March 9, 2022, in a lengthy Draft Red Herring Prospectus ("DRHP") filed with the Securities and Exchange Board of India, EbixCash included

4

in a series of disclosures that, "as a listed company, we will need to improve the effectiveness of [EbixCash's] disclosure controls and procedures and internal control over financial reporting, including keeping adequate records of daily transactions." *Id.* ¶ 4.  This disclosure, the importance of which is hotly debated by the parties, states in full:

> The requirements of being a listed company may strain our resources.  We are not a listed company and have not, historically, been subjected to the increased scrutiny of our affairs by shareholders, regulators and the public at large that is associated with being a listed company.  As a listed company, we will incur significant legal, accounting, corporate governance and other expenses that we did not incur as an unlisted company.  We will be subject to the SEBI Listing Regulations which will require us to file audited annual and unaudited quarterly reports with respect to our business and financial condition.  If we experience any delays, we may fail to satisfy our reporting obligations and/or we may not be able to readily determine and accordingly report any changes in our results of operations as promptly as other listed companies.  Further, *as a listed company, we will need to maintain and improve the effectiveness of our disclosure controls and procedures and internal control over financial reporting*, including keeping adequate records of daily transactions.  As a result, our management's attention may be diverted from our business concerns, which may adversely affect our business, prospects, financial condition, results of operations and cash flows.

ECF No. 77-3, at 74-75 (emphasis added).  Saraf alleges that "[t]his admission" — most notably, the italicized portion of the foregoing passage — "appears to have gone unnoticed by the market because it was buried in a single sentence in the 457-page single-spaced DRHP filed in India and generally unavailable in the U.S."  TAC ¶ 4.

On June 16, 2022, Hindenburg Research, a well-known short seller that had taken a short position in Ebix, published a report titled "Ebix: This House of 'Cards' Seems to Have a Glaring Fake Revenue Problem," which asserted that "a substantial portion of EbixCash's gift card revenue" — namely, that attributable to consumer sales — "is non-existent."  *Id.* ¶ 196.  In response, Ebix issued a public "Clarification" that, notwithstanding prior representations that EbixCash sold gift cards to both corporate customers and consumers, "EbixCash gift cards are sold to Corporate clients only."  *Id.* ¶¶ 208-10.  In addition to refuting parts of the report in this

manner, Ebix also took legal action in India. On July 7, 2022, Ebix announced that it had successfully petitioned a court in Delhi to "block the publishing of the Hindenburg Report in India" and to direct "Google LLC and Twitter, Inc to take down relevant URLs from the Indian domain pertaining to the Hindenburg Report." *Id.* ¶ 211.

One final set of allegations, although not alleged in the Third Amended Complaint, is also relevant here. In a proposed sur-reply filed after Defendants' motion to dismiss was fully submitted, Saraf states that he "obtained materials filed by Ebix in the Indian court which plainly demonstrate that as early as 2019, Defendants knew of and sought to block allegations by Viceroy Research," another short seller, "of a material weakness in Ebix's internal controls." ECF No. 81-9 ("Pl.'s Sur-Reply"), at 1. Saraf explains that his "Second Amended Complaint contained allegations about Viceroy Reports in 2019, but did not allege Defendants' litigation in India to block publication of the Reports, as that fact was only known to Plaintiff upon receipt of the Incomplete Rebuttal first obtained after briefing on the pending motion to dismiss closed." *Id.* at 3 n.3 (citation omitted). The oral opinion of the High Court of Delhi submitted by Saraf describes Viceroy Research's report as containing "outrageous allegations," *see* ECF No. 81-8, at 592, finding that Ebix has "a reputable track record in terms of compliance, ethics, operating performance, research and development in India" and "maintained highest standards of financial discipline and professional standards," *id.* at 593, and concluding that Ebix was harmed by short sellers with a "notorious history of adopting shorting positions in listed companies globally and thereafter publishing reports and spreading misinformation about these companies to make illegal and unlawful profits out of such misinformation," *id.* at 593-94.

**PROCEDURAL HISTORY**

As noted, the Court previously granted Defendants' motion to dismiss the Second Amended Complaint on the ground that Saraf had "fail[ed] to adequately allege that any Defendant acted with the requisite state of mind." *Saraf I*, 2022 WL 4622676, at *4. Specifically, the Court concluded first that Saraf's "motive and opportunity" arguments with respect to Raina fell short because the Second Amended Complaint did not allege that Raina sold shares during the Class Period and the alleged motivation to profit from an IPO is a motivation possessed by virtually all corporate insiders. *Id.* Second, the Court found Saraf's "conscious misbehavior and recklessness" allegations wanting. The Court explained that Saraf's claims regarding the Form 10-Q statements and SOX certifications fell short because there is no evidence that Raina and Hamil *knew* that the representations were false at the time they were made or had access to specific contradictory information concerning those representations. *See id.* at *5. Saraf's argument that Defendants recklessly disregarded red flags fared no better, as the allegations were insufficiently specific and did not demonstrate that Raina or Hamil should have known they were making misrepresentations concerning internal controls. *Id.* at *6. The Court further explained that other actions — including awareness of outside accusations of misconduct by Ebix and the resignation of Ebix's auditor — did not support an inference of scienter. *Id.* at *7. Nevertheless, the Court granted Saraf leave to amend. *Id.*

Saraf has now filed a Third Amended Complaint. It includes four sets of new allegations that, Saraf contends, bolsters the case for scienter:

- First, that Raina and Hamil had a motive to conceal the weakness in internal controls in order to ensure a successful IPO — and that this IPO was Ebix's only hope of avoiding insolvency, TAC ¶¶ 7-16, 92-98;

- Second, that Raina switched his compensation from stock to cash in 2021 because he knew of a weakness in Ebix's internal controls, *id.* ¶¶ 277-90;

7

- Third, that Raina and Hamil allegedly admitted a material weakness in internal control at EbixCash in the DRHP, *id.* ¶¶ 165-95; and

- Fourth, that a "damning" report by Hindenburg Research — and Defendants' responses to it — reveal knowledge of the alleged weakness, *id.* ¶¶ 196-216.

Finally, as noted above, Saraf relies also on the Viceroy Research report and Ebix's response to it, asserting that these demonstrate scienter as well. *See* Pl.'s Sur-Reply 1.

## LEGAL STANDARDS

In reviewing a motion to dismiss pursuant to Rule 12(b)(6), a court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *See Giunta v. Dingman*, 893 F.3d 73, 79 (2d Cir. 2018). A court will not dismiss any claims unless the plaintiff has failed to plead sufficient facts to state a claim to relief that is facially plausible, *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), that is, one that contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). More specifically, the plaintiff must allege facts showing "more than a sheer possibility that a defendant has acted unlawfully." *Id.* A complaint that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. Further, if the plaintiff "ha[s] not nudged [his] claims across the line from conceivable to plausible, [those claims] must be dismissed." *Id.* at 570.

Because Saraf alleges securities fraud, he must also satisfy the heightened pleading requirements of both Rule 9(b), which requires that the circumstances constituting fraud be "state[d] with particularity," Fed. R. Civ. P. 9(b), and the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b)(2), which requires that scienter — that is, a defendant's "intention to deceive, manipulate, or defraud" — also be pleaded with particularity, *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 313 (2007) (internal quotation marks omitted).

Indeed, all of Saraf's claims require proof of scienter. *See Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37 (2011) (noting that scienter is an element of a Section 10(b) and Rule 10b-5 claim); *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 108 (2d Cir. 2015) (dismissing Section 10(b) and Rule 10b-5 claims for failure to adequately plead scienter); *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996) (noting that, to state a control-person claim under Section 20(a), a plaintiff must, at a minimum, plead a plausible "primary violation" of Section 10(b)); *Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 356-57 (2d Cir. 2022) (dismissing a Section 20(a) claim for failure to plead a "primary violation" of Section 10(b)); *City of N. Miami Beach Police Officers' & Firefighters' Ret. Plan v. Nat'l Gen. Holdings Corp.*, No. 19-CV-10825 (JPO), 2021 WL 212337, at *11 (S.D.N.Y. Jan. 21, 2021) (holding that the plaintiffs failed to plead corporate scienter "because they have not proven that anyone 'whose intent could be imputed to the corporation acted with the requisite scienter'" (quoting *Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*, 531 F.3d 190, 195 (2d Cir. 2008))).

To satisfy Rule 9(b), a plaintiff generally "must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 108 (2d Cir. 2012) (quoting *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004)). To satisfy the PSLRA's scienter requirement, a complaint must, with respect to each defendant and "'with respect to each act or omission alleged to [constitute securities fraud], state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *ATSI Commc'ns*, 493 F.3d at 99 (quoting 15 U.S.C. § 78u-4(b)(2)); *see, e.g., City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 419 (S.D.N.Y. 2020) ("[I]n a case involving multiple defendants, [the]

9

plaintiffs must plead circumstances providing a factual basis for scienter for each defendant . . . ." (cleaned up)); *In re Lions Gate Ent. Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 22 (S.D.N.Y. 2016) (noting that a plaintiff must "allege facts supporting a strong inference with respect to *each* defendant" (emphasis added)).  The "strong inference" must be "more than merely plausible or reasonable." *Tellabs*, 551 U.S. at 314.  The necessary inquiry is "inherently comparative." *Id.* at 323.  That is, the Court "must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Id.* at 324.  A complaint alleging securities fraud will survive "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.*

In this Circuit, a plaintiff may satisfy the scienter pleading requirement in either of two ways: "by alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI Commc'ns*, 493 F.3d at 99.  The former requires a plaintiff to allege that the defendant "benefitted in some concrete and personal way from the purported fraud." *ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009) (quoting *Novak v. Kasaks*, 216 F.3d 300, 307-08 (2d Cir. 2000)).  The latter requires allegations of either actual intent or "conscious recklessness — *i.e.*, a state of mind approximating actual intent, and not merely a heightened form of negligence." *Stratte-McClure*, 776 F.3d at 106. More specifically, a plaintiff must allege conduct by a defendant that is, "at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001)

(internal quotation marks omitted).  As a general matter, courts have approved of claims when plaintiffs "have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements.  Under such circumstances, defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation."  *Novak*, 216 F.3d at 308.

## DISCUSSION

Measured against the foregoing standards, the Court concludes that Saraf's allegations of scienter still fall short.  Given that the Court reached a similar conclusion in *Saraf I* with respect to the allegations in the Second Amended Complaint, the Court focuses here — as the parties do in their briefing — on the four sets of allegations that Saraf added to the Third Amended Complaint, and the fifth proffered in its proposed sur-reply, and why they do not alter the result.

### A.  The IPO and Ebix's Potential Insolvency

First, Saraf alleges that Raina and Hamil had a motive to conceal the weakness in internal controls in order to create a successful IPO because it would boost the share price and thus lead to a large gain for the two executives.  TAC ¶¶ 256-57; *see* ECF No. 78 ("Pl.'s Mem."), at 11.  The Court previously rejected nearly identical arguments, explaining that this kind of alleged motive is "possessed by virtually all corporate insiders" and, thus, "does not qualify as a 'motive' for purposes of the scienter analysis."  *Saraf I*, 2022 WL 4622676, at *4 (citing *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009).  To what he previously offered, Saraf adds a new assertion: that Ebix was the brink of insolvency, which only an IPO could avert.  TAC ¶ 256; Pl.'s Mem. 11-12.  Relatedly, he asserts that Somani was incentivized to engage in fraud in order to earn fees from the forthcoming IPO.  Pl.'s Mem. 13.

11

Neither of these new assertions does the trick. As to the former, because "[a]ny corporation would be motivated . . . to avoid bankruptcy," allegations about paying down debts or avoiding insolvency "do not support an inference of scienter." *In re Elan Corp. Sec. Litig.*, 543 F. Supp. 2d 187, 216 (S.D.N.Y. 2008); *accord Haw. Structural Ironworkers Pension Tr. Fund v. AMC Ent. Holdings, Inc.*, 422 F. Supp. 3d 821, 848-49 (S.D.N.Y. 2019) (Nathan, J.); *Janbay v. Canadian Solar, Inc.*, No. 10-CV-4430 (RWS), 2013 WL 1287326, at *10 (S.D.N.Y. Mar. 28, 2013), *aff'd sub nom. Tabak v. Canadian Solar Inc.*, No. 13-1681 (2d Cir. Dec. 20, 2013); *Bd. of Trs. of City of Ft. Lauderdale Gen. Emps. Ret. Sys. v. Mechel OAO*, 811 F. Supp. 2d 853, 867 (S.D.N.Y. 2011) (Sullivan, J.). *Janbay* is especially instructive. There, as here, the plaintiff initially attempted to establish scienter by alleging that the company executives "wanted to complete a secondary public offering." *Janbay v. Canadian Solar, Inc.*, No. 10-CV-4430 (RWS), 2012 WL 1080306, at *10 (S.D.N.Y. Mar. 30, 2012). There, as here, the court found that allegation wanting, but granted leave to replead. *Id.* at *10, 17. And there, as here, the plaintiff re-pleaded to add that "the proceeds of the offering" would be used to "repay loans." *Janbay*, 2013 WL 1287326, at *10; *cf.* TAC ¶¶ 256-57. The court still dismissed, reasoning that even if "the proceeds of the offering might have been used to repay loans," that "does not change the outcome" because "it is common to most for-profit companies." *Janbay*, 2013 WL 1287326, at *10. Saraf's *ipse dixit* attempts to distinguish these cases are unavailing.

Equally unavailing is Saraf's assertion that "Defendants offered Somani a *quid pro quo* of lucrative auditing fees for the EbixCash IPO and future audit work in exchange for a clean opinion that covered-up the material weakness." Pl.'s Mem. 13 (citation omitted). Saraf alleges no facts to support this conclusory assertion. Nor does he cite any "authority for the proposition that fees from a significant audit client are sufficient to establish an auditor's motive to commit

12

securities fraud." *In re DNTW Chartered Accts. Sec. Litig.*, 96 F. Supp. 3d 155, 165 (S.D.N.Y. 2015). In fact, it has long been held that "a generalized economic interest in professional fees is insufficient to establish an accounting firm's motive to commit fraud." *In re Philip Servs. Corp. Sec. Litig.*, 383 F. Supp. 2d 463, 470 (S.D.N.Y. 2004) (Mukasey, J.); *see id.* ("[I]t strains reason that Deloitte would jeopardize its reputation, subject itself to civil and/or criminal liability, and risk substantial financial penalties simply because it wanted to keep Philip as a client."); *In re China Organic Sec. Litig.*, No. 11-CV-8623 (JMF), 2013 WL 5434637, at *9 (S.D.N.Y. Sept. 30, 2013) ("Although it may be plausible that an auditor would go to great lengths to keep a client's business — even, in some circumstances, by deliberately misstating its finances — such an assumption, by itself, is insufficient to show motive."); *Whalen v. Hibernia Foods PLC,* No. 04-CV-3182 (HB), 2005 WL 1799370, at *2 (S.D.N.Y. Aug.1, 2005) ("[T]he current state of the case law holds . . . that no independent auditor would risk ruination of its reputation for the fees it would collect in order to suppress fraud.").

In short, Saraf's new allegations about the IPO add nothing of weight.

**B. Raina's Compensation**

Second, Saraf cites the fact that Raina received his base salary in the form of stock in 2019 and 2020, but in the form of cash in 2021. *See* TAC ¶ 11. Saraf argues that this "propitious jettisoning of [Raina's] all-stock compensation in exchange for all-cash, while in possession of material inside information, is the same as insider selling." Pl.'s Mem. 15. This argument is nonsensical. Saraf's theory of the case is that the stock price was inflated in 2020, and then dropped by 40% in February 2021, after certain disclosures were made. But it is undisputed that the change from stock to cash compensation occurred in *October* 2021. *See id.* at 15 n.8 (simply arguing that "Defendants' assertion that the compensation changes occurred in

October 2021 and 2022 is irrelevant" (citation omitted)). If anything, therefore, the change evidences a *lack* of scienter. Raina was paid in stock when that stock was allegedly inflated; after the disclosures that allegedly corrected for this inflation, he was paid in cash. The authorities on which Saraf relies involved defendants who profited from trading decisions while in possession of material non-public information. *See id.* at 15-16 (citing *Nguyen v. New Link Genetics Corp.*, 297 F. Supp. 3d 472, 495 (S.D.N.Y. 2018), *vacated in part on other grounds sub nom. Abramson v. NewLink Genetics Corp.*, 965 F.3d 165 (2d Cir. 2020); *In re Oxford Health Plans, Inc.*, 187 F.R.D. 133, 139 (S.D.N.Y. 1999); and *Stevelman v. Alias Rsch. Inc.*, 174 F.3d 79, 85-86 (2d Cir. 1999)). Raina, however, is not alleged to have sold "any of his 14% stake in Ebix stock." Pl.'s Mem. at 16. In short, nothing about Raina's method of compensation or his approach to his holdings of Ebix stock supports an inference of scienter.

### C. The DRHP

Third, Saraf relies heavily on the sentence in Defendants' DRHP stating that, "as a listed company," Ebix "will need to maintain and improve the effectiveness of our disclosure controls and procedures and internal control over financial reporting, including keeping adequate records of daily transactions." ECF No. 77-3 at 74-75; *see* TAC ¶¶ 169-180; Pl.'s Mem. 17-18. But this reliance is misplaced for several reasons. First, as Defendants demonstrate, the sentence at issue appears to be boilerplate — as it is found in any number of other DRHPs filed in India. ECF No. 76 ("Defs' Mem."), at 17. Second, Saraf's reading of the sentence is, to put it mildly, strained. Conspicuously, Saraf omits or de-emphasizes the phrase word "maintain," which suggests that the company had effective internal controls at the time of the DRHP. The sentence may have acknowledged room for "improve[ment]." But it is nevertheless a far cry from an admission that the company had a material weakness in its internal controls. Finally, and in any event, Saraf's

reliance suffers from a timing problem. The DRHP was filed on March 9, 2022 — more than one year after the Class Period and sixteen months after Defendants' alleged misstatements in November 2020. Thus, it "says nothing about the knowledge (or lack thereof) of Raina and Hamil" at the relevant time, "in November 2020." *Saraf I*, 2022 WL 4622676, at *7; *see also, e.g.*, *Woolgar v. Kingston Cos., Inc.*, 477 F. Supp. 3d 193, 230 (S.D.N.Y. 2020) (holding that the defendant's admission of a weakness in internal controls after the class period was insufficient to show "that any Defendant was aware of a weakness during the Class Period").

### D. The Hindenburg Research Report

The fourth and final set of new allegations in the Third Amended Complaint on which Saraf relies to establish scienter relate to the Hindenburg Research report published in June 2022. *See* TAC ¶¶ 196-205; Pl.'s Mem. 2-3, 8. Significantly, Saraf concedes that the report itself does not support "his scienter allegations." Pl.'s Mem. 2. That is wise: The report, issued well after the Class Period, says nothing about the company's internal controls, let alone its internal controls in November 2020, and nothing about Defendants' knowledge of any weaknesses in those internal controls at that time. *See* Defs.' Mem. 19-20. Instead, Saraf points to Ebix's response to the report, namely its June 2022 clarification that it sold gift cards only to corporate clients; this response, Saraf asserts, is "inconsistent" with Ebix's statements in public filings and, thus, "cast[s] serious doubt" on "the accuracy of Somani's 2020 and 2021 audits of Ebix and clean audit opinions for 2020 and 2021." Pl.'s Mem. 8, 20-21. But whether or not that is true, it has no bearing on the question here: whether Saraf's allegations suffice to establish that Defendants' statements in November 2020 were false or misleading when made. Put simply, neither the June 16, 2022 Hindenburg Research report nor Ebix's statements in its wake sheds

light on what Defendants knew in November 2020 — which predates even the service of Somani as Ebix's outside auditor.

### E.  The Viceroy Research Lawsuit

To the new allegations in the Third Amended Complaint, Saraf's proposed sur-reply adds one more: that Ebix's 2019 legal efforts to block publication of the Viceroy Research report provide proof of scienter.  Pl.'s Sur-Reply 3-4.  But "the law is clear that a party may not amend pleadings through a brief."  *Gamma Traders – I LLC v. Merrill Lynch Commodities, Inc.*, 41 F.4th 71, 80 (2d Cir. 2022) (internal quotation marks omitted).  In any event, Saraf's argument fails on its own terms, for several reasons.  First, nothing about Ebix's *own* resort to the Indian legal system to enjoin publication of the Viceroy Research report supports a finding of scienter.  Indeed, it defies logic to infer that someone seeking to commit fraud would subject himself to judicial scrutiny in that manner.  Second, it is well established that "unproven allegations in another case provide no support for an inference of scienter."  *Lau v. Opera Ltd.*, 527 F. Supp. 3d 537, 558 (S.D.N.Y. 2021).  Third, the allegations are worse than unproven.  Ebix actually prevailed in seeking an injunction against Viceroy Research, with the Indian High Court finding that Ebix has "a reputable track record in terms of compliance, ethics, operating performance, research and development in India" and "maintained highest standards of financial discipline and professional standards," ECF No. 81-8, at 593, and that Ebix was harmed by short sellers with a "notorious history of adopting shorting positions in listed companies globally and thereafter publishing reports and spreading misinformation about these companies to make illegal and unlawful profits out of such misinformation," *id.* at 593-94.  Finally, like the Hindenburg Research report, the Viceroy Research report says nothing about Ebix's internal controls in November 2020, let alone Defendants' knowledge of Ebix's internal controls at that time.

**CONCLUSION**

In short, even with his amendments (and proposed sur-reply), Saraf still "fails to point to any document, report, or oral statement showing that the Individual Defendants knew at the time that their statements regarding the effectiveness of Ebix's internal control were false or misleading." *Saraf I*, 2022 WL 4622676, at *5. It follows that Saraf does not adequately plead scienter as to any Defendant and that all of his claims fail as a matter of law. *See id.* at *7. Thus, Defendants' motion to dismiss must be and is GRANTED.

The Court denies leave to amend. Leave to amend a complaint should be freely given "when justice so requires," Fed. R. Civ. P. 15(a)(2), and complaints dismissed under the PSLRA "are almost always dismissed with leave to amend," *Pasternack v. Shrader*, 863 F.3d 162, 175 (2d Cir. 2017) (internal quotation marks omitted). That said, "[w]here it appears that granting leave to amend is unlikely to be productive, . . . it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993). Saraf has now had three opportunities to amend, *see* ECF Nos. 54, 62, 72, and the Court explicitly cautioned in *Saraf I* that Saraf's third opportunity to amend would be his "final chance," *Saraf I*, 2022 WL 4622676, at *7. Moreover, beyond this third and final chance to amend the complaint, the Court granted Saraf leave to file a sur-reply containing additional facts. And on top of that, Saraf fails to identify any facts in his possession that would cure the defects discussed above. In light of the foregoing, the Court concludes that any amendment would be futile. *See, e.g.*, *Roundtree v. NYC*, No. 19-CV-2475 (JMF), 2021 WL 1667193, at *6 (S.D.N.Y. Apr. 28, 2021) (citing cases).

One final housekeeping matter remains. Under the PSLRA, the Court is required to "include in the record specific findings regarding compliance by each party and each attorney representing any party with each requirement of Rule 11(b) of the Federal Rules of Civil

Procedure as to any complaint, responsive pleading, or dispositive motion." 15 U.S.C. § 78u-4(c)(1). Because all legal claims and defenses presented throughout this litigation were nonfrivolous under existing law and all factual contentions had evidentiary support or were reasonably based on belief or a lack of information, no sanctions under Rule 11 are warranted.

The Clerk of Court is directed to terminate ECF No. 75, to enter judgment consistent with this Opinion and Order, and to close the case.

SO ORDERED.

Dated: July 17, 2023
       New York, New York

                                 JESSE M. FURMAN
                                United States District Judge